2020 WI 42

# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2020AP765-OA |

COMPLETE TITLE:

Wisconsin Legislature,
            Petitioner,
      v.
Secretary-Designee Andrea Palm, Julie Willems Van Dijk and
Lisa Olson, In Their Official Capacities As Executives of
Wisconsin Department of Health Services,
            Respondents.

ORIGINAL ACTION

| | |
|---|---|
| OPINION FILED: | May 13, 2020 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | May 5, 2020 |

SOURCE OF APPEAL:
   COURT:
   COUNTY:
   JUDGE:

JUSTICES:

ROGGENSACK, C.J., delivered the majority opinion of the Court, in which ZIEGLER, REBECCA GRASSL BRADLEY, and KELLY, JJ., joined. ROGGENSACK, C.J., filed a concurring opinion. REBECCA GRASSL BRADLEY, J., filed a concurring opinion, in which KELLY, J. joined. KELLY, J., filed a concurring opinion, in which REBECCA GRASSL BRADLEY, J., joined. ANN WALSH BRADLEY, J., filed a dissenting opinion, in which DALLET, J., joined. DALLET, J., filed a dissenting opinion, in which ANN WALSH BRADLEY, joined. HAGEDORN, J., filed a dissenting opinion, in which ANN WALSH BRADLEY, and DALLET, JJ., joined with respect to ¶¶198-258.

NOT PARTICIPATING:

ATTORNEYS:

For the petitioners, there was a petition and reply filed by *Eric M. McLeod, Lane E.B. Ruhland* and *Husch Blackwell LLP*, Madison and *Ryan J. Walsh*, *John K. Adams*, *Amy Miller* and *Eimer Stahl LLP*, Madison. There was an oral argument by *Ryan J. Walsh*, Madison.

For the respondents, there was a response filed by *Colin A. Hector, Thomas C. Bellavia, Colin R. Stroud, Hannah S. Jurss, Steven C. Kilpatrick,* assistant attorneys general, and *Joshua L. Kaul*, attorney general. There was an oral argument by *Colin Thomas Roth*, assistant attorney general.

An amicus curiae brief was filed on behalf of The Tavern League of Wisconsin by *James A. Friedman, Zachary P. Bemis, Maxted M. Lenz* and *Godfrey & Kahn, S.C.*, Madison.

An amicus curiae brief was filed on behalf of Wisconsin Faith Voices for Justice by *Stephen E. Kravit*, *Benjamin J. Glicksman* and *Kravit, Hovel & Krawczyk, S.C.*, Milwaukee.

An amicus curiae brief was filed on behalf of Americans for Prosperity – Wisconsin by *Matthew M. Fernholz* and *Cramer, Multhauf & Hammes, LLP*, Waukesha and *Eric R. Bolinder*, pro hac vice, Arlington, Virginia.

An amicus curiae brief was filed on behalf of Wisconsin Manufacturers and Commerce and Wisconsin Dairy Alliance by *Robert I. Fassbender* and *Great Lakes Legal Foundation*, Madison and *Corydon J. Fish*, Madison.

An amicus curiae brief was filed on behalf of Wisconsin Public Health Association, Wisconsin Nurses Association, Wisconsin Chapter of American Academy of Pediatrics and Other Healthcare Amici Curiae by *Jeffrey A. Mandell* and *Stafford Rosenbaum LLP*, Madison.

An amicus curiae brief was filed on behalf of Legal Scholars as Amici Curiae by *Miriam Seifter*, *Robert Yablon* and the *University*

*of Wisconsin Law School* and *Barry J. Blonien* and *Boardman & Clark LLP*, Madison.

An amicus curiae brief was filed on behalf of Wisconsin Association of Local Health Departments and Boards and Associated Municipalities and Counties by *Paul V. Gagliardi*, Salem.

An amicus curiae brief was filed on behalf of 24 Wisconsin Community, Advocacy, Labor and Membership Organizations by *Douglas M. Poland* and *Rathje Woodward LLC*, Madison and *Richard Saks* and *Hawks Quindel, S.C.,* Milwaukee.

An amicus curiae brief was filed on behalf of Hunter Nation, Wisconsin Lakeshore Business Association, Sport-Fishing Guides and Individual Anglers by *Adam M. Jarchow* and *Jarchow Law, LLC*, Clear Lake.

An amicus curiae brief was filed on behalf of Legal Action of Wisconsin, Inc. by *Amanda C. Aubrey*, *Carlos N. Bailey* and *Robert Bebb Held*, Madison.

An amicus curiae brief was filed on behalf of Americans for Prosperity – Wisconsin by *Matthew M. Fernholz* and *Cramer, Multhauf & Hammes, LLP*, Waukesha and *Eric R. Bolinder*, pro hac vice, Arlington, Virginia.

An amicus curiae brief was filed on behalf of Disability Rights Wisconsin, The Arc Wisconsin, The Arc and Disability and Aging Organizations by *Elaine J. Goldenberg*, pro hac vice, *Brendan B. Gants*, pro hac vice and *Munger, Tolles & Olson LLP*, Washington D.C. and *Kristin M. Kerschensteiner*, Madison and *Lauren C. Barnett*, pro hac vice and *Munger, Tolles & Olson LLP*, Los Angeles, California and *Shira Wakschlag*, pro hac vice, Washington, D.C.

3

An amicus curiae brief was filed on behalf of Milwaukee Teachers' Education Association, Madison Teachers, Inc., SEIU Healthcare Wisconsin, and Amalgamated Transit Union Local 998 by *Lester A. Pines*, *Tamara B. Packard*, *Christa O. Westerberg* and *Pines Bach LLP*, Madison.

An amicus curiae brief was filed on behalf of Independent Business Association of Wisconsin, Double Decker Automotive, Inc. and Shear Xcellence, LLC by *Richard M. Esenberg*, *Luke Berg*, *Anthony LoCoco*, *Lucas Vebber* and *Wisconsin Institute for Law and Liberty, Inc.*, Milwaukee.

An amicus curiae brief was filed on behalf of Washington County, Wisconsin by *Bradley S. Stern*, county attorney, West Bend.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.   2020AP765-OA

STATE OF WISCONSIN                  :          IN SUPREME COURT

**Wisconsin Legislature,**

          **Petitioner,**

     v.

**Secretary-Designee Andrea Palm, Julie Willems Van Dijk and Lisa Olson, In Their Official Capacities As Executives of Wisconsin Department of Health Services,**

          **Respondents.**

**FILED**

**MAY 13, 2020**

Sheila T. Reiff
Clerk of Supreme Court

---

ROGGENSACK, C.J., delivered the majority opinion of the Court, in which ZIEGLER, REBECCA GRASSL BRADLEY, and KELLY, JJ., joined. ROGGENSACK, C.J., filed a concurring opinion.  REBECCA GRASSL BRADLEY, J., filed a concurring opinion, in which KELLY, J. joined. KELLY, J., filed a concurring opinion, in which REBECCA GRASSL BRADLEY, J., joined.  ANN WALSH BRADLEY, J., filed a dissenting opinion, in which DALLET, J., joined.   DALLET, J., filed a dissenting opinion, in which ANN WALSH BRADLEY, joined.  HAGEDORN, J., filed a dissenting opinion, in which ANN WALSH BRADLEY, and DALLET, JJ., joined with respect to ¶¶198-258.

---

     ORIGINAL ACTION.  *Rights declared.*


     ¶1   PATIENCE DRAKE ROGGENSACK, C.J.   This case is about the assertion of power by one unelected official, Andrea Palm, and her

order to all people within Wisconsin to remain in their homes, not to travel and to close all businesses that she declares are not "essential" in Emergency Order 28. Palm says that failure to obey Order 28 subjects the transgressor to imprisonment for 30 days, a $250 fine or both. This case is not about Governor Tony Evers' Emergency Order or the powers of the Governor.

¶2 Accordingly, we review the Wisconsin Legislature's Emergency Petition for Original Action that asserts: (1) Palm as Secretary-designee of the Department of Health Services (DHS), broke the law when she issued Emergency Order 28 after failing to follow emergency rule procedures required under Wis. Stat. § 227.24 (2017-18),[1] and (2) even if rulemaking were not required, Palm exceeded her authority by ordering everyone to stay home,[2] closing all "non-essential" businesses,[3] prohibiting private gatherings of any number of people who are not part of a single household,[4] and forbidding all "non-essential" travel.[5] Palm responded that Emergency Order 28 is not a rule. Rather, it is an Order, fully authorized by the powers the Legislature assigned to DHS under Wis. Stat. § 252.02.

---

[1] All subsequent references to the Wisconsin Statutes are to the 2017-18 version unless otherwise indicated.

[2] Order 28, Section 1.

[3] Id., Section 2.

[4] Id., Section 3.

[5] Id., Section 5.

¶3 We conclude that Emergency Order 28 is a rule under the controlling precedent of this court, Citizens for Sensible Zoning, Inc. v. DNR, 90 Wis. 2d 804, 280 N.W.2d 702 (1979), and therefore is subject to statutory emergency rulemaking procedures established by the Legislature. Emergency Order 28 is a general order of general application within the meaning of Wis. Stat. § 227.01(13), which defines "Rule." Accordingly, the rulemaking procedures of Wis. Stat. § 227.24 were required to be followed during the promulgation of Order 28. Because they were not, Emergency Order 28 is unenforceable.[6] Furthermore, Wis. Stat. § 252.25 required that Emergency Order 28 be promulgated using the procedures established by the Legislature for rulemaking if criminal penalties were to follow, as we explain fully below. Because Palm did not follow the law in creating Order 28, there can be no criminal penalties for violations of her order. The procedural requirements of Wis. Stat. ch. 227 must be followed because they safeguard all people.

¶4 We do not conclude that Palm was without any power to act in the face of this pandemic. However, Palm must follow the law that is applicable to state-wide emergencies. We further conclude that Palm's order confining all people to their homes, forbidding travel and closing businesses exceeded the statutory authority of Wis. Stat. § 252.02 upon which Palm claims to rely.[7]

---

[6] This decision does not apply to Section 4. a. of Emergency Order 28.

[7] The Legislature's petition included a third issue: "Even if the Department did not violate [Wis. Stat.] § 227.24, whether the Department acted arbitrarily and capriciously in issuing

3

## I. BACKGROUND

¶5 Although we do not address the Governor's order, we note for purposes of background, that on March 12, 2020, Governor Evers issued Executive Order 72 "Declaring a Health Emergency in Response to the COVID-19 Coronavirus." Order 72:

- proclaimed that a public health emergency existed in Wisconsin;

- designated DHS as the lead agency to respond to the emergency;

- directed DHS to take "all necessary and appropriate measures to prevent and respond to incidents of COVID-19 in the State";

- suspended administrative rules that the DHS Secretary thought would interfere with the emergency response and increase the health threat;

- authorized the Adjutant General to activate the National Guard to assist in responding to the emergency;

- directed all state agencies to assist in responding to the emergency;

- proclaimed "that a period of abnormal economic disruption" existed; and

- directed the Department of Agriculture, Trade, and Consumer Protection to guard against price gauging during the emergency.

---

Emergency Order 28." The court declined to take the third issue. Therefore, we do not address it.

4

¶6 As further background we note that DHS Secretary-designee, Andrea Palm, issued Emergency Order 12 on March 24, 2020, "under the authority of Wis. Stat. § 252.02(3) and (6) and all powers vested in [her] through Executive Order #72, and at the direction of Governor Tony Evers[.]" Palm's Emergency Order 12 ordered "[a]ll individuals present within the State of Wisconsin . . . to stay at home or at their place of residence" with certain delineated exceptions. It remained in effect until April 24, 2020.

¶7 On April 16, 2020, Palm issued Emergency Order 28, also titled "Safer at Home Order." This order was not issued by the Governor, nor did it rely on the Governor's emergency declaration. Rather, it relied solely on "the authority vested in [Andrea Palm, Department of Health Services Secretary-designee] by the Laws of the State, including but not limited to [Wis. Stat. §] 252.02(3), (4), and (6)." Emergency Order 28 commands all individuals in Wisconsin "to stay at home or at their place of residence" with certain limited exceptions approved by Palm or risk punishment "by up to 30 days imprisonment, or up to $250 fine, or both."[8] Order 28 also:

- Prohibits "[a]ll forms of travel" except what Palm deems essential.
- Orders "[a]ll for-profit and non-profit businesses" to "cease all activities" except for minimum operations that Palm deemed basic.

---

[8] Emergency Order 28, Section 18.

- Prohibits "[a]ll public and private gatherings of any number" "not part of a single household."

- Declares that all public and private K-12 schools "shall remain closed" for the remainder of the year.

- Declares that libraries shall remain closed for "all in-person services."

- Declares all "public amusement and activity" places closed regardless of whether "indoors or outdoors" except golf courses (with restrictions).  The order says "Driving ranges and miniature golf must remain closed."

- Continues the ordered closure of all salons and spas.

- Continues the closure of every restaurant and bar except for take-out or delivery service.

- Orders religious groups to limit gatherings to "fewer than 10 people in a room" including weddings and funerals.

- Imposes a six-foot social distancing requirement for any person not "residing in a single living unit or household."

Order 28 purports to remain in effect until May 26, 2020.

¶8   However, on April 20, 2020, Palm issued Emergency Order 31.  It is not challenged directly in this action.  In it, Palm established "Gating Criteria" that must be met in order to limit Emergency Order 28's proscriptions.[9]  Order 31 has no end date and relies solely on Palm's assertion of authority.

¶9   It is Order 28 that is being challenged in this original action.  The Legislature filed an Emergency Petition for Original

---

[9] Emergency Order 31, Section 2. b.

6

Action on April 21, 2020. On the same date, we issued an order setting a briefing schedule that required a response from Palm by April 28, 2020, and a reply from the Legislature by April 30, 2020. We also allowed numerous amici motions and briefs to be filed by April 29, 2020.[10] On May 1, 2020, we granted the Legislature's Emergency Petition for Original Action and assumed jurisdiction over two issues: (1) whether Palm violated Wis. Stat. § 227.24, governing emergency rules, by issuing Emergency Order 28 without complying with § 227.24's procedures, and (2) even if Palm did not violate § 227.24, whether Palm's Order 28 exceeds her authority under Wis. Stat. § 252.02 by ordering all persons to stay at home, forbidding all "nonessential" travel and closing all "nonessential" businesses. The court heard oral argument on May 5, 2020.

## II. DISCUSSION

### A. Our Review

¶10 We review this controversy under our original jurisdiction found in the Wisconsin Constitution, Article VII, § 3(2), which provides: "The supreme court has appellate jurisdiction over all courts and may hear original actions and proceedings. The supreme court may issue all writs necessary in aid of its jurisdiction." Wis. Const. art. VII, § 3(2). We exercise original jurisdiction when "the matter is one that should trigger the institutional responsibilities of the Supreme Court." Wis. S. Ct. IOP III (September 12, 2019). See Petition of Heil,

---

[10] We accepted 14 amici briefs.

230 Wis. 428, 436, 284 N.W. 42, 45 (1939) ("[T]he purpose of the constitution was, 'To make this court indeed a supreme judicial tribunal over the whole state; a court of last resort on all judicial questions under the constitution and laws of the state; a court of first resort on all judicial questions affecting the sovereignty of the state, its franchises or prerogatives, or the liberties of its people.'" (quoted source omitted)).

¶11 The dispute in this case involves whether the Secretary-designee of DHS issued an order in violation of the laws of Wisconsin——an order that impacts every person in Wisconsin, as well as persons who come into Wisconsin, and every "non-essential" business. Exercising original jurisdiction is appropriate in this dispute.

¶12 Palm has contended that the Legislature does not have standing to invoke our original jurisdiction for these claims. Whether a party has standing is a question of law. Schill v. Wis. Rapids Sch. Dist., 2010 WI 86, ¶38, 327 Wis. 2d 572, 786 N.W.2d 177 (Lead opinion). "Wisconsin courts evaluate standing as a matter of judicial policy rather than as a jurisdictional prerequisite." Id. (citing Milwaukee Dist. Council 48 v. Milwaukee Cty., 2001 WI 65, ¶38 n.7, 244 Wis. 2d 333, 627 N.W.2d 866). One has standing to seek judicial review when one has a stake in the outcome of the controversy and is affected by the issues in controversy. Schill, 327 Wis. 2d 572, ¶38 (Lead opinion).

¶13 The crux of the Legislature's claims is that Emergency Order 28 was promulgated without following required statutory procedures applicable to an emergency, and in so doing, Palm

8

impinged upon the Legislature's constitutional core power and its functions under Wis. Stat. §§ 227.24 and 227.26. The Legislature's claim is grounded in the concept of separation of powers that is inherent in the Wisconsin Constitution. We previously have concluded that petitioners had standing to sue when, as legislators, they claimed that a member of the executive branch invaded the Legislature's core powers. Panzer v. Doyle, 2004 WI 52, ¶42, 271 Wis. 2d 295, 680 N.W.2d 666, abrogated on other grounds by Dairyland Greyhound Park, Inc. v. Doyle, 2006 WI 107, ¶2, 295 Wis. 2d 1, 719 N.W.2d 408. Accordingly, we conclude that the Legislature has standing to proceed on the two claims for which we granted review.

### B. Standard of Review

¶14 Whether Emergency Order 28 fits the statutory definition of a "Rule" is critical to deciding the issues presented herein. We decide whether an action is a rule by interpreting Wis. Stat. § 227.01(13), which defines when an action is a rule and when specified actions are not rules. § 227.01(13)(a)-(zz). Issues of statutory interpretation and application present questions of law. Milwaukee Police Ass'n. v. City of Milwaukee, 2018 WI 86, ¶17, 383 Wis. 2d 247, 914 N.W.2d 597.

### C. Applicable Statutes

#### 1. Wisconsin Stat. § 227.01(13)

¶15 The Legislature contends that Palm violated the law by issuing Emergency Order 28 because Order 28 is a "Rule" as defined in Wis. Stat. § 227.01(13), and Palm did not follow rulemaking procedures that were required by Wis. Stat. § 227.24 when Order 28

was propagated. Palm contends that Order 28 is not a rule, but rather an order of state-wide application, which did not require that rulemaking procedures be followed during propagation. If Order 28 meets the statutory definition of a rule, then Palm violated the law because Palm admits that rulemaking procedures were not employed.

¶16 Wisconsin Stat. § 227.01(13), which defines "Rule" and those actions that are not rules is central to this controversy. It provides in relevant part:

> "Rule" means a regulation, standard, statement of policy, or general order of general application that has the force of law and that is issued by an agency to implement, interpret, or make specific legislation enforced or administered by the agency or to govern the organization or procedure of the agency. "Rule" includes a modification of a rule under s. 227.265. "Rule" does not include, and s. 227.10 does not apply to, any action or inaction of an agency, whether it would otherwise meet the definition under this subsection, that: [come within the actions described in (a)-(zz)].

¶17 The Legislature argues that Emergency Order 28 is a rule because it is a "general order of general application." Wis. Stat. § 227.01(13). The Legislature focuses the relevant inquiry on to whom the order applies; not why or how it applies. It is undisputed that Emergency Order 28 is applicable to every person physically present in Wisconsin, whether they were present when the order was issued or entered Wisconsin subsequently. Order 28 is not an "order in a contested case" nor "an order directed to a specifically named person or to a group of specifically named persons that does not constitute a general class."

10

§ 227.01(13)(b), (c). If it were either, it would be exempt from the definition of a rule set out in § 227.01(13).

¶18 Palm asserts that Emergency Order 28 is not a general order of general application because it responds to a specific situation. She states, "While an order responding to the pandemic may be a 'general order' because it applies to the population as a whole, it is not of 'general application' because it responds only to a specific, limited-in-time scenario."

¶19 Palm also cites Wis. Stat. § 252.02(4), which states, in part, that "[a]ny rule or order" made by DHS "may be made applicable to the whole or any specified part of the state." She argues there has to be some way for an order to be applicable to the "whole" state without it being a general order of general application or the reference to orders in § 252.02(4) is redundant because all general orders of general application are rules. Therefore, Palm contends, Emergency Order 28 cannot be a general order of general application solely because it applies to every person physically present in Wisconsin. She also cites § 252.02(6), which states that DHS can "authorize and implement all emergency measures to control communicable diseases."

¶20 The question of when a general order is of general application has been addressed previously by Wisconsin courts. We addressed the meaning of Wis. Stat. § 227.01(13)'s term, "of general application," in Citizens for Sensible Zoning, 90 Wis. 2d 804. There, "the DNR issued an order which found that Columbia County had not enacted a reasonable and effective flood plain zoning ordinance and which adopted a zoning ordinance for

11

the delineated flood plain."  Id. at 808.  Over ten months after DNR promulgated the ordinance, Citizens for Sensible Zoning, Inc. (Citizens) sought declaratory judgment that the ordinance was invalid.  Id. at 809.  The DNR moved to dismiss on the ground that Citizens' claim was time-barred.  Id.  As we explained, Citizens' claim was not time-barred if the ordinance was a rule.  Id. at 813-14.

¶21  Our answer to the question of whether the ordinance was a rule, was determined by the definition of "Rule" now set out in Wis. Stat. § 227.01(13).[11]  We concluded the ordinance was a rule because it was a "regulation of general application."  Id. at 816. We stated:

> It is not always easy to determine whether an agency action is a rule and is of general application or is a determination which affects specific parties.  The Columbia County flood plain zoning ordinance applies only to land within the floodplain in unincorporated areas of Columbia County.  The ordinance restricts the conduct of only those persons with a legal interest in such land.  Nevertheless, to be of general application, a rule need not apply to all persons within the state. Even though an action applies only to persons within a small class, <u>the action is of general application if that class is described in general terms and new members can be added to the class.</u>

Id. at 814-16 (emphasis added).

---

[11] At the time that Citizens for Sensible Zoning, Inc. v. DNR, 90 Wis. 2d 804, 280 N.W.2d 702 (1979) was decided, Wis. Stat. § 227.01(3) (1973-74) defined "Rule" as "a regulation, standard, statement of policy or general order . . . of general application and having the effect of law, issued by an agency to implement, interpret or make specific legislation enforced or administered by such agency or to govern the organization or procedure of such agency."

12

¶22 We explained that "a rule for purposes of ch. 227 is (1) a regulation, standard, statement of policy or general order; (2) of general application; (3) having the effect of law; (4) issued by an agency; (5) to implement, interpret or make specific legislation enforced or administered by such agency as to govern the interpretation or procedure of such agency." Id. at 814. We concluded that the flood plain ordinance was a rule. Id. In so doing, our focus was on the people who were regulated by the order. Id. (explaining that the ordinance restricts the conduct of those persons with a legal interest in property in the flood plain). Our focus was not on the type of factual circumstances that led to the DNR order. We concluded that when the class of people regulated by an order "is described in general terms and new members can be added to the class," the order is of general application and is a rule. Id. at 816. There, the class of people were described in general terms and new members could be added to the class when others secured legal interests in property in the flood plain.

¶23 Citizens for Sensible Zoning has been cited for its explanation of the Wis. Stat. § 227.01(13) term, "of general application," when a challenge is made to an agency action asserting that the action is a "Rule." In Cholvin v. DHFS, 2008 WI App 127, 313 Wis. 2d 749, 758 N.W.2d 118, the court of appeals applied Citizens for Sensible Zoning. Id., ¶23. In Cholvin, the plaintiff had been receiving Wisconsin Medicaid program benefits. Id., ¶1. She challenged an instruction given to screeners that hindered her ability to continue receiving benefits. Id. One of

13

the issues was whether the instruction was a policy of general application and therefore a rule. She argued the policy was "of general application because it applie[d] to the entire class of persons who have their eligibility for a Medicaid waiver program determined by the use of the functional screen." Id., ¶24. She contended "that new members can be added to the class as additional people seek to receive Medicaid waiver benefits and as changes in their fluctuating abilities occur." Id. The court of appeals agreed, concluding that the instruction was a policy of general application and therefore a rule. Id., ¶25. As with Citizens for Sensible Zoning, in Cholvin, the focus was on the people regulated, not on the factual context in which the regulation arose. The class of people was described in general terms and there was the ability to add new members to the class. Id.

¶24 We conclude that Order 28 is a "general order of general application." The order regulates all persons in Wisconsin at the time it was issued and it regulates all who will come into Wisconsin in the future. If we were to read the definition of "Rule" as Palm suggests, one person, Palm, an unelected official, could create law applicable to all people during the course of COVID-19 and subject people to imprisonment when they disobeyed her order.

¶25 Palm has not addressed either Citizens for Sensible Zoning or Cholvin, yet these precedential decisions directly address whether Palm's Order 28 is a rule. In addition, both cases stand contrary to her argument that the reason for the order is controlling. Furthermore, both cases noted the openness of the

14

groups of people regulated. Stated otherwise, people not regulated by the order one day could have been regulated the next. Citizens for Sensible Zoning, 90 Wis. 2d at 814-16; Cholvin, 313 Wis. 2d 749, ¶24. In the case now before us, persons travelling from other states become bound by Order 28 when they cross into Wisconsin.

¶26 We note that the legislative history underlying Wis. Stat. § 252.02 confirms our understanding that the drafters of the language on which Palm relies did not contemplate expanding DHS's authority, nor did DHS understand the amendment to do so. 1981 Assembly Bill 711 created the "issue orders" language. In the "Explanatory Notes" DHS stated that the bill is "basically technical changes designed to bring the statute into concordance with the current public health and epidemiologic thought and terminology." In 1979, the predecessor statute of Wis. Stat. § 227.01(13) addressed "general orders of general application," showing that DHS had the authority to issue orders in 1979, but that an "order" was a "Rule" when it met the statutory definition of a rule. Citizens for Sensible Zoning, 90 Wis. 2d at 815. And finally, the Legislative Reference Bureau never described the added language as changing DHS's authority.

¶27 We also are not persuaded by Palm's characterization of Emergency Order 28. Her assertion that "it responds only to a specific, limited-in-time scenario" is questionable and not relevant to whether Order 28 is a rule. Furthermore, a "limited-in-time scenario" is not the power that Palm has seized. To

explain further, subsequent to Order 28, Palm has issued Emergency Order 31, which states:

> Wisconsin shall adopt a phased approach to re-opening its economy and society, with each phase being incrementally less restrictive on businesses and individuals while protecting the public from COVID-19. The Department of Health Services shall announce the transition to each Phase with an order fully articulating the activities that will resume.

Emergency Order 31's "Gating Criteria" direct repeated extensions of the restrictions in Order 28 until criteria Palm has established, again without following the procedures for emergencies set out in Wis. Stat. § 227.24, are met. Stated otherwise, Palm's subjective judgment in regard to "Gating Criteria" is the only limitation of Order 28's restrictions.

¶28 Rulemaking exists precisely to ensure that kind of controlling, subjective judgment asserted by one unelected official, Palm, is not imposed in Wisconsin. See NLRB v. Wyman-Gorden Co., 394 U.S. 759, 764 (1969) (plurality opinion) (explaining that "rule-making provisions of that Act [the Administrative Procedures Act], which the Board would avoid, were designed to assure fairness and a mature consideration of rules of general application").

¶29 We recognize that emergency rulemaking procedures contemplate that rules may have to be promulgated in response to extraordinary circumstances. Wisconsin Stat. § 227.24(1)(a) explains that:

> An agency may . . . promulgate a rule as an emergency rule without complying with the notice, hearing, and publication requirements under this chapter if

16

preservation of the public peace, health, safety, or
welfare necessitates putting the rule into effect prior
to the time it would take effect if the agency complied
with the procedures.

An emergency rule promulgated under § 227.24(1)(a) "remains in effect only for 150 days," § 227.24(1)(c), unless extended by the Legislature's Joint Committee for Review of Administrative Rules. § 227.24(2)(a).  As counsel for the Legislature explained during oral argument:  "Necessarily under [ch.] 227 you're dealing with a rule that's time limited and necessarily you're dealing with a rule that's responding to a new set of circumstances and is prospective."  Therefore, Emergency Order 28 is a general order of general application:  the class is generally defined and new members are added to the class when people enter Wisconsin.

¶30  We also note that Wis. Stat. § 227.01(13)(a)-(zz) contains 72 specific exemptions from the definition of "Rule." The exemptions are extraordinarily detailed.[12]  Some exemptions apply to DHS.  For example, DHS actions relating "to computing or publishing the number of nursing home beds, to be added in each

---

[12] For example, "standards under subch. IX of ch. 254" are exempted.  Wis. Stat. § 227.01(13)(zu).  Subchapter IX covers the "Sale or Gift of Cigarettes or Tobacco Products to Minors." Wisconsin Stat. § 254.916(1)(b) states: "The department, in consultation with other governmental regulatory authorities and with retailers, shall establish standards for procedures and training for conducting investigations under this section." Further, a rule does not include agency action that "[e]stablishes criteria and standards for certifying instructors for the trapper education program." § 227.01(13)(zn).  Furthermore, the definition of rule does not cover decisions that "relate[] to the curriculum of, admission to or graduation from a public educational institution, as determined by each institution." § 227.01(13)(f). The list goes on and on, describing § 227.01(13)'s 72 exemptions from the definition of "Rule."

health planning area under s. 150.33(1)" are exempt from the definition of "Rule." § 227.01(13)(u). Some exemptions relate to "orders," e.g., § 227.01(13)(b) and (c). However, despite the detailed nature of the list, and the Legislature's consideration of acts of DHS and its consideration of "orders," no act or order of DHS pursuant to Wis. Stat. § 252.02 is exempted from the definition of "Rule."

¶31 In addition, we employ the constitutional-doubt principle. That is, we disfavor statutory interpretations that unnecessarily raise serious constitutional questions about the statute under consideration. Clark v. Martinez, 543 U.S. 371, 380-81 (2005). Palm points to statutes that she asserts give her broad authority to impose regulation; but it does not follow she can impose regulation without going through a process to give the people faith in the justness of the regulation. However, under Palm's theory, she can "implement all emergency measures necessary to control communicable diseases," Wis. Stat. § 252.02(6), even at the expense of fundamental liberties, without rulemaking. That interpretation is constitutionally suspect. We do not construe § 252.02(6) as an "open-ended grant" of police powers to an unconfirmed cabinet secretary. Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst., 448 U.S. 607, 646 (1980) (plurality) (explaining that statutory construction that affords a "sweeping delegation of legislative power" has the potential to cause constitutional problems in future cases).

¶32 To explain further, Article I, Section 1 of the Wisconsin Constitution provides that "All people are born equally free and

18

independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers form the consent of the governed." The people consent to the Legislature making laws because they have faith that the procedural hurdles required to pass legislation limit the ability of the Legislature to infringe on their rights. These limits include bicameralism and presentment, Wis. Const. art. V, § 10, quorum requirements, Wis. Const. art. IV, § 7, and journal and open door requirements, Wis. Const. art. IV, § 10. At times, legislation is enacted that infringes on a person's rights despite these front-end procedures, however, for that we have judicial review.

¶33 We have allowed the Legislature to delegate its authority to make law to administrative agencies. But as we stated in Martinez v. DILHR, 165 Wis. 2d 687, 697, 478 N.W.2d 582 (1992), such a delegation is allowed only if there are "adequate standards for conducting the allocated power." Stated otherwise, "[a] delegation of legislative power to a subordinate agency will be upheld if the purpose of the delegating statute is ascertainable and there are procedural safeguards to insure that the board or agency acts within that legislative purpose." J.F. Ahern Co. v. Wis. State Bldg. Comm'n, 114 Wis. 2d 69, 90, 336 N.W.2d 679 (Ct. App. 1983) (quoting Watchmaking Examining Bd. v. Husar, 49 Wis. 2d 526, 536, 182 N.W.2d 257 (1971)).

¶34 When a grant of legislative power is made, there must be procedural safeguards to prevent the "arbitrary, unreasonable or oppressive conduct of the agency." J.F. Ahern, 114 Wis. 2d at 90

19

(quoting <u>DOA v. DILHR</u>, 77 Wis. 2d 126, 135, 252 N.W.2d 353 (1977)). Procedural safeguards, generally, are those requirements imposed by the Administrative Procedures Act, codified at ch. 227. <u>Id.</u> at 135.

¶35 Palm cannot point to any procedural safeguards on the power she claims. At oral argument, she continuously referenced judicial review; but judicial review takes place after an allegation is made that an individual's rights have been violated. That is why our case law consistently speaks of "procedural <u>and</u> judicial safeguards." <u>E.g.</u>, <u>id.</u> (emphasis added). Rulemaking provides the ascertainable standards that hinder arbitrary or oppressive conduct by an agency. Judicial review does not prevent oppressive conduct from initially occurring.

¶36 Furthermore, Emergency Order 28 purports to criminalize conduct pursuant to Wis. Stat. § 252.25 when a factual directive of Order 28 is transgressed.[13] For example, Order 28 purports to impose 30 days in jail when a person leaves home for a purpose Palm did not approve.

¶37 However, in order to constitute criminal conduct proscribed by statute, the conduct must be set out with specificity in the statute to give fair notice. <u>State v. Starks</u>, 51 Wis. 2d 256, 263-64, 186 N.W.2d 245 (1971). The same specificity is

---

[13] Emergency Order 28, Section 18; Wis. Stat. § 252.25 provides: "Any person who willfully violates or obstructs the execution of any . . . department order under this chapter and relating to the public health, for which no other penalty is prescribed, shall be imprisoned for not more than 30 days or fined not more than $500 or both."

20

required in a properly promulgated rule before criminal sanctions could follow violations. Both must "meet the standards of definiteness applicable to statutory definitions of criminal offenses." State v. Courtney, 74 Wis. 2d 705, 709, 247 N.W.2d 714 (1976) (violation of rule, Wis. Admin. Code § Ag 29.12(6), was charged as a misdemeanor).

¶38 It has long been the law in Wisconsin that in order for the violation of an administrative agency's directive to constitute a crime, the directive must have been properly promulgated as a rule. HM Distribs. of Milwaukee v. Dep't of Ag., 55 Wis. 2d 261, 268-69, 198 N.W.2d 598 (1972) (discussing a contention that criminal penalties were not proper because the administrative regulation was not properly promulgated as a rule); see also State v. Lambert, 68 Wis. 2d 523, 526, 229 N.W.2d 622 (1975) (explaining that criminal conduct can follow from a properly promulgated rule).

¶39 Palm asserts that Order 28 is not a rule, yet she also asserts Wis. Stat. § 252.25 endows her with the power to create criminal penalties for violations of Order 28. Her argument stands § 252.25 on its head. This is so because criminal penalties can arise from a rule violation only when the rule was properly promulgated. HM Distribs., 55 Wis. 2d at 268-69 (explaining that HM Distributors' contention that "proper and required rulemaking procedures were not followed" was without merit). Without the promulgation of a rule, no criminal penalties are possible for violations of administrative agency directives. Id.

21

¶40 Notwithstanding the law, Emergency Order 28 does not rely on a statute within ch. 252 defining the elements of the crime to which punishment under Wis. Stat. § 252.25 must refer. Rather, the prohibited "criminal conduct" to which Palm refers is factually defined solely by Emergency Order 28. Stated otherwise, Palm created the potential for a crime by Order 28. Counsel for Palm admitted as much at oral argument when he said that there was only one element that needed to be proved in a criminal prosecution for a violation of Emergency Order 28: that a provision of the order was violated. Such an argument is without legal foundation and ignores more than 50 years of Wisconsin law, some of which we cited above.

¶41 As we said at the beginning of this decision, the Governor's emergency powers are not challenged by the Legislature, and Palm does not rely on the Governor's emergency powers. Constitutional law has generally permitted the Governor to respond to emergencies without the need for legislative approval. "With no time for ex ante deliberation, and no metric for ex post assessments, the executive's capacities for swift, vigorous, and secretive action are at a premium." Deborah N. Pearlstein, Form and Function in the National Security Constitution, 41 Conn. L. Rev. 1549, 1565 (2009) (internal quotations omitted). But the Governor's emergency powers are premised on the inability to secure legislative approval given the nature of the emergency. For example, if a forest fire breaks out, there is no time for debate. Action is needed. The Governor could declare an emergency and respond accordingly. But in the case of a pandemic, which lasts

22

month after month, the Governor cannot rely on emergency powers indefinitely.[14]

¶42 Emergency Order 28 is a general order of general application within the meaning of Wis. Stat. § 227.01(13). It is a rule; and accordingly, the rulemaking procedures of Wis. Stat. § 227.24, which protect people affected by DHS orders, were required to be followed during the promulgation of Order 28. Furthermore, Palm's reliance on Wis. Stat. § 252.25 for criminal penalties for those who violate Order 28 is misplaced. She chose not to follow the law; therefore, there can be no criminal penalties for violations of Order 28. Courtney, 74 Wis. 2d at 709.

## 2. Wisconsin Stat. ch. 252

¶43 Chapter 252 addresses communicable diseases. Palm relies on Wis. Stat. § 252.02 for the legitimacy of Order 28. As already explained, Palm was in error to assert that she was not required to comply with rulemaking procedures. However, because we granted review of the second issue presented by the Legislature, we assume, arguendo, that rulemaking was not required, and consider

---

[14] Indeed, Wis. Stat. § 323.10 authorizes the Governor to invoke special emergency powers for 60 days when the Governor declares an emergency, which Governor Evers did here. We note that 60 days is more than enough time to follow rulemaking procedures pursuant to Wis. Stat. § 227.24. Therefore, emergency circumstances do not justify Palm's failure to follow the Administrative Procedures Act. However, Palm claims that neither rulemaking nor time-constraints inherent to emergency powers restrict her power. That assertion is contrary to the law in the State of Wisconsin.

whether Emergency Order 28 exceeded the scope of permissible actions under § 252.02.

¶44 Palm claims that "the meaning of the provisions in [Wis. Stat. §] 252.02 are plain." She argues that "DHS has the power to take direct action to control communicable diseases, just as it did through Safer-at-Home [Order 28]." She asserts that § 252.02(6) gives DHS expansive authority to respond to a rare public health crisis like COVID-19. Therefore, she can "authorize and implement all emergency measures necessary to control communicable diseases." In addition, Palm asserts that Order 28 is independently authorized under § 252.02(4), which provides DHS with multiple avenues "for the control and suppression of communicable diseases." And finally, many of Order 28's provisions also fall under § 252.02(3), which Palm asserts empowers her to "close schools and forbid public gatherings in schools, churches, and other public places to control outbreaks and epidemics."

¶45 Palm asserts her broadest grant of authority is Wis. Stat. § 252.02(6) because it says she can authorize and implement "all" emergency measures "necessary" to control communicable diseases.[15] She asserts that "'all' [as a modifier] suggests an expansive meaning because 'all' is a term of great breadth." She cites Project Vote/Voting for Am., Inc. v. Long, 682 F.3d 331, 336 (4th Cir. 2012) (quoting Nat'l Coal. for Students with Disabilities Educ. & Legal Def. Fund v. Allen, 152 F.3d 283, 290 (4th Cir.

---

[15] Wisconsin Stat. § 252.02(6) provides: "The department may authorize and implement all emergency measures necessary to control communicable diseases."

1998)). She argues that she does not have limitless power under this subsection because it applies "only in an 'emergency,'" and "the statute requires an action be 'necessary.'"

¶46 Crimes created by the Legislature in statutes must have specificity in order to be enforceable. State v. Popanz, 112 Wis. 2d 166, 173, 332 N.W.2d 750 (1983) (explaining that a "criminal statute must be sufficiently definite to give a person of ordinary intelligence who seeks to avoid its penalties fair notice of conduct required or prohibited"). Because Palm fails to understand the specificity necessary to a valid criminal statute, she also fails to understand that no less specificity is required of a rule to which criminal penalties are assigned. Courtney, 74 Wis. 2d at 709.

¶47 If Wis. Stat. § 252.02(6) were the sole factual foundation for criminal charges, no criminal prosecution could result because § 252.02(6) does not have the specificity required for fair notice of the conduct required or prohibited. Stated otherwise, it has no definable standards for required or prohibited conduct. Popanz, 112 Wis. 2d at 173. If Emergency Order 28 had been promulgated as a rule, it has much more specificity; however, since no rulemaking occurred, Order 28 cannot save itself.

¶48 Palm next cites Wis. Stat. § 252.02(4).[16] Section 252.02(4) addresses four occurrences that permit DHS

---

[16] Wisconsin Stats. § 252.02(4) provides:

Except as provided in ss. 93.07 (24) (e) and 97.59, the department may promulgate and enforce rules or issue orders for guarding against the introduction of any communicable disease into the state, for the control and

25

action: First, "for guarding against the introduction of any communicable disease into the state;" second, "for control and suppression of communicable diseases;" third, "for the quarantine and disinfection of persons, localities and things infected or suspected of being infected by a communicable disease," and fourth, "for the sanitary care of jails, state prisons, mental health institutions, schools, and public buildings and connected premises."

¶49 However, Order 28 goes far beyond what is authorized in Wis. Stat. § 252.02(4). For example, Order 28 exceeds the § 252.02(4) authority to quarantine those infected or suspected of being infected. Instead, Palm quarantines "[a]ll individuals present within the State of Wisconsin" by ordering them "to stay at home or at their place of residence" with exceptions she deems appropriate.[17] She also prohibits "All public and private gatherings of any number of people that are not part of a single

---

suppression of communicable diseases, for the quarantine and disinfection of persons, localities and things infected or suspected of being infected by a communicable disease and for the sanitary care of jails, state prisons, mental health institutions, schools, and public buildings and connected premises. Any rule or order may be made applicable to the whole or any specified part of the state, or to any vessel or other conveyance. The department may issue orders for any city, village or county by service upon the local health officer. Rules that are promulgated and orders that are issued under this subsection supersede conflicting or less stringent local regulations, orders or ordinances.

[17] Emergency Order, Section 1.

26

household or living unit."[18] Again, this directive is not based on persons infected or suspected of being infected.

¶50 Palm skips over this obvious overreach and contends that the first and second provision of Wis. Stat. § 252.02(4) permit actions taken in Order 28. However, once again, Order 28 is overly broad in its proscriptions. "Áll forms of travel are prohibited except for essential travel as defined in this Order,"[19] i.e., by Palm. If this restriction supposedly is connected to the first permissible action under § 252.02(4) to "guard against the introduction of any communicable disease into the state," Order 28 goes well beyond entry of communicable disease into the state. It prevents "All forms of travel," not simply interstate travel. Furthermore, nothing in § 252.02(4) permits Palm to close "All for-profit and non-profit businesses with a facility in Wisconsin, except [those Palm defies as essential businesses and operations]." She cites no authority for this vast seizure of power.

¶51 In opposition to Palm's claims, the Legislature raised legislatively-imposed directives that courts are to follow when interpreting the scope of agency authority. To place this contention in context, the reader should note that there is history underlying how courts have interpreted administrative agency powers. Formerly, court decisions permitted Wisconsin administrative agency powers to be implied. See Wis. Citizens

---

[18] Id., Section 3.

[19] Id., Section 5.

27

Concerned for Cranes & Doves v. DNR, 2004 WI 40, ¶14, 270 Wis. 2d 318, 677 N.W.2d 612.  In theory, "any reasonable doubt pertaining to an agency's implied powers" was resolved "against the agency." Wis. Builders Ass'n v. DOT, 2005 WI App 160, ¶9, 285 Wis. 2d 472, 702 N.W.2d 433.  However, the Legislature concluded that this theory did not match reality.  Therefore, under 2011 Wis. Act 21, the Legislature significantly altered our administrative law jurisprudence by imposing an "explicit authority requirement" on our interpretations of agency powers.  Kirsten Koschnick, Comment, Making "Explicit Authority" Explicit Deciphering Wis. Act 21's Prescriptions for Agency Rulemaking Authority, 2019 Wis. L. Rev. 993, 997.

¶52 The explicit authority requirement is codified at Wis. Stat. § 227.10(2m), which provides:  "No agency may implement or enforce any standard, requirement, or threshold, . . . unless that standard, requirement, or threshold is explicitly required or explicitly permitted by statute or by a rule that has been promulgated in accordance with this subchapter[.]"  Furthermore, Wis. Stat. § 227.11(2)(a)1.—3., as summarized by a recent comment in the Wisconsin Law Review, "prevent[s] agencies from circumventing this new 'explicit authority' requirement by simply utilizing broad statutes describing the agency's general duties or legislative purpose as a blank check for regulatory authority."[20]

---

[20] Wisconsin Stat. § 227.11(2)(a)2. provides: "A statutory provision describing the agency's general powers or duties does not confer rule-making authority on the agency or augment the agency's rule-making authority beyond the rule-making authority that is explicitly conferred on the agency by the legislature."

Koschnick, Making "Explicit Authority" Explicit, at 996. The explicit authority requirement is, in effect, a legislatively-imposed canon of construction that requires us to narrowly construe imprecise delegations of power to administrative agencies. See Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 225 (2012) ("Interpretive-Direction Canon": "interpretation clauses are to be carefully followed.").

¶53 In addition, the Legislature cites two more canons of construction that it asserts apply here: first, the Legislature does not alter fundamental details of a regulatory scheme in vague terms or in ancillary provisions. Second, the Legislature cites the constitutional-doubt principle. As the United States Department of Justice has recently written in a COVID-19-related case raising constitutional issues, "There is no pandemic exception . . . to the fundamental liberties the Constitution safeguards. Indeed, 'individual rights secured by the Constitution do not disappear during a public health crisis.' These individual rights, including the protections in the Bill of Rights made applicable to the states through the Fourteenth Amendment, are always in force and restrain government action." Statement of Interest, Temple Baptist Church v. City of Greenville, No. 4:20-cv-64-DMB-JMV (N.D. Miss. April 14, 2020), ECF No. 6 (quoting In re Abbott, 954 F.3d 772 (5th Cir. 2020)).

¶54 With these canons as guides, the Legislature interprets Wis. Stat. § 252.02(3), (4) and (6) much differently than Palm. To some extent, Palm and the Legislature are talking past each other. For example, Palm focuses on § 252.02(6) which she asserts

granted broad powers to DHS. The Legislature focuses on the necessary procedural foundation that must precede DHS's implementation or enforcement. As Wis. Stat. § 227.10(2m) directs, unless a rule has been promulgated pursuant to ch. 227 or the DHS action is "explicitly required or explicitly permitted by statute" DHS has no power to implement or enforce its directives.

¶55 We do not define the precise scope of DHS authority under Wis. Stat. § 252.02(3), (4) and (6) because clearly Order 28 went too far. We cannot expansively read statutes with imprecise terminology that purport to delegate lawmaking authority to an administrative agency. The Legislature appropriately cites the statutory explicit authority requirement, Wis. Stat. § 229.10(2m), and has provided plausible readings of the text.

¶56 We have declared rights under the law wherein we have concluded that Emergency Order 28 is invalid and therefore, unenforceable. Although a very unusual request, on April 21, 2020, the Legislature asked this court to issue a temporary injunction of Emergency Order 28 but then requested a stay of that injunction for at least six days. We perceive this request as being grounded in a concern for an orderly transition from Order 28 to a lawful rule.

¶57 However, more than two weeks have passed since we began our consideration of this case. Therefore, we trust that the Legislature and Palm have placed the interests of the people of Wisconsin first and have been working together in good faith to establish a lawful rule that addresses COVID-19 and its devastating effects on Wisconsin. People, businesses and other institutions

30

need to know how to proceed and what is expected of them. Therefore, we place the responsibility for this future law-making with the Legislature and DHS where it belongs.

## IV.  CONCLUSION

¶58  We conclude that Emergency Order 28 is a rule under the controlling precedent of this court, Citizens for Sensible Zoning, Inc. v. DNR, 90 Wis. 2d 804, 280 N.W.2d 702 (1979), and therefore is subject to statutory emergency rulemaking procedures established by the Legislature.  Emergency Order 28 is a general order of general application within the meaning of Wis. Stat. § 227.01(13) which defines "Rule."  Accordingly, the rulemaking procedures of Wis. Stat. § 227.24 were required to be followed during the promulgation of Order 28.  Because they were not, Emergency Order 28 is unenforceable.[21]  Furthermore, Wis. Stat. § 252.25 required that Emergency Order 28 be promulgated using the procedures established by the Legislature for rulemaking if criminal penalties were to follow. Because Palm did not follow the law in creating Order 28, there can be no criminal penalties for violations of her order.  The procedural requirements of Wis. Stat. ch. 227 must be followed because they safeguard all people.

¶59  We further conclude that Palm's order confining all people to their homes, forbidding travel and closing businesses

---

[21] This decision does not apply to Section 4. a. of Emergency Order 28.

31

exceeded the statutory authority of Wis. Stat. § 252.02, upon which Palm claims to rely.

*By the Court.*—Palm's Emergency Order 28 is declared unlawful, invalid, and unenforceable.

¶60 PATIENCE DRAKE ROGGENSACK, C.J. *(concurring).* I join the majority opinion, but for the reasons set forth below I also concur.

¶61 We have declared that Emergency Order 28 is invalid and therefore, unenforceable. Earlier, the Legislature asked us to issue an injunction but to stay such an injunction for six days, and at oral argument, the Legislature implied that a longer stay may be appropriate if we were to enjoin Order 28.

¶62 Requesting a stay for a requested injunction is a very unusual request, but we understand that it is driven by the Legislature's concern that confusion may result if Order 28 is declared invalid and actions to enforce our declaration immediately commence. People, businesses and other institutions may not know how to proceed or what is expected of them.

¶63 Furthermore, there is authority supporting such a request. Declaratory judgment is a legal remedy; however, it is analogous to an injunction, which is an equitable remedy. Samuels v. Mackell, 401 U.S. 66, 70-71 (1971). In Samuels, The United States Supreme Court stated:

> Although the declaratory judgment sought by the plaintiffs [in Great Lakes Dredge & Dock Co. v. Huffman, 319 U.S. 293 (1943)] was a statutory remedy rather than a traditional form of equitable relief, the Court made clear that a suit for declaratory judgment was nevertheless 'essentially an equitable cause of action,' and was 'analogous to the equity jurisdiction in suits quia timet or for decree quieting title.' . . . [T]he Court held that in an action for a declaratory judgment, 'the district court was as free as in any other suit in equity to grant or withhold the relief prayed, upon equitable grounds.

1

Samuels, 401 U.S. at 70-71 (internal citations omitted). The Court emphasized the "continuing validity" of its analogy between declaratory judgments and injunctive relief. Id. at 71.

¶64 The analogy between declaratory judgment and injunctive relief is particularly strong in the context of this case. As then-Chief Justice Abrahamson and Justice Ann Walsh Bradley said, "[t]he oft-stated, oft-repeated legal maxim is clear: declaratory judgments are treated functionally as injunctions, when applied to governmental parties who are bound by the force and meaning of judgments under the law." Madison Teachers, Inc. v. Walker, 2013 WI 91, ¶43, 351 Wis. 2d 237, 869 N.W.2d. 388 (Abrahamson, C.J., & A.W. Bradley, J., dissenting).[1]

¶65 Therefore, I conclude there is a legal basis upon which to consider the Legislature's extraordinary request. I too am appreciative of the concerns raised by COVID-19 and the possibility of throwing the state into chaos. Accordingly, although our declaration of rights is effective immediately, I would stay future actions to enforce our decision until May 20, 2020. However, I

---

[1] In Village of Brown Deer, we concluded that the circuit court could not stay execution of a declaratory judgment. Village of Brown Deer v. City of Milwaukee, 8 Wis. 2d 631, 635, 99 N.W.2d 860 (1959). However, Village of Brown Deer is factually distinct from the case before us because the stay resulted in creation of a financial obligation for a city. Id. at 637. We explained that by staying execution, "the city would be required to finance services in an area that had been judiciary [sic] determined to belong to the village. The trial court had no authority to impose that duty upon the city." Id. In the present dispute, there is no burden imposed on DHS as a result of our stay. Indeed, it will be helpful to Palm because she and her staff can use the period to promulgate an emergency rule pursuant to Wis. Stat. § 227.24.

trust that the parties will place the interests of the people of Wisconsin first and work together in good faith to quickly establish a rule that best addresses COVID-19 and its devastating effects on Wisconsin.

¶66 REBECCA GRASSL BRADLEY, J. *(concurring).*[1] Under the Wisconsin Constitution, all governmental power derives "from the consent of the governed" and government officials may act only within the confines of the authority the people give them. Wis. Const. art. I, § 1. The people of Wisconsin never consented to any <u>elected</u> official, much less an <u>unelected</u> cabinet secretary, having the power to create law, execute it, and enforce it. "[E]ver vigilant in averting the accumulation of power by one body——a grave threat to liberty——the people devised a diffusion of governmental powers" among three branches of government. <u>Gabler v. Crime Victims Rights Bd.</u>, 2017 WI 67, ¶60, 376 Wis. 2d 147, 897 N.W.2d 384. Whenever any branch of government exceeds the boundaries of authority conferred by the people, it is the duty of the judicial branch to say so.

¶67 However well-intentioned, the secretary-designee of the Department of Health Services exceeded her powers by ordering the people of Wisconsin to follow her commands or face imprisonment for noncompliance.[2] In issuing her order, she arrogated unto herself the power to make the law and the power to execute it, excluding the people from the lawmaking process altogether. The

---

[1] I join the majority opinion in full.

[2] I would have promptly granted the Legislature's Emergency Motion for Temporary Injunction, enjoining Emergency Order 28, the Safer at Home Order, a motion the legislature filed on April 21, 2020. An unlawful order should never issue in the first place, and it should not remain in effect for any period past the time a court ascertains its unlawfulness. In the context of a request for injunctive relief, an unlawful order of this magnitude, applicable to every citizen and every person present in the State of Wisconsin, should be enjoined as soon as a court determines the moving party is likely to succeed on the merits.

separation of powers embodied in our constitution does not permit this. Statutory law being subordinate to the constitution,[3] not even the people's representatives in the legislature may consolidate such power in one person.

> To the Framers of the United States Constitution, the concentration of governmental power presented an extraordinary threat to individual liberty: "The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, . . . may justly be pronounced the very definition of tyranny." The Federalist No. 47, at 298 (James Madison) (Clinton Rossiter ed., 1961).

---

[3] Spurning more than two centuries of fundamental constitutional law as well as the Wisconsin Constitution's guarantee of liberty, Justice Brian Hagedorn shockingly proclaims "the judiciary must never cast aside our laws or the constitution itself in the name of liberty." Justice Hagedorn's dissent, ¶259. Setting aside the self-contradictory nature of that statement, Justice Hagedorn's 53-page opinion contains no constitutional analysis whatsoever, affirmatively rejects the constitution, and subjugates liberty. The Wisconsin Constitution IS the law——and it reigns supreme over any statute. "The Constitution's supremacy over legislation bears repeating: 'the Constitution is to be considered in court as a paramount law' and 'a law repugnant to the Constitution is void, and . . . courts, as well as other departments, are bound by that instrument.' See Marbury [v. Madison], 5 U.S. (1 Cranch) [137] at 178, 180 [1803]." Mayo v. Wis. Injured Patients and Families Comp. Fund, 2018 WI 78, ¶91, 383 Wis. 2d 1, 914 N.W.2d 678 (Rebecca Grassl Bradley, J., concurring).

> The Constitution is either a superior, paramount law, unchangeable by ordinary means, or it is on a level with ordinary legislative acts, and like other acts, is alterable when the legislature shall please to alter it. If the former part of the alternative be true, then a legislative act contrary to the Constitution is not law; if the latter part be true, then written constitutions are absurd attempts, on the part of the people, to limit a power, in its own nature illimitable.

Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803).

Gabler, 376 Wis. 2d 147, ¶4 (ellipsis by Gabler). Blackstone——whose conception of the separation of powers "profoundly influenced" the Founders——"defined a tyrannical government as one in which 'the right both of making and of enforcing the laws, is vested in one and the same man, or one and the same body of men,' for 'wherever these two powers are united together, there can be no public liberty.'" Koschkee v. Taylor, 2019 WI 76, ¶50, 387 Wis. 2d 552, 929 N.W.2d 600 (Rebecca Grassl Bradley, J., concurring) (citing DOT v. Association of Am. R.Rs., 575 U.S. 43, 73 (2015) (Thomas, J., concurring) (quoted source omitted)). Thomas Jefferson similarly warned that "concentrating [all the powers of government] in the same hands is precisely the definition of despotic government."[4]

¶68 The people of Wisconsin pronounced liberty to be of primary importance, establishing government principally to protect their freedom. "The Wisconsin Constitution begins with a Declaration of Rights, echoing language from our nation's Declaration of Independence, recognizing that the proper role of government——the very reason governments are instituted——is to secure our inherent rights, including liberty:

> All people are born equally free and independent, and
> have certain inherent rights; among these are life,
> liberty and the pursuit of happiness; to secure these

---

[4] Thomas Jefferson, Notes on the State of Virginia. Edited by William Peden. Chapel Hill: University of North Carolina Press for the Institute of Early American History and Culture, Williamsburg, Virginia, 1954. The Founders' Constitution, Volume 1, Chapter 10, Document 9, http://press-pubs.uchicago.edu/founders/documents/v1ch10s9.html The University of Chicago Press.

rights, governments are instituted, <u>deriving their just powers from the consent of the governed</u>. Wis. Const. art. I, § 1 (emphasis added). 'Too much dignity cannot well be given to that declaration.' An <u>inherent</u> right to liberty means all people are born with it; the government does not bestow it upon us and it may not infringe it." <u>Porter v. State</u>, 2018 WI 79, ¶52, 382 Wis. 2d 697, 913 N.W.2d 842 (Rebecca Grassl Bradley, J. and Daniel Kelly, J., dissenting) (emphasis added; internal citation omitted). Under the Wisconsin Constitution, government officials, whether elected or appointed, are servants of the citizens, not their masters.

¶69 Endowing one person with the sole power to create, execute, and enforce the law contravenes the structural separation of powers established by the people. Through the Wisconsin Constitution, the people confer distinct powers on the legislative, executive, and judicial branches of government. "Three clauses of the Wisconsin Constitution embody this separation: Article IV, Section 1 ('[t]he legislative power shall be vested in a senate and assembly'); Article V, Section 1 ('[t]he executive power shall be vested in a governor'); and Article VII, Section 2 ('[t]he judicial power . . . shall be vested in a unified court system')." <u>Gabler</u>, 376 Wis. 2d 147, ¶11. "[T]he Constitution's central mechanism of separation of powers depends largely upon common understanding of what activities are appropriate to legislatures, to executives, and to courts." <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 559-60 (1992). Under the Wisconsin Constitution, the legislature makes the laws; an

4

unelected cabinet secretary serving in the executive branch cannot unilaterally do so.

¶70 Underlying the separation of powers reflected in our governmental structure is an avoidance of concentrations of authority: "it may be too great a temptation to human frailty, apt to grasp at power, for the same persons who have the power of making laws to have also in their hands the power to execute them." John Locke, The Second Treatise of Civil Government § 143 (1764), reprinted in Two Treatises of Government 119, 194 (Thomas I. Cook ed., 1947). "Montesquieu shared Locke's concern about the threat to liberty from accumulated power, expressing apprehension that a government with shared legislative and executive power could first 'enact tyrannical laws' then 'execute them in a tyrannical manner.'" Gabler, 376 Wis. 2d 147, ¶5 (citing 1 Montesquieu, The Spirit of the Laws 151-52 (Oskar Piest et al. eds., Thomas Nugent trans., 1949) (1748) (footnote omitted)). Preserving the perimeters of power constitutionally conferred on each branch of government is essential for securing the liberty of the people. "The purpose of the separation and equilibration of powers in general . . . was not merely to assure effective government but to preserve individual freedom." Morrison v. Olson, 487 U.S. 654, 727 (1988) (Scalia, J., dissenting). Although consolidation of power in one person may be tempting in times of exigency, for purposes of expeditiously producing an efficient and effective response to emergencies like a pandemic, history informs of the perils of the consolidation of power, and not merely through the exhortations of the Founders and philosophers. Regrettably, we

have tangible examples of judicial acquiescence to unconstitutional governmental actions considered——at the time——to inure to the benefit of society, but later acknowledged to be vehicles of oppression. This is particularly true in the context of the police power, the source of authority cited by the DHS secretary-designee in this case.

¶71 "Historically, when courts contaminate constitutional analysis with then-prevailing notions of what is 'good' for society, the rights of the people otherwise guaranteed by the text of the Constitution may be trampled. Departures from constitutional text have oppressed people under all manner of pernicious pretexts:

> [T]he notion of "social harm" supporting the police power was completely untethered from constitutional text and ripe for misuse in the hands of a Justice such as Holmes, who believed that the Constitution could be reduced to ad hoc balancing. Eugenics was built upon the notion of harm; indeed, it thrived on a sense of imminent doom: that society was degenerating because of what were called its "weaklings" and "discards." The idea that society was being swamped by incompetents was a common trope for eugenicists: the unfit were a "menace." . . . Like the great popular eugenicists of the day, Holmes wrote in Buck that eugenics would prevent society from being "swamped" by incompetents, that fewer criminals would be executed, and that fewer imbeciles would starve.

Victoria Nourse, Buck v. Bell: A Constitutional Tragedy from a Lost World, 39 Pepp. L. Rev. 101, 114-15 (2011) (emphasis added; footnotes omitted)." State v. Roberson, 2019 WI 102, ¶84, 389 Wis. 2d 190, 935 N.W.2d 813 (Rebecca Grassl Bradley, J., concurring) (some emphasis omitted; some emphasis added).

¶72  In Korematsu v. United States, 323 U.S. 214 (1944),[5] the United States Supreme Court professed to apply "the most rigid scrutiny" to the internment of Japanese-Americans during World War II but nevertheless found the "assembling together and placing under guard all those of Japanese ancestry" in "assembly centers" to be constitutional based on "[p]ressing public necessity" and further rationalized this defilement of the Constitution because "the need for action was great, and time was short." Id. at 216, 221, 223-24. "Korematsu is one of the Supreme Court's most reviled decisions——a relic of the nation's dark past widely regarded as unlikely to be repeated." Stephen Dycus, Requiem for Korematsu, 10 J. Nat'l Sec. L. & Pol'y 237 (2019). And thankfully so. Nonetheless, the public fear underlying this contemptible case is capable of pressuring jurists to misuse the constitution in other contexts:

> Judges "are heavily influenced by the perceived practical consequences of their decisions rather than being straight-jacketed by legal logic. . . . In a democracy," [Eric Yamamoto] writes, "judicial independence serves as the crucial check on the political branches' majoritarian impulses." Careful judicial scrutiny is especially important in times of stress, when Americans may find themselves "at the mercy of wicked rulers, or the clamor of an excited people."

Id. at 246 (citing Eric K. Yamamoto, In the Shadow of Korematsu: Democratic Liberties and National Security (Oxford Univ. Press 2018) (footnotes omitted)). Although headlines may sensationalize the invocation of cases such as Korematsu, the point of citing them is not to draw comparisons between the circumstances of people

---

[5] Abrogated by Trump v. Hawaii, 138 S. Ct. 2392 (2018).

horrifically interned by their government during a war and those of people subjected to isolation orders during a pandemic. We mention cases like Korematsu in order to test the limits of government authority, to remind the state that urging courts to approve the exercise of extraordinary power during times of emergency may lead to extraordinary abuses of its citizens.[6] "Of

---

[6] During oral arguments in this case, I posed multiple questions to the state's attorney representing the DHS secretary-designee, asking him to identify the limits on her powers. Ultimately, he conceded the DHS secretary-designee could "take all necessary action" and identified only judicial review and "the medical community" as constraints on her power:

Court: One of the rationales that we're hearing justifying the Secretary's order in this case is that, well it's a pandemic, and there isn't enough time to promulgate a rule and have the legislature involved with determining the details of the scope of the Secretary's authority. I'll direct your attention to another time in history and the Korematsu decision where the Court said the need for action was great and time was short and that justified, and I'm quoting, "assembling together and placing under guard all those of Japanese ancestry in assembly centers during World War II." Could the Secretary under this broad delegation of legislative power or legislative-like power order people out of their homes into centers where they are properly socially distanced in order to combat the pandemic?

State's counsel: Your Honor, Korematsu was an equal protection challenge to the action that the government took to address the crisis. This is not a substantive constitutional challenge to what DHS has done –

Court: My question goes to the scope again of the Secretary's authority and what the limits are. What I'm hearing is, well the legislature doesn't need to specify the limits, it's a time of pandemic, there isn't enough time to go through rulemaking, so the Secretary just has to do whatever she alone deems necessary to combat the pandemic. So my question to you in invoking Korematsu is not the bases for the claims that were brought in that case versus this case; the point of my question is,

8

what are the limits, constitutional or statutory? There have to be some, don't there counsel?

State's counsel: Yes. There absolutely are your Honor. Justice Bradley, I think if you read the petition for an original action that was filed with your court just last evening, there are a variety of fundamental rights based claims that target different pieces of Executive [sic "Emergency"] Order 28 on the basis of the freedom of religion, the freedom to travel, and-and I don't know all what's in there, it's a long petition, but there's a lot of constitutional rights in it. That is one of the fundamental backstops against an unreasonable and unconstitutional exercise of power by DHS.

Court: Counsel, that's not answering my question. I understand. We all understand that people have the right to come to this court or another court to vindicate their constitutional interests. What I'm asking——set aside the constitution for a moment, then. What are the statutory limits on the Secretary's power because I'm looking at page 45 of your brief and you say that section "252.02 is not legislation 'enforced or administered by' DHS through issuing Safer-at-Home, and DHS's actions did not 'implement, interpret, or make more specific' standards that the legislature designed by statute." Section 252.02, according to your brief, "simply empowers DHS to act." What are the limits on the powers of DHS to act? What can't DHS do under the statute?

State's counsel: Your Honor, I think you take the statutory text as it is and the statutory text empowers DHS to take all necessary action to combat communicable diseases. I understand your Honor may be uncomfortable with that broad grant of authority in the sense that you think it may allow DHS to go too far. I humbly submit to you that that concern is best addressed to the legislature and asking them to amend the statute that they passed and-and-and lobby them to add limitations of the kind that your Honor is discussing.

Court: Let me just follow-up please. I have one more question. I think it goes to the heart of what this case is all about and as I understand the legislature's argument, the legislature is asking us to construe the statute so that there isn't a constitutional problem because counsel, I think there is a constitutional problem with the legislature giving away this much power

9

to an unelected cabinet secretary. The people never consented to a single individual having that kind of power.

State's counsel: I would respond in two ways. First, the DHS cabinet secretary serves at the pleasure of the Governor. She's clearly accountable to the people in the same way the Governor is. The second thing I'd say is the people chose to grant a broad power to the state's public health agency to do what's necessary in a pandemic to fight it. Courts for over a century have recognized that legislatures – I really encourage you to just think about it – think about it.

Court: Counsel, I have thought a lot about it. And my concern goes back to what the limits are on the Secretary because under your interpretation of the statutes she can do whatever she wants and she can order people to jail if they don't comply and I don't think the legislature can give that kind of power to an unelected individual.

State's counsel: Your Honor, what I can say is for over a century, courts have recognized that in the context of infectious diseases, it is practically impossible for the legislature to be able to predict exactly what is necessary. You have to keep in mind this is a novel – it is literally called the novel coronavirus. We have never seen it before. We don't know exactly what it can do. And so the legislature realized that it needed to give an agency with the ability to respond with expertise and alacrity to changing dynamic circumstances on the ground.

Court: The logical consequence of your argument, counsel, is that the government could step in and do this, the DHS secretary could step in and do this every single flu season, every year, because the flu kills tens of thousands of people in America every year and that's a communicable disease. So would you agree with me then that the DHS secretary under your interpretation could be empowered to do this every single flu season?

State's counsel: No your Honor. I think that the DHS secretary if it tried to do that every single flu season would have no support in the medical community for imposing that kind of restriction.

10

course, history may repeat itself - if we ignore the lessons of the past, and if the courts fail to do their duty." Stephen Dycus, Requiem for Korematsu, 10 J. Nat'l Sec. L. & Pol'y at 252.[7]

¶73 These cases, among other similarly despicable examples, illustrate rather painfully why the judiciary cannot dispense with constitutional principles, even in response to a dire emergency. Indeed, it is in the midst of emergencies that constraints on government power are most important. It is during such emergencies that our historical memory is of vital importance. Although invoking the most odious instances of government-sanctioned oppression makes many uncomfortable and tends to trigger outrage, it is imperative to do so in order to remind the citizenry of grave abuses that have been justified in the name of exigent need. These repugnant cases must be cited to explain the fundamental importance of judicial resistance to popular pressures, which in times of crisis implore judges to cast aside the law in the name of emergency. "History teaches that grave threats to liberty often come in times of urgency, when constitutional rights seem too extravagant to endure. . . . [W]hen we allow fundamental freedoms to be sacrificed in the name of real or perceived exigency, we

_____

(Emphasis added.)

[7] Although Korematsu has been disavowed by the United States Supreme Court, astonishingly, it has never been overruled. See Trump v. Hawaii, 138 S. Ct. 2392, 2423 (2018) ("The dissent's reference to Korematsu, however, affords this Court the opportunity to make express what is already obvious: Korematsu was gravely wrong the day it was decided, has been overruled in the court of history, and——to be clear——'has no place in law under the Constitution.' [Korematsu v. United States,] 323 U.S. [214], at 248 [1944] (Jackson, J. dissenting).").

11

invariably come to regret it." Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 635 (1989) (Marshall, J., dissenting). Even if a significant portion of the public supports the Safer at Home Order, the judiciary must protect the structural separation of powers embodied in our state and federal constitutions in order to avoid future monumental mistakes from which our republic may never recover. "Experience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding." Olmstead v. United States, 277 U.S. 438, 479 (1928) (Brandeis, J. dissenting) (overruled in part on other grounds by Katz v. United States, 389 U.S. 347 (1967)).

¶74 Thomas Jefferson counseled that "the powers of government should be so divided and balanced among several bodies of magistracy, as that no one could transcend their legal limits, without being effectually checked and restrained by the others."[8] The judiciary serves as a check not only on the legislative and executive branches, but on itself no less. In the midst of the COVID-19 pandemic, I dissented from this court's indefinite

---

[8] Thomas Jefferson, Notes on the State of Virginia. Edited by William Peden. Chapel Hill: University of North Carolina Press for the Institute of Early American History and Culture, Williamsburg, Virginia, 1954. The Founders' Constitution, Volume 1, Chapter 10, Document 9, http://press-pubs.uchicago.edu/founders/documents/ v1ch10s9.html The University of Chicago Press.

12

suspension of criminal jury trials as a violation of the Sixth Amendment to the United States Constitution.[9] I also dissented from this court's indefinite suspension of non-criminal jury trials, which overrode every statutory deadline applicable to such proceedings, because "[t]he court lacks any authority to infringe the right of Wisconsin citizens to have their cases tried by juries within the time frames established by the people's representatives in the legislature."[10] In its ongoing suspension of the laws enacted by the people's representatives in the legislature, I cautioned that this court "invades the province of the legislature, violates the separation of powers, and 'creates a confrontation of constitutional magnitude between the legislature and this court.'"[11] Notwithstanding COVID-19, "[n]either the constitution nor the statutes recognize an exception for public health emergencies."[12]

¶75 It "is the obligation of the Judiciary not only to confine itself to its proper role, but to ensure that the other branches do so as well." City of Arlington, Tex. v. F.C.C., 569

---

[9] In Re the Matter of Jury Trials During the COVID-19 Pandemic (S. Ct. Order issued March 22, 2020) (Rebecca Grassl Bradley, J., dissenting) ("The Wisconsin Supreme Court suspends the constitutional rights of Wisconsin citizens, citing the exigency of a public health emergency. The Constitution does not countenance such an infringement.").

[10] Interim Rule 20-02 In the Matter of an Interim Rule Re: Suspension of Deadlines for Non-Criminal Jury Trials Due to the COVID-19 Pandemic (March 31, 2020) (Rebecca Grassl Bradley, J., dissenting).

[11] Id. (quoted source omitted).

[12] Id.

13

U.S. 290, 327 (2013) (Roberts, C.J., dissenting). In Gabler, this court invalidated a legislative conferral of authority on the executive branch: "In creating an executive branch entity with authority to pass judgment and impose discipline on a judge's exercise of core judicial powers, the Wisconsin legislature violates the Wisconsin Constitution's structural separation of powers and invades a domain recognized for over two hundred years as the exclusive province of the judiciary." Gabler, 376 Wis. 2d 147, ¶1. Declaring the statute unconstitutional was necessary to protect the independence of the judiciary: "By statutorily authorizing executive action against the judiciary, the legislature unconstitutionally conferred power on an executive board to impair, improperly influence, and regulate the judiciary's exercise of its constitutional duties." Id., ¶2.

¶76 These instances illustrate that the judiciary acts as the backstop against encroachments by any branch——including the judiciary——on the core powers of a coordinate branch. "Whenever any branch of government claims the authority to act beyond the boundaries of its powers, the people should be alarmed."[13] It is "judicial independence that serves as a bulwark protecting the people against tyranny." Gabler, 376 Wis. 2d 147, ¶2.

¶77 This court is well aware that many Wisconsin citizens support the Safer at Home Order while many oppose it. This court does not base its decisions on popular opinion; it grounds them in

---

[13] Interim Rule 20-02 In the Matter of an Interim Rule Re: Suspension of Deadlines for Non-Criminal Jury Trials Due to the COVID-19 Pandemic ¶15 n.1 (March 31, 2020) (Rebecca Grassl Bradley, J., dissenting).

the law. It is for the political branches, not the judiciary, to respond to the public's wishes, and for this court to declare whether each branch acts within its constitutional grant of power and in accord with statutory law.[14] "Emergency does not create power. Emergency does not increase granted power or remove or diminish the restrictions imposed upon power granted or reserved. The Constitution was adopted in a period of grave emergency. Its grants of power to the federal government and its limitations of the power of the States were determined in the light of emergency, and they are not altered by emergency." Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 425 (1934) (emphasis added). In a republic in which the constitution demarcates the powers assigned to each branch of government, it is of foundational importance which government official presumes the power to control the people. Particularly in an emergency, this court may not cast aside the constitution nor disregard statutory law.

---

[14] In a thinly-veiled attempt at garnering a sensationalized headline, Justice Rebecca Dallet repeatedly employs fear tactics in lieu of the law in order to dramatize her perceptions of the consequences of the majority's opinion. See, e.g., Justice Dallet's dissent, ¶¶132, 147, 162. Well-established canons of law soundly reject this method of statutory construction, which favors an interpretation that will "produce sensible, desirable results, since that is surely what the legislature must have intended. But it is precisely because people differ over what is sensible and what is desirable that we elect those who will write our laws—and expect courts to observe what has been written." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 22 (2012). Hyperbolic concerns about the consequences of judicial interpretation of the law cannot override our duty to say what the law is and not what we may wish it to be. Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803).

15

¶78 The DHS secretary-designee bases her authority to enter the Safer at Home Order on Wis. Stat. § 252.02, which she characterizes as a law that "simply empowers DHS to act"——unilaterally, and with no input from the legislature or the people. The statutory language is indeed sweeping, and if interpreted expansively, calls into question its constitutionality as an impermissible delegation of legislative power never authorized by the people. As a general principle, it is the duty of the legislature to create the law, and any delegation of lawmaking responsibility to administrative agencies like DHS must be carefully circumscribed in order to avoid the people being governed by unelected bureaucrats.

¶79 "The concentration of power within an administrative leviathan clashes with the constitutional allocation of power among the elected and accountable branches of government at the expense of individual liberty." Koschkee, 387 Wis. 2d 552, ¶42 (Rebecca Grassl Bradley, J., concurring). There is an inherent incompatibility between "the system of bureaucratic rule that took root in the Progressive era and now reaches into virtually every realm of American life" and the constitution's "'deliberate calibration of incentives and control between the branches' reflected in the structural separation of powers." Id., ¶43 (first quoting Charles J. Cooper, Confronting the Administrative State, 25 National Affairs 96, 96 (Fall 2015); then quoting Gabler, 376 Wis. 2d 147, ¶7). "The philosophical roots of rule by bureaucratic overlords are antithetical to the Founders' vision of our constitutional Republic, in which supreme power is held by the

16

people through their elected representatives." Koschkee, 387 Wis. 2d 552, ¶45 (Rebecca Grassl Bradley, J., concurring). When legislatures expound broad policy goals and leave the details to administrative bodies, "[t]he consolidation of power within executive branch agencies 'often leaves Americans at the[ir] mercy' endowing agencies with 'a nearly freestanding coercive power' and '[t]he agencies thereby become rulers of a sort unfamiliar in a republic, and the people must jump at their commands.'" Id. (citing Phillip Hamburger, Is Administrative Law Unlawful? 335 (2014)).

¶80 It is insufficient for the DHS secretary-designee to point to the legislature's statutory delegation of lawmaking power as the source of her authority to dictate how the people must conduct their lives, without considering the constitutional ramifications of such a broad statutory interpretation——namely, the threat to the liberty of the people. "The Founders recognized that maintaining the formal separation of powers was essential to preserving individual liberty.

> This devotion to the separation of powers is, in part, what supports our enduring conviction that the Vesting Clauses are exclusive and that the branch in which a power is vested may not give it up or otherwise reallocate it. The Framers were concerned not just with the starting allocation, but with the 'gradual concentration of the several powers in the same department.' The Federalist No. 51, at 321 (J. Madison).

Koschkee, 387 Wis. 2d 552, ¶51 (Rebecca Grassl Bradley, J., concurring) (citing DOT v. Association of Am. R.Rs., 575 U.S. 43, 73 (Thomas, J., concurring)). "Under the original understanding of the Constitution," devising and imposing "generally applicable

17

rules of private conduct" on the people "requires the exercise of legislative power," and "the discretion inherent in executive power does <u>not</u> comprehend the discretion to formulate generally applicable rules of private conduct." <u>Association of Am. R.Rs.</u>, 575 U.S. at 69 (Thomas, J., concurring). Nor does the constitution contemplate executive power to penalize noncompliance with administratively-drawn rules of conduct through fines and imprisonment. "In facilitating the vast expansion of the administrative state, the legislative and executive branches transferred power from the people's elected representatives and elected executives, bestowing it upon unelected and unaccountable bureaucrats, thereby jeopardizing the constitution's safeguards against the tyrannical concentration of power." <u>Koschkee</u>, 387 Wis. 2d 552, ¶53 (Rebecca Grassl Bradley, J., concurring).

¶81 In a particularly chilling exchange with this court during oral arguments, the attorney for the state representing the DHS secretary-designee claimed the authoritarian power to authorize the arrest and imprisonment of the people of Wisconsin for engaging in lawful activities proscribed by the DHS secretary-designee in her sole discretion:

> Court: Are there any statutory or constitutional limits on the powers of the Secretary?
>
> . . . .
>
> State's counsel: DHS's actions are limited by what is necessary to combat the infectious disease that's presented at the time. . . . when DHS faces an outbreak of a dangerous, communicable disease, it can do what is necessary to combat that disease.
>
> Court: Whatever DHS and the cabinet secretary solely determine is necessary, right?

18

> State's counsel: . . . this is what the statute says . . . it says that DHS shall implement all emergency measures to control communicable diseases. . . . [T]hat is what the statute says. It gives that power to DHS. This is the statute the legislature chose to enact.
>
> Court: . . . [T]he Secretary can identify behavior that is not otherwise criminal and . . . she can all by herself sit down at her computer keyboard, write up a description of behavior and make it criminal, correct?
>
> . . . .
>
> State's counsel: Yes. The scope of available enforcement is determined by the order. Yes. . . . That's true.

"If the separation of powers means anything, it must mean that the prosecutor isn't allowed to define the crimes he gets to enforce." Neil Gorsuch, A Republic If You Can Keep It 87 (Crown Forum ed., 1st ed. 2019). Justice Gorsuch's admonishment applies no less to an unelected cabinet secretary claiming the power to unilaterally define the crime and then enforce it.

¶82 "The people of Wisconsin vest distinct constitutional powers of governance in each branch of government, but consistent with founding principles of limited government and individual freedom, the people also impose constraints on the exercise of those powers." Porter, 382 Wis. 2d 697, ¶52 (Rebecca Grassl Bradley, J. and Daniel Kelly, J., dissenting). Among those constraints, it is constitutionally impermissible for the legislature to authorize the head of an administrative agency to unilaterally compel the 5.8 million citizens of Wisconsin to stay home, close their businesses, and face imprisonment if they do not

19

comply.[15] Even in a pandemic, and notwithstanding the good intentions of the cabinet secretary. Thomas Jefferson advised against being "deluded by the integrity of" governmental actors' "purposes" and cautioned against "conclud[ing] that these unlimited powers will never be abused" merely because current office holders "are not disposed to abuse them."[16] Jefferson forewarned that "[t]he time to guard against corruption and tyranny, is before they shall have gotten hold on us. It is better to keep the wolf out of the fold, than to trust to drawing his teeth and talons after he shall have entered."[17]

¶83 While the rulemaking process the law requires as a precondition to an order of this magnitude may seem cumbersome during a pandemic, "the difficulties of the legislative process were essential to [the constitution's] design, purposefully placed there to ensure that laws would be more likely the product of deliberation than haste; more likely the product of compromise among the many than the will of the few; and more likely to respect

---

[15] The Safer at Home Order actually reaches beyond Wisconsin citizens to any individual present within the State: "All individuals present within the State of Wisconsin are ordered to stay at home or at their place of residence[.]"

[16] Thomas Jefferson, Notes on the State of Virginia. Edited by William Peden. Chapel Hill: University of North Carolina Press for the Institute of Early American History and Culture, Williamsburg, Virginia, 1954. The Founders' Constitution, Volume 1, Chapter 10, Document 9, http://press-pubs.uchicago.edu/founders/documents/v1ch10s9.html The University of Chicago Press.

[17] Id.

minority interests than trample on their rights." Neil Gorsuch, A Republic If You Can Keep It 63 (Crown Forum ed., 1st ed. 2019).

\* \* \*

¶84 Informed by the lessons of history, the Constitution was established to safeguard the rights of the people even under the most exigent circumstances. The framers "foresaw that troublous times would arise, when rulers and people would become restive under restraint, and seek by sharp and decisive measures to accomplish ends deemed just and proper; and that the principles of constitutional liberty would be in peril, unless established by irrepealable law. The history of the world had taught them that what was done in the past might be attempted in the future. The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances. No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government. Such a doctrine leads directly to anarchy or despotism, but the theory of necessity on which it is based is false; for the government, within the Constitution, has all the powers granted to it, which are necessary to preserve its existence; as has been happily proved by the result of the great effort to throw off its just authority." Ex parte Milligan, 71 U.S. 2, 120-21 (1866) (emphasis added). It is especially in times of emergency that we must protect the rights of the people, lest we establish a dangerous precedent empowering less benevolent

21

government officials in the future to oppress the people in the name of exigency.

¶85 "In America THE LAW IS KING!  For as in absolute governments the king is law, so in free countries the law ought to be king; and there ought to be no other."  Thomas Paine, 1776, Common Sense (1776).  In Wisconsin, as in the rest of America, the Constitution is our king——not the governor, not the legislature, not the judiciary, and not a cabinet secretary.  We can never "allow fundamental freedoms to be sacrificed in the name of real or perceived exigency" nor risk subjecting the rights of the people to "the mercy of wicked rulers, or the clamor of an excited people."  Fear never overrides the Constitution.  Not even in times of public emergencies, not even in a pandemic.

¶86  I am authorized to state that Justice DANIEL KELLY joins this concurrence.

22

¶87 DANIEL KELLY, J. *(concurring).* Secretary-designee Andrea Palm, pursuant to authority she says she found in Wis. Stat. § 252.02 (2017-18),[1] has taken control of a stunningly broad swath of the lives and activities of every single individual and business in the State of Wisconsin. Pursuant to Executive Order 28 (the "Order"), she is dictating that, <u>inter alia</u>:

- all individuals present within the State of Wisconsin stay at home or at their place of residence, subject only to exceptions allowed by the Secretary. Section 1;

- all for-profit and non-profit businesses with a facility in Wisconsin, except essential businesses and operations (as defined in the Order) cease all activities at facilities located within Wisconsin except as allowed by the Secretary. Section 2;

- all businesses allowed to remain open conform to the Secretary's directives on how to conduct their activities. Sections 2, 13, 14;

- there be no private gatherings except as allowed by the Secretary. Section 3;

- no one may travel except as allowed by the Secretary. Section 5;

- all people engaged in activities allowed by the Order must comply with DHS guidelines. Section 6;

- everyone must comply with social distancing requirements, including minimum spacing between individuals, how to wash one's hands, how to cough or sneeze, when to clean, and a ban on shaking hands. Sections 1, 2(b), 5, 8, 11(c), 13, 14, 15, 16.

---

[1] All subsequent references to the Wisconsin Statutes are to the 2017-18 version unless otherwise indicated.

1

And she asserts that violations of her Order are punishable as crimes.  Order, Section 18 ("This Order is enforceable by any local law enforcement official, including county sheriffs. Violation or obstruction of this Order is punishable by up to 30 days imprisonment, or up to $250 fine, or both.").

¶88  The Secretary says the Legislature delegated to her the authority to exercise this nearly total control over our lives via Wis. Stat. § 252.02.  As relevant here, that statute empowers the Department of Health Services to:

> "[C]lose schools and forbid public gatherings in schools, churches, and other places to control outbreaks and epidemics."  Wis. Stat. § 252.02(3);
>
> "[P]romulgate and enforce rules or issue orders for guarding against the introduction of any communicable disease into the state, for the control and suppression of communicable diseases . . . ."  Wis. Stat. § 252.02(4); and
>
> "[A]uthorize and implement all emergency measures necessary to control communicable diseases." Wis. Stat. § 252.02(6).

The court's opinion ably describes why these provisions do not confer on her the authority necessary to support the Order, and I join it.  My purpose in writing separately is to describe why, under our constitutional form of government, the Legislature cannot possibly have given the Secretary the authority she believes she has.

¶89 In the Secretary's view, the Legislature gave her plenary power to simply "act" without the need of any further statutory or regulatory policy.  Her brief candidly asserts there are no statutory or regulatory limitations on her authority to address communicable diseases:

2

> Wis. Stat. § 252.02 is not legislation "enforced or administered by" DHS through issuing Safer-at-Home [Order], and DHS's actions here did not "implement, interpret, or make more specific" standards that the Legislature designed by statute. Unlike statutes that regulate certain conduct or activities, like food safety or traffic laws, section 252.02, as relevant here, <u>simply empowers DHS to act</u>. Thus, Safer-at-Home is not "enforc[ing]" any legislative requirement . . . .

(Emphasis added.) That is to say, she expressly disavows any suggestion that she is implementing statutory standards. And she not only acknowledges, but affirmatively asserts, that she is not enforcing any statutory requirement. This statute, she says, simply empowers her to "act." When queried during oral arguments, her attorney said there are no limits on this power, saving only judicial or legislative intervention.

¶90 But our constitution does not confer on any governmental official, bureaucrat, or employee a generalized power to "act." There are three powers on loan to our government——legislative, executive, and judicial. To the extent governmental officials may act at all, it is only within the context of one of those powers. Therefore, we must discern what type of authority the Secretary exercised when she issued her Order. And then, assuming Wis. Stat. § 252.02 granted the Secretary all the power necessary to issue the Order, we must compare that grant against our basic constitutional structure and the non-delegation doctrine to determine whether the statute impermissibly delegated part of the Legislature's power to the Secretary. I'll begin with a brief rehearsal of the nature of legislative and executive powers.

### I. THE LEGISLATIVE AND EXECUTIVE POWERS

3

¶91 The executive's constitutionally-vested authority consists of executing the laws, not creating them: "The executive power shall be vested in a governor." Wis. Const. art. V, § 1. The difference between legislative and executive authority has been described as the difference between the power to prescribe and the power to put something into effect:

> In 1792, Jacques Necker, the famous French statesman, neatly summed up the function and significance of the executive power. Of the function: "[I]f by a fiction we were for a moment to personify the legislative and the executive powers, the latter in speaking of the former might . . . say: All that this man has talked of, I will perform." Of the significance: "The laws would in effect be nothing more than counsels, than so many maxims more or less sage, without this active and vigilant authority, which assures their empire and transmits to the administration the motion of which it stands in need."

Saikrishna Prakash, The Essential Meaning of Executive Power, 2003 U. Ill. L. Rev. 701, 819 (2003) (alteration in original; quoted source omitted). This commentator concluded that, "[i]n the late-eighteenth century, someone vested with the executive power and christened as the chief executive enjoyed the power to control the execution of law." Id.

¶92 On the other hand, we characterize legislative power as:

> "the authority to make laws, but not to enforce them." Schuette v. Van De Hey, 205 Wis. 2d 475, 480-81, 556 N.W.2d 127 (Ct. App. 1996). Powers constitutionally vested in the legislature include the powers: "'to declare whether or not there shall be a law; to determine the general purpose or policy to be achieved by the law; [and] to fix the limits within which the law shall operate.'" See, e.g., Schmidt v. Dep't of Res. Dev., 39 Wis. 2d 46, 59, 158 N.W.2d 306 (1968) (quoting State ex rel. Wis. Inspection Bureau v. Whitman, 196 Wis. 472, 505, 220 N.W. 929 (1928)).

4

<u>Koschkee v. Taylor</u>, 2019 WI 76, ¶11, 387 Wis. 2d 552, 929 N.W.2d 600 (alteration in original). It includes "the power to adopt generally applicable rules of conduct governing future actions by private persons——the power to 'prescrib[e] the rules by which the duties and rights of every citizen are to be regulated,' or the power to 'prescribe general rules for the government of society.'" <u>Gundy v. United States</u>, 139 S. Ct. 2116, 2133, <u>reh'g denied</u>, 140 S. Ct. 579 (2019) (Gorsuch, J., dissenting) (alteration in original) (quoting <u>Fletcher v. Peck</u>, 10 U.S. (6 Cranch) 87, 136 (1810)). These powers must be kept forever separate because, as Madison once observed, "[t]here can be no liberty where the legislative and executive powers are united in the same person, or body of magistrates." The Federalist No. 47, at 299 (James Madison) (Clinton Rossiter ed., 1961). As I discuss below, our duty to ensure the lines do not cross is mandatory and non-discretionary.

## II. THE SEPARATION OF POWERS AND THE NON-DELEGATION DOCTRINE

¶93 Our constitution opens with a frank statement of the proper relationship between the people of Wisconsin and their government. It declares that "[w]e, the people of Wisconsin . . . do establish this constitution." Wis. Const. pmbl. This is a declaration of ownership; it establishes that the power to create and maintain governments belongs to the people. Our constitution also recognizes that the authors merely loan their authority to the government, they do not cede it. The very first article and section of the Wisconsin Constitution states that "[a]ll people are born equally free and independent, and have

5

certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, <u>deriving their just powers from the consent of the governed</u>." Wis. Const. art. I, § 1 (emphasis added). The government's power must come to it as a loan because the freedom to consent necessarily encompasses the freedom to withdraw that consent.

¶94 That has serious implications for the work conducted by each of the governmental branches. It means, first and foremost, that we must respect the constitutional structure they chose to create. Those selected to wield the government's loaned authority have no right to question the handiwork of the constitution's progenitors, except to the extent expressly allowed. <u>See, e.g.</u>, Wis. Const. art. XII (providing for constitutional amendments and conventions). As relevant here, that means we must respect the fact that the constitution——the document adopted by the people of Wisconsin to direct and control the government they created—— divides authority amongst three distinct branches. <u>Goodland v. Zimmerman</u>, 243 Wis. 459, 466-67, 10 N.W.2d 180 (1943) ("[G]overnmental powers are divided among the three departments of government, the legislative, the executive, and judicial[.]").[2]

---

[2] "The executive power shall be vested in a governor." Wis. Const. art. V, § 1. "The legislative power shall be vested in a senate and assembly." Wis. Const. art. IV, § 1. "The judicial power of this state shall be vested in a unified court system . . . ." Wis. Const. art. VII, § 2.

6

A.  Separation of Powers

¶95 The "separation of powers" doctrine describes our understanding of how the constitution allocates each type of power to its respective branch.[3] This fundamental principle of American constitutional government was "established at the founding of our nation and enshrined in the structure of the United States Constitution," and "inform[s] our understanding of the separation of powers under the Wisconsin Constitution."  Gabler v. Crime Victims Rights Bd., 2017 WI 67, ¶11, 376 Wis. 2d 147, 897 N.W.2d 384; see also Flynn v. DOA, 216 Wis. 2d 521, 545, 576 N.W.2d 245 (1998) ("The doctrine of separation of powers is implicitly found in the tripartite division of government [among] the judicial, legislative and executive branches." (citation omitted)); Goodland, 243 Wis. at 466-67 ("It must always be remembered that one of the fundamental principles of the American constitutional system is that governmental powers are divided among the three departments of government, the legislative, the executive, and judicial, and that each of these departments is separate and independent from the others except as otherwise provided by the constitution."); Rules of Court Case, 204 Wis. 501, 503, 236 N.W. 717 (1931) ("It is, of course, elementary that we are committed by constitution to the doctrine of separation of powers.").

¶96 We must be assiduous in patrolling the borders between the branches.  This is not just a practical matter of efficient

---

[3] I addressed this topic at some length in Tetra Tech EC, Inc. v. DOR, 2018 WI 75, ¶¶44-46, 382 Wis. 2d 496, 914 N.W.2d 21, and repeat it here for ease of access.

and effective government. We maintain this separation because it provides structural protection against depredations on our liberties. The Framers of the United States Constitution understood that "[t]he accumulation of all powers legislative, executive and judiciary in the same hands, whether of one, a few or many, . . . may justly be pronounced the very definition of tyranny." The Federalist No. 47, at 298. Consequently, "[a]s Madison explained when advocating for the Constitution's adoption, neither the legislature nor the executive nor the judiciary 'ought to possess, directly or indirectly, an overruling influence over the others in the administration of their respective powers.'" Gabler, 376 Wis. 2d 147, ¶4 (quoting The Federalist No. 48, at 305). "The purpose of the separation and equilibration of powers in general," said Justice Antonin Scalia, "was not merely to assure effective government but to preserve individual freedom."[4] Morrison v. Olson, 487 U.S. 654, 727 (1988) (Scalia, J., dissenting). To this day, "[a]fter more than two hundred years of constitutional governance, th[is] tripartite separation of independent governmental power remains the bedrock of the structure by which we secure liberty in both Wisconsin and the United States." Gabler, 376 Wis. 2d 147, ¶3. As Justice Joseph Story said, "the three great powers of government . . . should for

---

[4] See also Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635 (1952) (Jackson, J., concurring) (stating that "the Constitution diffuses power the better to secure liberty"). Centuries earlier, the French writer Montesquieu said "there is no liberty, if the judiciary power be not separated from the legislative and executive." Charles-Louis de Secondat Montesquieu, The Spirit of Laws bk. XI, at 152 (Thomas Nugent trans., The Colonial Press rev. ed. 1900) (1748).

ever be kept separate and distinct." Id. (quoting 2 Joseph Story, Commentaries on the Constitution of the United States § 519, at 2-3 (Boston: Hilliard, Gray, & Co., 1833)).

¶97 The constitution does not, however, hermetically seal the branches from each other. The separation of powers doctrine "envisions a system of separate branches sharing many powers while jealously guarding certain others, a system of 'separateness but interdependence, autonomy but reciprocity.'" State ex rel. Friedrich v. Circuit Court for Dane Cty., 192 Wis. 2d 1, 14, 531 N.W.2d 32 (1995) (quoting Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635 (1952) (Jackson, J., concurring)). "The constitutional powers of each branch of government fall into two categories: exclusive powers and shared powers." State v. Horn, 226 Wis. 2d 637, 643, 594 N.W.2d 772 (1999). "Shared powers lie at the intersections of these exclusive core constitutional powers," and "[t]hese '[g]reat borderlands of power' are not exclusive to any one branch." Id. at 643-44 (quoting Friedrich, 192 Wis. 2d at 14); see also State v. Holmes, 106 Wis. 2d 31, 42-43, 315 N.W.2d 703 (1982). Although the "branches may exercise [shared] power within these borderlands," they "may [not] unduly burden or substantially interfere with another branch." Horn, 226 Wis. 2d at 644.

¶98 Core powers, however, are not for sharing. "Each branch has exclusive core constitutional powers, into which the other branches may not intrude." Flynn, 216 Wis. 2d at 545. These "[c]ore zones of authority are to be 'jealously guarded' by each branch of government . . . ." Gabler, 376 Wis. 2d 147, ¶31

9

(quoting <u>Barland v. Eau Claire Cty.</u>, 216 Wis. 2d 560, 573, 575 N.W.2d 691 (1998)). The importance of constitutional limitations, Chief Justice Marshall once said, is that they compel restraint when restraint is not desired: "To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained?" <u>Marbury v. Madison</u>, 5 U.S. (1 Cranch) 137, 176 (1803).[5]

¶99 The separation of powers forbids abdication of core power just as much as it protects one branch from encroachment by another. "It is . . . fundamental and undeniable that no one of the three branches of government can effectively delegate any of the powers which peculiarly and intrinsically belong to that branch." <u>Rules of Court Case</u>, 204 Wis. at 503; <u>see also</u> <u>id.</u> (stating that "any attempt to abdicate [a core power] in any particular field, though valid in form, must, necessarily, be held void'" (quoting <u>State ex rel. Mueller v. Thompson</u>, 149 Wis. 488, 491, 137 N.W. 20 (1912))). Even if one branch truly wished to abandon some aspect of its core power, no other branch may take it up and use it as its own. "As to these areas of authority, . . . <u>any</u> exercise of authority by another branch of government is unconstitutional.'" <u>Gabler</u>, 376 Wis. 2d 147, ¶31 (quoting <u>State ex rel. Fiedler v. Wis. Senate</u>, 155 Wis. 2d 94,

---

[5] Chief Justice Marshall could be reaching through the intervening centuries to ask that exact question of Justice Hagedorn, who deploys a bevy of decision-avoidance doctrines so that he can affirm the Secretary's Order without determining whether it, or the statute upon which she relies, has exceeded constitutional boundaries. Justice Hagedorn's dissent, ¶¶245-258.

100, 454 N.W.2d 770 (1990)); see also Town of Holland v. Vill. of Cedar Grove, 230 Wis. 177, 190, 282 N.W. 111 (1938) ("This court has repeatedly held that the judicial power vested by the constitution in the courts cannot be exercised by administrative or executive agencies.").

¶100 The borders between the branches require constant surveillance. It is not enough that we carefully drew them when our state was new. We need to keep a weather eye on the divide to ensure they maintain their separation:

> This devotion to the separation of powers is, in part, what supports our enduring conviction that the Vesting Clauses are exclusive and that the branch in which a power is vested may not give it up or otherwise reallocate it. The Framers were concerned not just with the starting allocation, but with the "gradual concentration of the several powers in the same department." It was this fear that prompted the Framers to build checks and balances into our constitutional structure, so that the branches could defend their powers on an ongoing basis.

Dep't of Transp. v. Ass'n of Am. Railroads, 575 U.S. 43, 74 (2015) (Thomas, J., concurring) (quoted source and citations omitted).

### B. The Non-Delegation Doctrine

¶101 The border between the legislature and the executive is maintained, or at least it once was, under the aegis of the non-delegation doctrine. There are some who say this is a dead letter. See, e.g., Jason Iuliano & Keith E. Whittington, The Nondelegation Doctrine: Alive and Well, 93 Notre Dame L. Rev. 619 (2017) ("The nondelegation doctrine is dead. It is difficult to think of a more frequently repeated or widely accepted legal conclusion."). If that describes the doctrine's vitality in Wisconsin, it is not because we never recognized it or outright rejected it, but because

11

we allowed it to fall into desuetude.[6] To the extent that has happened, we have been derelict in our duties.

¶102 The non-delegation doctrine rests on the premise that "[i]t is . . . fundamental and undeniable that no one of the three branches of government can effectively delegate any of the powers which peculiarly and intrinsically belong to that branch." Rules of Court Case, 204 Wis. at 503. The operative principle here is not that the branches should not delegate their core authority, it is that they cannot.

¶103 This principle is a matter of power, not of prudence: the constitution's progenitors did not grant the various branches permission to shuffle their distinct powers amongst themselves. Justice Neil Gorsuch, commenting on this principle in the federal context, consulted John Locke ("one of the thinkers who most influenced the framers' understanding of the separation of powers") for its animating rationale:

> The legislative cannot transfer the power of making laws to any other hands; for it being but a delegated power from the people, they who have it cannot pass it over to others. The people alone can appoint the form of the commonwealth, which is by constituting the legislative, and appointing in whose hands that shall be. And when the people have said we will submit to rules, and be governed by laws made by such men, and in such forms, nobody else can say other men shall make laws for them; nor can the people be bound by any laws but such as are enacted by those whom they have chosen and authorised to make laws for them.

---

[6] We described this creeping enervation in Gilbert v. State, Med. Examining Bd., 119 Wis. 2d 168, 185, 349 N.W.2d 68 (1984): "Since 1928, however, the doctrine of the delegation of legislative power has shifted the focus away from the nature of the power delegated through scrutiny of the delegating standard's language and more toward the safeguards surrounding the delegated power."

12

Gundy, 139 S. Ct. at 2133-34 (Gorsuch, J., dissenting) (quoting John Locke, The Second Treatise of Civil Government and a Letter Concerning Toleration § 41, p. 71 (1947)).  It is for that reason the legislature cannot alienate even a sliver of its core power, even if it consciously intends that end.  Not because it would be unwise, or imprudent, but because those who created the legislature gave it no power to do so.  Therefore, prohibiting the legislature from transferring its authority to the executive "isn't about protecting institutional prerogatives or governmental turf." Gundy, 139 S. Ct. at 2135 (Gorsuch, J., dissenting).  Instead, "[i]t's about respecting the people's sovereign choice to vest the legislative power in [the legislature] alone.  And it's about safeguarding a structure designed to protect their liberties, minority rights, fair notice, and the rule of law."  Id.  In the constellation of constitutional doctrines, this serves as one of the central organizing principles.  Without it, our constitution would be an incomprehensible jumble:  "If [the Legislature] could pass off its legislative power to the executive branch, the '[v]esting [c]lauses, and indeed the entire structure of the Constitution,' would 'make no sense.'"  Id. at 2134-35 (quoted source omitted).

¶104 But just because the legislature cannot pass off its powers to the executive doesn't mean it won't sometimes try.  Even though the authors of our constitution designed it to maintain equilibrium amongst the branches through its internal system of checks and balances, and by arraying ambition against ambition, it has always been apparent that aberrations might arise.  "The

13

framers knew . . . that the job of keeping the legislative power confined to the legislative branch couldn't be trusted to self-policing by Congress; often enough, legislators will face rational incentives to pass problems to the executive branch." Id. at 2135. And when an alleged aberration comes before us, we do not have the luxury of shrugging off the duty to discern whether a border incursion has occurred.

> [T]he Constitution does not permit judges to look the other way; we must call foul when the constitutional lines are crossed. Indeed, the framers afforded us independence from the political branches in large part to encourage exactly this kind of "fortitude . . . to do [our] duty as faithful guardians of the Constitution."

Id. (quoting The Federalist No. 78, at 468-469).

¶105 Adjudicating these constitutional border disputes is not easy. Even when our country was young, government was less pervasive, and there were far, far fewer statutes, Madison acknowledged that "no skill in the science of government has yet been able to discriminate and define, with sufficient certainty, its three great provinces—the legislative, executive, and judiciary." The Federalist No. 37, at 224. But as Justice Gorsuch observed, there are three principles by which to guide our inquiry.

¶106 The first is that "as long as Congress makes the policy decisions when regulating private conduct, it may authorize another branch to 'fill up the details.'" Gundy, 139 S. Ct. at 2136 (Gorsuch, J., dissenting) (quoted source omitted). But the filling up must truly comprise details. "The framers understood . . . that it would frustrate 'the system of government ordained by the Constitution' if [the legislature] could merely

14

announce vague aspirations and then assign others the responsibility of adopting legislation to realize its goals." Id. at 2133. So legislation must "set forth standards 'sufficiently definite and precise to enable Congress, the courts, and the public to ascertain' whether Congress's guidance has been followed." Id. at 2136 (quoted source omitted). Second, "once [the legislature] prescribes the rule governing private conduct, it may make the application of that rule depend on executive fact-finding." Id. And third, the legislature "may assign the executive and judicial branches certain non-legislative responsibilities." Id. at 2137. That is to say, a statute may require the executive to apply authority already resident in the executive branch to the matter addressed by the statute.

¶107 Although there is a great deal more that can be said——and probably should be——about the non-delegation doctrine, we are resolving this case on an extraordinarily expedited basis (barely more than a week between arguments and release of our opinion). But this is sufficient for the day, and will adequately answer the Secretary's claim that the Legislature could give her enough power to justify the Order.

### III. THE ORDER

¶108 Secretary Palm is the head of the Department of Health Services, an executive branch agency. Koschkee, 387 Wis. 2d 552, ¶14 ("Agencies are considered part of the executive branch."). As a member of the executive branch, she has no inherent legislative authority, and "no inherent constitutional authority to make rules . . . ." Martinez v. DILHR, 165 Wis. 2d 687, 698, 478

15

N.W.2d 582 (1992). <u>See also</u> Wis. Stat. § 227.11(2) ("Rule-making authority is expressly conferred on an agency"). She says the Order is a purely and "quintessentially" executive action authorized by Wis. Stat. § 252.02, and so she need not promulgate any new rules or refer to any other statute before issuing the Order. So our task is to determine whether the Order incorporates, either explicitly or implicitly, policy decisions not already encompassed by current statutes or rules.[7] If it does, and § 252.02 allows her to make those policy decisions, then the statute violates the non-delegation doctrine. As Justice Scalia once said,

> [f]requently an issue of this sort will come before the Court clad, so to speak, in sheep's clothing:  the potential of the asserted principle to effect important change in the equilibrium of power is not immediately evident, and must be discerned by a careful and perceptive analysis.  But this wolf comes as a wolf."

<u>Morrison</u>, 487 U.S. at 699 (Scalia, J., dissenting).

¶109 Under any rational reading, the Order contains or assumes policy decisions that are staggering both in their reach and in their effect on what we once thought of as inherent rights——rights that, according to our constitution, the government exists to secure.  <u>See</u> Wis. Const. art. I, § 1.  The Secretary insists the Order does not adopt any policies because, by its nature, it is time-delimited and directed at a certain set of temporary facts that (we all hope) won't recur.  She says "the power to set public policy," on the other hand, is accomplished by "establishing

---

[7] I express no opinion on whether the Department could have supplied the standards on which the Order is based through the rule-making process.  I have no need to do so because the Secretary insists her actions be judged without regard to any rule-making authority she might have.

16

prospective, generally applicable requirements to govern future conduct." The Order, she claims, hasn't done that.

¶110 Although the Secretary's argument seems to accept the conceptual distinction between executive and legislative power, it does not adequately address the totality of what the Order accomplishes. The Order, it is true, contains an executive component. But much more significantly for our analysis today, it also announces some shockingly profound public policy decisions, or assumes they have previously been made. For example, the Order could not function without a public policy decision that the Secretary of the Department of Health Services has the authority to confine people to their homes. That's a policy decision with respect to both the grant of authority itself, as well as the choice of person in which to vest it. So is the public policy decision that the Secretary has the power to close private businesses, or forbid private gatherings, or ban intra-state travel, or dictate personal behavior. The Order also depends on a public policy decision that the Secretary has the authority, all by herself, to criminalize whatever conduct she believes is anathema to controlling communicable diseases.

¶111 The heart of the Secretary's error is her failure to recognize that her Order contains both executive and legislative components. Executive action does not exist in a vacuum. It must execute on a policy——a policy chosen by the legislature or promulgated as a rule. When such a policy decision has not been promulgated by the agency or adopted by the legislature, and the executive acts anyway, it is by that very action either announcing

17

adoption of the policy or erroneously assuming its existence. Consequently, when the Order confines people to their homes to manage the spread of COVID-19, it does far more than engage the executive power. It also simultaneously asserts there has been a public policy decision to vest this type of power in the Secretary. Her exercise of that authority in this situation is executive in nature, but the genesis of the authority itself is not——it is legislative. The same is true with respect to the Order's implicit assertion that there has been a public policy decision to vest in the Secretary the power to close private businesses, or forbid private gatherings, or ban intra-state travel, or dictate personal behavior.

¶112 But no such public policy decisions have been taken. There are no statutes or rules that confer on the Secretary these sweeping powers. The Secretary not only knows this, she affirmatively asserts that Wis. Stat. § 252.02 gave her all the power needed to confer this type of authority on herself: "Under the statute's plain language," the Secretary says, "DHS may give legal force to suitable actions that it then carries out. The law requires no intermediary that DHS must go through . . . ." If § 252.02 enables the Department to confer on itself the power to confine people to their homes, close businesses, etc., then it has quite obviously transferred no small amount of the legislature's core authority to the executive branch, thereby enabling the Secretary to make up public policy decisions as she goes along. Without that understanding of the Secretary's authority, the Order could not function. Justice Hagedorn mirrors this error, and even

18

uses it as the organizing principle for his dissent. The whole of his statutory analysis is faulty because he has not discerned that the Order implicitly created, or assumed to exist, a host of public policy decisions.[8] Under Justice Hagedorn's rationale, an executive branch agency is free to make ad hoc policy decisions, so long as they are temporary and acted upon immediately. Nothing in our legal canon supports such an odd proposition.

¶113 The Secretary's incursion on legislative authority is readily apparent when we compare Wis. Stat. § 252.02 and the Order to the three principles that give life to the non-delegation doctrine. As described above, the first inquires into whether the legislature decided on the conduct-regulating policy and left the executive branch to only "fill up the details." The power to confine law-abiding individuals to their homes, commandeer their businesses, forbid private gatherings, ban their intra-state travel, and dictate their personal behavior cannot, in any imaginable universe, be considered a "detail." This comprehensive claim to control virtually every aspect of a person's life is something we normally associate with a prison, not a free society governed by the rule of law.

¶114 Further, if Wis. Stat. § 252.02 actually allows this, as the Secretary says, the Framers would recognize the statute as a frustration of our system of government because it allows the

---

[8] Justice Hagedorn's statutory analysis might be perfectly serviceable if we were considering an executive order implementing previously established public policy decisions. But that is not this case. So, as a functional matter, his analysis is operating on a hypothetical set of facts.

19

legislature to "merely announce vague aspirations and then assign others the responsibility of adopting legislation to realize its goals." See Gundy, 139 S. Ct. at 2136 (Gorsuch, J., dissenting). To avoid offending the separation of powers, § 252.02 would have to "set forth standards 'sufficiently definite and precise to enable [the Legislature], the courts, and the public to ascertain' whether [the Legislature's] guidance has been followed." Id. The Secretary eschews the need for any guidance. Her power, she says, is simply to "act" with all dispatch. If § 252.02 allows this, there is literally no means by which we could ascertain whether the Secretary is following any legislatively determined policy at all. The Secretary's view of the statute is, essentially, that the Legislature charged her with the vague aspiration of controlling communicable diseases, and then left to her the responsibility of making the public policy decisions that she would then execute.

¶115 If her authority is that boundless, there is no method by which we can determine what power she might assert next. The Secretary understands the scope of her power under Wis. Stat. § 252.02 to be so complete, so comprehensive, that she can do literally anything she believes is necessary to combat COVID-19. Can she also dictate what we do in our own homes? Can she tell us how many hours we can spend outdoors in our own yards? Can she forbid us from buying certain products? Compel us to buy others? Nothing in § 252.02 is "sufficiently definite and precise to enable [the Legislature], the courts, and the public to ascertain whether [the Legislature's] guidance has been followed" with respect to

20

the types of power the Secretary may employ. Indeed, nothing in § 252.02——the sole and sufficient source of power for everything the Secretary is doing——gives us any benchmark or even the vaguest of clues about what other types of power she might one day assert.

¶116 The Order fares no better under the second principle of non-delegation: "[O]nce [the Legislature] prescribes the rule governing private conduct, it may make the application of that rule depend on executive fact-finding." Id. Under this rationale, it could conceivably be appropriate for the Legislature to confer on the Secretary the power to confine people to their homes if she finds that such an action is necessary to control the spread of a communicable disease. But no statute or rule confers on her that authority, so the Order cannot be justified as the exercise of executive authority under this principle.

¶117 Nor is the Order salvageable under the third non-delegation principle, which provides that the legislature "may assign the executive and judicial branches certain non-legislative responsibilities." Id. at 2137. The Secretary, however, insists that Wis. Stat. § 252.02 "simply empowers DHS to act," and that the Order "embodies the quintessential executive task of deciding how to address, for the time being, the exigency caused by COVID-19," and that her authority to address that exigency is limited only by judicial or legislative intervention. If accepted, this would work an intolerable inversion in the nature of executive authority, allowing it to swallow almost all of the Legislature's power. Here's why.

21

¶118 If Wis. Stat. § 252.02 makes the Order's contents entirely executive, a few strategically written statutes would make the legislature a virtual non-entity. What if the legislature instructed the Department of Justice to "issue orders . . . for the control and suppression of [crime]"? Or it enacted a statute that "simply empower[ed] [the Department of Financial Institutions] to act" with respect to the subjects within its purview? Or it charged some agency or other with "the quintessential executive task of deciding how to address, for the time being, the exigency caused by" economic vicissitudes? If the executive's authority under each of these hypothetical delegations was as staggeringly broad as the Secretary claims for herself under § 252.02, the whole of our lives could be governed exclusively from within the executive branch.

¶119 But none of those hypotheticals would be consistent with the separation of powers for the same reason the Order is not. An agency cannot confer on itself the power to dictate the lives of law-abiding individuals as comprehensively as the Order does without reaching beyond the executive branch's authority.[9]

---

[9] Justice Hagedorn suggests my attention to constitutional boundaries is merely an effort to "try to get around" his observation that "[w]e do not enjoin particular enforcement actions under a facially constitutional statute simply because the statute could be deployed in ways that violate the constitution." Justice Hagedorn's dissent, ¶¶249, 248. I have no need to "get around" this observation because in this court we don't let the tail wag the dog. Justice Hagedorn is concerned about remedies when what we are concerned about is enforcing a structural limitation on the branches' powers. It would be irresponsible of us not to consider constitutional limitations when we declare what the law is.

IV. CONCLUSION

¶120 The Order may be a brilliantly conceived and executed response to COVID-19. Or maybe it's not. Either way, that is not the question before the court. Brilliance does not confer authority. Nor does necessity. Our only task in this case was to determine whether Secretary Palm has the authority to issue the Order. We had an unavoidable, non-discretionary, obligatory responsibility to decide that question. And so we have.[10] Because I agree with that declaration, I join the court's opinion. I wrote separately because it is important to establish that, if we agreed with the Secretary's reading of Wis. Stat. § 252.02, we would have to conclude the statute violated the separation of powers by

---

[10] Justice Ann Walsh Bradley is concerned that, without a stay on our decision, "chaos and confusion" may ensue. Although it is true that the legislature requested a temporary injunction pending our decision, subject to a stay for a period of time, it did not ask us to stay our decision. And even if it had, I'm not entirely sure what a stay would mean in this context. The petition requested a declaration of rights. Our opinion declares those rights . . . today. What would it mean to stay that declaration? Would everyone have to act like they hadn't read our decision until the end of the stay? Would there be an embargo on reporting on our decision until that date? I don't think staying a declaration of rights that we have just declared would mean anything at all because it couldn't un-say what we just said.

conferring on the Secretary the power to make laws without going through the rule-making process.[11]

¶121 I am authorized to state that Justice REBECCA GRASSL BRADLEY joins this concurrence.

---

[11] Justice Hagedorn suggests that somehow it is ironic that we should pay attention to the constitutionally-mandated demarcation between the legislative and executive branches. Justice Hagedorn's dissent, ¶252. Apparently, in his view, there is to be no policing of this boundary unless we are prepared to dismantle the entire administrative state. He condescends that "[i]f we are going to have a serious discussion about the separation of powers and its relationship to the administrative state, I welcome that conversation," insinuating that our reasoning is a species of "it's good for me but not for thee" rationalizing. Id. Justice Hagedorn doesn't provide any justification for this insult, and there appears to be none. As for the "serious discussion about the separation of powers" . . . the invitation to that conversation was included in our oath of office, wherein we swore to uphold the Wisconsin Constitution. He's free to join in anytime he wishes.

¶122 ANN WALSH BRADLEY, J. *(dissenting).* Our responsibility as a court is to write clear decisions that provide guidance to the litigants, courts and the public at large. I write separately to address the issue of a stay and the confusion arising from the majority and concurring opinions of Chief Justice Roggensack on the issue.

¶123 The majority opinion, authored by Chief Justice Roggensack, does not grant a stay. Thus, the declaration of rights takes immediate effect, leaving no time for a transitional safety net that a stay could provide. Majority op., ¶¶56-57. That opinion garnered four votes (Chief Justice Roggensack and Justices Ziegler, Rebecca Grassl Bradley, and Kelly). However, concurring to her own authored majority opinion, Chief Justice Roggensack writes that she "would stay future actions to enforce our decision until May 20, 2020." Chief Justice Roggensack's concurrence, ¶65. These positions taken in the majority opinion and the concurrence are fundamentally contradictory. If you are confused, you are not alone.

¶124 Chief Justice Roggensack needs to clarify in an opinion whether she is or is not voting for a stay of the majority's decision. If her concurrence is to be interpreted as merely a lament that she would stay it, then such a lament rings hollow. She can stay the immediate effect of the majority opinion.

¶125 In a court of seven, it takes four votes to form a controlling majority on an issue. Chief Justice Roggensack provides the fourth vote to form a majority denying a stay. Without her vote there would be only three votes and the

1

declaration of rights would not have immediate effect. However, assuming Chief Justice Roggensack is actually voting for a stay, as her concurrence seemingly indicates, there appear to be four votes for issuing a stay (Chief Justice Roggensack and Justices Ann Walsh Bradley, Dallet, and Hagedorn).[1] See Justice Dallet's Dissent, ¶161; Justice Hagedorn's dissent, ¶263 n.25. So, is there a stay or isn't there? It can't be both ways.

¶126 If the clarified vote is one for no stay, then the concurrence cannot stand. It is illogical to vote to deny a stay, while at the same time lamenting that because of the way you voted, there is no stay.

¶127 If there is no stay, I repeat to the petitioner, the Wisconsin Legislature, the old adage: "be careful what you wish for." You have come to this court asking that Emergency Order 28 be deemed unlawful and unenforceable. Your wish is granted by today's majority.[2]

¶128 But, it appears you did not intend that your wish would go into effect immediately. You requested initially in briefing

---

[1] This apparent existence of a majority to issue a stay is unaffected by this court's statement in State v. Griep regarding "pooling" the votes of separate writings to create a majority proposition. See State v. Griep, 2015 WI 40, ¶37 n.16, 361 Wis. 2d 657, 863 N.W.2d 567. In Griep, the court set forth that under Marks v. United States, 430 U.S. 188, 193 (1977), "the positions of the justices who dissented from the judgment are not counted in examining the divided opinions for holdings." In the present case, we are not "examining the divided opinions for holdings" on the presented issues, but instead we are deciding whether an equitable remedy should be granted.

[2] The majority strikes down Emergency Order 28 in its entirety with the exception of section 4(a). Majority op., ¶3 n.6.

2

that if you prevail, there should be a six-day stay before the decision would go into effect. Later, at oral argument, presumably mindful that any rulemaking would take longer than six days, your counsel advanced that approximately 12 days would be necessary for a rule replacing Emergency Order 28 to go into effect. Aware of the delicate balance necessary to save both livelihoods and lives, counsel likely was concerned with the chaos and confusion that would be occasioned by any decision in your favor with no stay.

¶129 But if there is no stay, your request has fallen on deaf ears. And there appears nothing in place to fill the void rendered by such a majority decision. The lack of a stay would be particularly breathtaking given the testimony yesterday before Congress by one of our nation's top infectious disease experts, Dr. Anthony Fauci. He warned against lifting too quickly stay-at-home orders such as embodied in Emergency Order 28. He cautioned that if the country reopens too soon, it will result in "some suffering and death that could be avoided [and] could even set you back on the road to trying to get economic recovery."[3]

¶130 Given the admonition of Dr. Fauci, I fail to see the wisdom or the equity in invalidating Emergency Order 28 and, at

---

[3] Sheryl Gay Stolberg, "At Senate Hearing, Government Experts Paint Bleak Picture of the Pandemic," New York Times (May 12, 2020), https://www.nytimes.com/2020/05/12/us/politics/fauci-cdc-coronavirus-senate-testimony.html.

least for the time being, leaving nothing in its stead.[4]
Accordingly, I dissent.

¶131 I am authorized to state that Justice REBECCA FRANK DALLET joins this dissent.

---

[4] Declaratory judgments are treated functionally as injunctions when applied to governmental parties who are bound by the force and meaning of judgments. Chief Justice Roggensack's Concurrence, ¶64. The issuance of a permanent injunction demands that equity favors issuing the injunction. Pure Milk Prods. Co-op v. Nat'l Farmers Org., 90 Wis. 2d 781, 800, 280 N.W.2d 691 (1979).

I also observe that, when balancing the equities to determine whether injunctive relief is appropriate, courts around the country have given the utmost weight to the protection of health and human life. See McLaughlin by McLaughlin v. Williams, 801 F. Supp. 633, 644 (S.D. Fla. 1992); see also Todd by Todd v. Sorrell, 841 F.2d 87, 88 (4th Cir. 1988); Rockhill Care Center, Inc. v. Harris, 502 F. Supp. 1227, 1231 (W.D. Mo. 1980).

¶132 REBECCA FRANK DALLET, J. *(dissenting)*. Today, a majority of this court does the Legislature's bidding by striking the entirety of Emergency Order 28, "Safer at Home Order," yet confusingly, in a footnote, upholding Section 4. a. The majority reaches its conclusion by torturing the plain language of Wis. Stat. § 252.02 (2017-18)[1] and completely disregarding the long-standing, broad statutory powers the Legislature itself granted to the Department of Health Services (DHS) to control COVID-19, a novel contagion.[2] This decision will undoubtedly go down as one of the most blatant examples of judicial activism in this court's history. And it will be Wisconsinites who pay the price.

¶133 A majority of this court falls hook, line, and sinker for the Legislature's tactic to rewrite a duly enacted statute through litigation rather than legislation. But legislating a new policy from the bench exceeds the constitutional role of this court. While a majority of this court is clearly uncomfortable with the broad grants of authority the Legislature gave to DHS

---

[1] All subsequent references to the Wisconsin Statutes are to the 2017-18 version unless otherwise indicated.

[2] In the United States alone COVID-19 has sickened more than 1.34 million people and approximately 80,820 people have died. https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html. Here in Wisconsin, as of this writing, there are 10,902 confirmed cases and 421 COVID-19 related deaths, with cases confirmed in almost every county. https://www.dhs.wisconsin.gov/covid-19/data.htm.

through Wis. Stat. § 252.02 and throughout Wisconsin history,[3] the court's role is only to examine and apply the plain statutory language. "It is the duty of the courts to enforce the law as written." Baierl v. Riesenecker, 201 Wis. 454, 458, 227 N.W. 9 (1929), rev'd on reh'g on other grounds, 201 Wis. 454, 230 N.W. 605 (1930).

¶134 Rather than examine the plain language of Wis. Stat. § 252.02, the majority engages in analytical gymnastics to arrive at a desired conclusion. One need only examine the clear and plain statutory language to uncover what the majority attempts to obscure. Because the Legislature has bestowed on the DHS Secretary through § 252.02 the explicit authority to issue orders such as Emergency Order 28 without first going through the rulemaking process, the majority's exercise ultimately fails. I dissent.

I. EMERGENCY ORDER 28 DID NOT REQUIRE RULEMAKING

¶135 It is first important to understand Wisconsin's long-standing history of giving a broad grant of power to its public health authority, a history the majority purposefully overlooks. The Wisconsin Legislature was among the first state legislatures to address public health emergencies when it created the State

---

[3] See, e.g., majority op., ¶31: "Palm points to statutes that she asserts give her broad authority to impose regulation; but it does not follow she can impose regulation without going through a process to give the people faith in the justness of the regulation"; "However, under Palm's theory, she can 'implement all emergency measures necessary to control communicable diseases,' Wis. Stat. § 252.02(6), even at the expense of fundamental liberties . . . ."

Board of Health in March 1876.[4]  See ch. 366, Laws of 1876.  This was a panel of seven physicians who were responsible for "general supervision of the interests of the health and life of the citizens of the state."  § 2, ch. 366, Laws of 1876.[5]  The Legislature granted the board unusually broad powers, allowing it to impose statewide quarantines unilaterally in times of public health emergencies, as well as making "rules and regulations . . . necessary for the preservation or improvement of public health . . . ."  § 10, ch. 366, Laws of 1876.

¶136 In 1904 this court recognized that the Legislature may "rightfully grant to boards of health authority to employ all necessary means to protect the public health" given the need to "act immediately and summarily in cases of . . . contagious and malignant diseases, which are liable to spread and become epidemic, causing destruction of human life."  Lowe v. Conroy, 120 Wis. 151, 155, 97 N.W. 942 (1904) (citing Bittenhaus v. Johnston, 92 Wis. 588, 66 N.W. 805 (1896); City of Salem v. E. Ry. Co., 98 Mass. 431 (1868); Lawton v. Steele, 152 U.S. 133 (1894)).  Similarly, the United States Supreme Court has recognized that it was

---

[4] The impetus for the creation of the State Board of Health was "[t]he high death rate from various communicable diseases and subsequent efforts of medical societies."  See State of Wisconsin Blue Book 465 (1983-84).

Notably, public health legislation in Wisconsin dates back to the territorial days.  Id.

[5] Wisconsin became the tenth state in the nation with such a board.  See Steven B. Burg, Wisconsin and the Great Spanish Flu Epidemic of 1918, Wisconsin Magazine of History 37, 44 (Autumn 2000).

"surely . . . appropriate," and "not an unusual, nor an unreasonable or arbitrary, requirement," to vest a board of health with the authority to respond to "an epidemic of disease" because it is composed of persons in the affected locality who presumably had "fitness to determine such questions." Jacobson v. Commonwealth of Mass., 197 U.S. 11, 27 (1905).

¶137 The State Board of Health exercised its broad emergency powers during the Spanish Flu pandemic of 1918. In October 1918, State Health Officer Dr. Cornelius Harper, in consultation with the governor, issued an order closing all public institutions in Wisconsin, including "schools, theaters, moving picture houses, other places of amusement and public gathering for an indefinite period of time." Burg, supra n.5, at 45. "[N]owhere except in Wisconsin was such an order issued statewide or in such a comprehensive fashion," as practically every local government in Wisconsin cooperated with the order immediately. Id. For almost three months, isolation rather than socialization was the norm for citizens of Wisconsin. Id. at 52. Compliance undoubtedly spelled the difference between life and death for hundreds, if not thousands, of Wisconsin citizens. Id. at 53.

¶138 The broad executive power to take swift measures in response to an outbreak of communicable disease has existed uninterrupted since 1876. The language of ch. 252 expressly

4

confers on DHS, the modern successor to the State Board of Health,[6] broad pandemic-response powers. Section 252.02, "Powers and duties of department," sets forth the powers and duties of DHS, the limits of which are not at issue in this case.

¶139 With this background, I turn to DHS's issuance of Emergency Order 28. DHS asserts that the plain text of Wis. Stat. §§ 252.02(3), (4), and (6) authorizes it to issue Emergency Order 28 without first engaging in rulemaking. To determine the extent of the powers the Legislature has granted DHS to use during a pandemic, I start with the plain language of the statute. State ex rel. Kalal v. Circuit Court for Dane Cty., 2004 WI 58, ¶46, 271 Wis. 2d 633, 681 N.W.2d 110.

¶140 Wisconsin Stat. § 252.02(4) reads:

> The department may promulgate and enforce rules or issue orders for guarding against the introduction of any communicable disease into the state, for the control and suppression of communicable diseases, for the quarantine and disinfection of persons, localities and things infected or suspected of being infected by a communicable disease and for the sanitary care of jails, state prisons, mental health institutions, schools, and public buildings and connected premises. Any rule or order may be made applicable to the whole or any specified part of the state, or to any vessel or other conveyance. . . .

---

[6] The State Board of Health was abolished in 1939 and its functions were subsequently transferred throughout the executive branch. See State of Wisconsin Blue Book 141 (1940-41). Chapter 250 of the Wisconsin Statutes designates DHS as "the state lead agency for public health," with "all powers necessary to fulfill the duties prescribed in the statutes." Wis. Stat. §§ 250.03(1)(b); 250.04(2)(a). In Chapter 252 of the Wisconsin Statutes, DHS is charged with controlling communicable disease within Wisconsin.

5

(Emphasis added). Section 252.02(4) plainly grants DHS the power to address COVID-19 through rulemaking or by issuing orders. The use of the word "or" distinguishes "orders" from "rules." See Loughrin v. United States, 573 U.S. 351, 357 (2014) (noting the use of "or" in a statute is "disjunctive, that is, the words it connects are to be given separate meanings"). Whichever alternative DHS chooses, order or rule, it can be made "applicable to the whole" of Wisconsin. The Legislature chose these words and is presumed to say what it means and mean what it says. See Johnson v. City of Edgerton, 207 Wis. 2d 343, 351, 558 N.W.2d 653 (Ct. App. 1996) ("When the Legislature uses different terms in a statute——particularly in the same section——we presume it intended the terms to have distinct meanings.").

¶141 The statutory history of Wis. Stat. § 252.02(4), part of a plain meaning analysis, confirms the authority of DHS to issue orders applicable to the whole of Wisconsin separate and apart from rules. See United States v. Franklin, 2019 WI 64, ¶13, 387 Wis. 2d 259, 928 N.W.2d 545 (quoted source omitted) ("Evaluation of the context of a statute is part of a plain-meaning analysis and includes a review of . . . 'previously enacted and repealed provisions of a statute.'"). Originally, the predecessor to § 252.02(4) did not allow for the issuance of orders; DHS could only "adopt and enforce rules and regulations," with "rule" carrying a similar definition as it does today, including "general order . . . of general application." See Wis. Stat. § 143.02(4) (1955-56); compare Wis. Stat. § 227.01(3) (1955-56), with Wis. Stat. § 227.01(13) (2017-18).

6

¶142 However, in 1982, at the beginning of the AIDS epidemic,[7] the Legislature amended the predecessor to Wis. Stat. § 252.02(4) to explicitly include as part of DHS's power the ability "to issue orders" of statewide application. <u>See</u> § 21, ch. 291, Laws of 1981.[8] Even though DHS had existing authority to promulgate a "rule" which, again, had always included a "general order . . . of general application," the Legislature chose to give DHS the

---

[7] <u>See</u> https://www.hiv.gov/hiv-basics/overview/history/hiv-and-aids-timeline

[8] The majority cites to extrinsic evidence, an "Explanatory Note" to Senate Bill 711, for support that the insertion of the phrase "issue orders" was "basically technical changes designed to bring the statute into concordance with the current public health and epidemiologic thought and terminology." Majority op., ¶26. Reliance on this "Explanatory Note" is problematic for several reasons. First, the court has clearly enunciated that it does not look to extrinsic sources in a plain language analysis. <u>See</u> <u>State ex rel. Kalal v. Circuit Court for Dane Cty.</u>, 2004 WI 58, ¶46, 271 Wis. 2d 633, 681 N.W.2d 110 ("Where statutory language is unambiguous, there is no need to consult extrinsic sources of interpretation, such as legislative history."). Second, the cited "Explanatory Note" language was not even related to the "issue orders" language. Instead, it refers to inserting words like "communicable" before disease and switching the phrase "jails, asylums, schoolhouses" to "correctional facilities, mental health institutions, schools." The majority should have realized that the "issue orders" language has nothing to do with "public health and epidemiologic thought and terminology" and not blindly adopted an argument made by Wisconsin Manufacturers and Commerce in its amicus brief.

Further, the majority asserts that "the Legislative Reference Bureau never described the added language as changing DHS's authority." Majority op., ¶26. There is no support for the proposition that the LRB is expected to make such comments or that its description of any textual additions is dispositive. These strained inferences from inapplicable extrinsic evidence and the LRB's silence illustrate how willing the majority is to circumvent the plain text of a statute to reach its desired policy outcome.

7

separate power to issue orders on a statewide basis to control and suppress communicable diseases.

¶143 Additionally, in the same 1982 amendment giving DHS the power to issue orders of statewide application, the Legislature added the requirement that "<u>Rules</u> of general application shall be adopted under ch. 227." <u>See</u> § 21, ch. 291, Laws of 1981 (emphasis added).[9] The amendment did not say that "orders" applicable to the entire state shall be adopted pursuant to Wis. Stat. ch. 227. This further supports the Legislature's distinction between "orders" permitted under Wis. Stat. § 252.02(4) and "rules" subject to ch. 227.

¶144 According to the majority opinion, any order applicable to the whole state would be a rule. But an "order" "made applicable to the whole" state cannot be synonymous with "rule" because, such a reading ignores the different words chosen by the Legislature and renders the language in the 1982 amendment superfluous. It is a basic tenet of statutory interpretation that we must read statutory language "to give reasonable effect to every word, in order to avoid surplusage."[10] <u>See</u> <u>Kalal</u>, 271 Wis. 2d 633, ¶46; <u>see also</u> Antonin Scalia & Bryan A. Garner, <u>Reading Law: The Interpretation of Legal Texts</u> 176 (2012) ("Because legal drafters

---

[9] That language was removed from the predecessor to Wis. Stat. § 252.02(4) pursuant to 1993 Wis. Act 27, § 284.

[10] Notably, a majority of this court just recently relied on this interpretive canon against surplusage in striking down Executive Order 74 which had suspended in-person voting in response to the ongoing COVID-19 pandemic. <u>See</u> Am. Order, <u>Wis. Legislature v. Evers</u>, No. 2020AP608-OA, at 3 (Apr. 6, 2020).

should not include words that have no effect, courts avoid a reading that renders some words altogether redundant.").

¶145 Emergency Order 28 is authorized by two other subsections of Wis. Stat. § 252.02: §§ 252.02(3) and (6), neither of which require rulemaking under ch. 227. Section § 252.02(6) is the broadest grant of authority given by the Legislature to DHS. Subsection 6 reads: "The department may authorize and <u>implement all emergency measures necessary</u> to control communicable diseases." (Emphasis added). The very broad language of § 252.02(6) to "authorize and implement all emergency measures necessary" includes the issuance of emergency orders necessary to combat a deadly virus.[11] The Legislature asks the court to read in language that simply is not there. Section 252.02(6) does not

---

[11] The concurrences of Justice Rebecca Grassl Bradley and Justice Kelly attempt to resuscitate the non-delegation doctrine. They cite dissenting opinions, evocative precedent, and a selective assortment of foreboding historical quotes, but their ultimate analyses of Wis. Stat. § 252.02 have been repeatedly rejected under modern administrative law. Broad grants of authority are routinely upheld where the statute as a whole, including its purpose, factual background, and context, bind the agency's authority. <u>See, e.g.,</u> <u>Am. Power & Light Co. v. SEC</u>, 329 U.S. 90, 104-05, (1946); <u>see also</u> <u>Gundy v. United States</u>, 139 S. Ct. 2116, 2130, <u>reh'g denied</u>, 140 S. Ct. 579 (2019) ("It is wisdom and humility alike that this Court has always upheld such 'necessities of government.'") (citation omitted). The language of § 252.02(6) fits comfortably within the range of broad grants historically approved by the United States Supreme Court. <u>See</u> <u>Mistretta v. United States</u>, 488 U.S. 361, 416 (1989) (Scalia, J., dissenting) ("What legislated standard, one must wonder, can possibly be too vague to survive judicial scrutiny, when we have repeatedly upheld, in various contexts, a 'public interest' standard?") (citing <u>Nat'l Broad. Co. v. United States</u>, 319 U.S. 190, 216-17 (1943)); <u>N.Y. Cent. Sec. Corp. v. United States</u>, 287 U.S. 12, 24-25 (1932)).

contain any limiting language——it does not say that DHS may "authorize and implement all emergency measures necessary <u>except</u> general orders of general application, for which rulemaking is required." We will not read into a statute "words the legislature did not see fit to write." <u>Dawson v. Town of Jackson</u>, 2011 WI 77, ¶42, 336 Wis. 2d 318, 801 N.W.2d 316; <u>see also</u> <u>State v. Fitzgerald</u>, 2019 WI 69, ¶30, 387 Wis. 2d 384, 929 N.W.2d 165 ("[R]ather, we interpret the words the legislature actually enacted into law.").

¶146 The statutory history of Wis. Stat. § 252.02(6) further supports a reading of § 252.02(6) which gives DHS a broad grant of authority to issue the entirety of Emergency Order 28 without going through the rulemaking process. The Legislature enacted this subsection in 1982 contemporaneously with adding the power to issue statewide orders and declaring that only rules of general application, not orders, be adopted as rules under ch. 227. <u>See</u> §§ 21-22, ch. 291, Laws of 1981. Section 252.02(6) post-dates both §§ 252.02(3) and (4) and demonstrates how, over time, the Legislature has continued to expand DHS's ability to act to control contagion in emergencies such as this one.

¶147 Finally, Wis. Stat. § 252.02(3) independently provides authority for the issuance of several provisions in Emergency Order 28 without rulemaking. Yet, it is significant that the majority fails to even mention this subsection despite Emergency Order 28 explicitly citing § 252.02(3) as authority. Section 252.02(3) allows DHS to "close schools and forbid public gatherings in schools, churches and other places to control outbreaks and epidemics." Although § 252.02(3) does not specify the method by

which DHS can close schools and forbid public gatherings, this subsection clearly envisions the issuance of orders. To suggest that in the midst of an outbreak or epidemic of a contagious disease DHS must go through the process of rulemaking before closing schools is preposterous and at odds with the other subsections of § 252.02. See Kalal, 271 Wis. 2d 633, ¶46 (noting that statutory language is examined "not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes"). The majority opinion seemingly admits the absurdity of this outcome when it states that the decision striking the entirety of Emergency Order 28 "does not apply to Section 4. a. of Emergency Order 28." Majority op., ¶3 n.6.

¶148 The majority's attempts to circumvent the statute's plain meaning in order to reach its desired outcome are legally suspect and, frankly, unpersuasive. To establish that Emergency Order 28 is a rule subject to the emergency rulemaking provisions in Wis. Stat. § 227.24, the majority reads "order" "made applicable to the whole" in Wis. Stat. § 252.02(4) as a "general order of general application." This reading makes the word "order" superfluous and changes the language of § 252.02(4) to read "the department may promulgate and enforce rules or issue rules . . . ." Courts do not read in redundancies for the sake of aligning a statute with a brand new policy preference. See Kalal, 271 Wis. 2d 633, ¶46; Scalia & Garner, supra ¶144, at 176.

¶149 This reading of Wis. Stat. § 252.02 is even more illogical because it hamstrings DHS to a time-consuming, lengthy rulemaking scheme inconsistent with the authorization for DHS to

11

act "immediately and summarily" to guard against the introduction of communicable disease as well as to control and suppress it. Lowe, 120 Wis. at 155. A review of the tedious multi-step process required to enact an emergency rule illustrates why the Legislature authorized DHS to issue statewide orders to control contagion.

¶150 The emergency rulemaking process set forth in Wis. Stat. § 227.24 includes 11-13 steps which the briefing indicates takes a minimum of 18 and a maximum of 49 days.[12] At oral argument, counsel for the Legislature focused only on the first eight steps, from the creation of a scope statement until the time a rule is published, which he thought "could take 12 days, in this case." However, counsel's phrases like "matter of an hour," "approve it in one minute," and "about a second" show that the time it takes to enact an emergency rule is guess work, at best, and discounts the uncertainty tied to this process.

¶151 Even assuming the Legislature's best-case-scenario timeframe of 12 days, DHS still may not be able to act to control a contagion using only emergency rulemaking. While the Legislature does not get a seat at the table to draft an emergency rule, a

---

[12] There are eleven mandatory steps contained in Wis. Stat. § 227.24, including drafting a statement of scope for the emergency rule, obtaining gubernatorial approval for the statement of scope, submitting the statement of scope for publication in the Administrative Register, and obtaining approval for the statement from the individual or body with the appropriate policy-making powers. See § 227.24(1)(e)1d. Additionally, the Joint Committee for Review of Administrative Rules (JCRAR), a legislative committee, can request a preliminary public hearing, which is a potential step that delays the process for several days to several weeks.

12

partisan legislative committee[13] has the ability to suspend any emergency rule following a public hearing. See Wis. Stat. § 227.26 (2)(d). This, and any other change in circumstances requiring a new scope statement, would send DHS right back to the drawing board. These procedures and timelines are wholly inconsistent with the prompt and decisive action necessary to control and suppress a deadly communicable disease like COVID-19.

¶152 The majority and the Legislature point the finger at DHS and assert that it should have gone through emergency rulemaking while Governor Evers' Executive Order 72 was in effect.[14] This overlooks the Legislature's own inaction. During the 23 days before DHS issued Emergency Order 28, there was already in effect a nearly identical emergency order issued under Wis. Stat. §§ 252.02(3) and (6), which the Legislature never challenged. See Emergency Order 12, at 2. During those 23 days, the Legislature convened several times, including two special sessions, but chose not to address Order 12 or DHS's claimed grant of authority under

---

[13] The Joint Committee for Review of Administrative Rules is currently made up of: Representative Joan Ballweg (R), Senator Stephen Nass (R), Representative Adam Neylon (R), Senator Duey Stroebel (R), Senator David Craig (R), Senator Chris Larson (D), Senator Robert Wirch (D), Representative Romaine Quinn (R), Representative Gary Hebl (D), and Representative Lisa Subeck (D). https://docs.legis.wisconsin.gov/2019/committees/joint/1965.

[14] In Executive Order 72, Governor Evers declared a public health emergency.

§ 252.02. <u>See</u> Executive Order 73; Executive Order 74.[15] Instead, the Legislature now comes to this court and asks it to rescind the broad powers it granted to DHS. Whatever policy choices the Legislature makes going forward should be effectuated by the legislative process, not as a result of a decision made by the judiciary.

¶153 The majority further disregards the nature of Emergency Order 28, which is inconsistent with the purpose of emergency rulemaking. An emergency rule does not share the limited nature of an order; instead, it is intended to be in place temporarily until a permanent rule can be promulgated. <u>See</u> Wis. Stat. §§ 227.24(1)(c), (2)(a). Moreover, a rule applies to future circumstances and is enacted with the purpose of guiding future conduct. Emergency Order 28 is an immediate response to current circumstances and has an end-date of May 26, 2020. It does not serve as guidance for response to any future unique contagious disease, or even to the evolving circumstances surrounding COVID-19, and is therefore by its very nature not a rule.

¶154 Finally, the majority conspicuously omits the fact that Emergency Order 28 expressly allows this court to sever any

---

[15] The majority calls Secretary Palm an "unelected," "unconfirmed" cabinet member. Majority op., ¶¶24, 28, 31. It is the Legislature who controls her confirmation and has yet to vote despite her approval by a bipartisan Senate Committee in August of 2019. Secretary Palm does not need confirmation to serve as DHS Secretary. Wisconsin's executive branch is structured such that a department secretary, even one awaiting Senate confirmation, "serve[s] at the pleasure of the governor." Wis. Stat. § 15.05.

14

unconstitutional provision and save the rest.[16] Why? So it could feign that it had no choice but to strike the entirety of the order. The majority had another option: sever the provisions besides those "clos[ing] schools and forbid[ding] public gatherings in schools, churches, and other places," which the Legislature conceded are valid under Wis. Stat. § 252.02(3).[17] While the majority in a footnote says "This decision does not apply to Section 4. a. of Emergency Order 28," majority op., ¶3 n.6, it does not explicitly sever Section 4. a. In fact, the broad language in the majority opinion suggests otherwise: "Emergency Order 28 is invalid and therefore, unenforceable." Majority op., ¶56. The majority's act of striking the entirety of Emergency Order 28 effective immediately is a prime example of judicial activism.

¶155 Relatedly, the majority makes much ado about nothing when bemoaning that Emergency Order 28 allows the executive to

---

[16] Section 19 of Emergency Order 28 says: "To this end, the provisions of this Order are severable."

[17] For example, Section 4. a. of Emergency Order 28 indicates that "Public and private K-12 schools shall remain closed for pupil instruction and extracurricular activities for the remainder of the 2019-2020 school year." Such a provision is clearly within DHS's explicit authority pursuant to Wis. Stat. 252.02(3). Similarly, Section 4. c. closes "places of public amusement and activity." Such places include but are not limited to "amusement parks, carnivals, water parks, licensed public or private swimming pools, splash pads, aquariums, zoos, museums, arcades, fairs, children's play centers, playgrounds, funplexes, theme parks, bowling alleys, movie and other theaters, concert and music halls, country clubs, social clubs, and gyms and fitness centers." Again, the Legislature concedes that DHS may order at least some of these places to close under § 252.02(3).

arbitrarily define crimes and impose criminal penalties.[18] In fact, for shock value, the majority ties much of its reasoning to the imposition of criminal penalties. As detailed in Justice Hagedorn's dissent, ¶255 & n.21, criminal penalties for the violation of an agency action is nothing new. Nonetheless, as the assistant attorney general conceded at oral argument, this court could simply issue a ruling that Emergency Order 28 can only be enforced through civil fines and sever the language regarding criminal penalties. The majority fails to even mention this possibility because to do so would expose the flaws in their reasoning. Instead, the majority of this court strikes the entirety of Emergency Order 28, see majority op., ¶¶3, 56, and limits DHS's ability to act quickly while in the midst of its efforts to fight COVID-19.

## II. THE MAJORITY'S ADVISORY OPINION ON THE LEGISLATURE'S SECOND CLAIM

¶156 The majority opinion should end after it addresses the Legislature's first claim and strikes the entirety of Emergency Order 28. Instead, the majority "assumes arguendo" that rulemaking was not required so that it can opine on issues not properly before the court. The reason given by the majority is that the court granted review of the second issue. See majority op., ¶43. Having decided to accept a question on review has never provided a justification to engage in an advisory opinion, which this court

---

[18] Section 18 of Emergency Order 28 indicates that violations of the order are punishable by up to 30 days imprisonment, pursuant to Wis. Stat. § 252.25.

16

disfavors. See Am. Med. Servs., Inc. v. Mut. Fed. Sav. & Loan Ass'n, 52 Wis. 2d 198, 203, 188 N.W.2d 529 (1971) ("Advisory opinions should not be given under the guise of a declaration of rights.").

¶157 The majority appropriately defines standing to seek judicial review as "when one has a stake in the outcome of the controversy and is affected by the issues in controversy." Majority op., ¶12 (citing Schill v. Wis. Rapids Sch. Dist., 2010 WI 65, ¶38, 327 Wis. 2d 572, 786 N.W.2d 177). Yet, the majority offers a cursory and incomplete analysis on this issue because it only addresses standing based on an invasion of the Legislature's core powers. While the Legislature conceivably has standing on the first claim regarding rulemaking, this does not confer standing to challenge Emergency Order 28 as exceeding DHS's statutory authority. The majority opinion is void of any analysis as to the Legislature's standing to bring its second claim.

¶158 The Legislature has no stake whatsoever in whether the mandate in Emergency Order 28 exceeded DHS's authority under Wis. Stat. §§ 252.02(3), (4), and (6). The Legislature itself is expressly exempt from the legal directives of Emergency Order 28. See Emergency Order 28 at 11 ("This section does not limit the ability or authority of the Wisconsin Legislature to meet or conduct business."). No single legislator signed on in an individual capacity to this lawsuit. In order for this court to properly reach this claim, it must be brought by one who is harmed by the order, a Wisconsin citizen or business entity that falls under the scope of Emergency Order 28.

17

¶159 Recognizing the Legislature's standing to bring a claim that enforcement of a statute "exceeded statutory authority" sets a dangerous precedent. This court has deemed it error for a legislator to testify regarding legislative intent of a statute and likewise the Legislature here cannot testify to its view of the scope of a statute. Cartwright v. Sharpe, 40 Wis. 2d 494, 508-509, 162 N.W.2d 5 (1968); see also Responsible Use of Rural and Agr. Land v. PSC, 2000 WI 129, ¶39 n.20, 239 Wis. 2d 660, 619 N.W.2d 888 ("ex post facto explanations from legislators cannot be relied upon to determine legislative intent . . . ."); State v. Consolidated Freightways Corp., 72 Wis. 2d 727, 738, 242 N.W.2d 192 (1976) ("However, neither a legislator, nor a private citizen, is permitted to testify as to what the intent of the legislature was in the passage of a particular statute."). Moreover, allowing the Legislature to challenge the scope of a duly enacted statute without a showing of any particularized harm opens the floodgates for future litigation about the application of each and every statute. See also Justice Hagedorn's dissent, ¶¶233-44 (providing a well reasoned and extensive discussion on standing).

¶160 Even overlooking the clear standing issues, the advisory part of the opinion is cursory and misreads the statutory language. The majority cuts and pastes portions of Wis. Stat. § 252.02 and reaches undeveloped conclusions. For example, the majority opinion appears to say that Emergency Order 28 exceeds the authority given to DHS in § 252.02(4) because it goes beyond the quarantining of suspected infected persons and guarding against

18

the introduction of communicable disease into the state. Majority op., ¶¶49-50. The majority conveniently fails to mention the rest of § 252.02(4), including the authority to issue statewide orders "for the control and suppression of communicable diseases." Ultimately, by engaging in an advisory opinion about the potential limits of § 252.02, the majority of this court did not just jump when the Legislature asked it to, it asked "how high?"

### III. CONCLUSION

¶161 It is important to understand that the Legislature's request was not to immediately strike Emergency Order 28. Even the Legislature appreciated the abrupt changes that will be wrought by this decision and thus asked this court for a stay. In its initial brief, the Legislature requested that this Court stay enforcement of an injunction for a period of six days to allow DHS "to promulgate an emergency rule consistent" with state law. The reply brief suggests this court "stay enforcement of its injunction in its equitable discretion, to allow DHS sufficient time to promulgate a new emergency rule consistent with Wisconsin law." In its last act of judicial activism, the majority takes it upon itself to immediately overturn Emergency Order 28, a remedy neither party asked for.

¶162 The effective date of this decision should be stayed and the majority has the equitable power to do so. In her concurrence, Chief Justice Roggensack claims she would stay "future actions to enforce our decision," but since Emergency Order 28 will no longer be in effect, there will be no "future actions" of enforcement. These words are meaningless. It is clear that a majority of this

19

court has no appreciation of the consequences of doing the Legislature's bidding in the midst of a pandemic.  The Legislature has always had the power to act, but would rather ask this court to do so to avoid political fallout.  Unfortunately for Wisconsinites, this court took the bait.

¶163 For the foregoing reasons, I dissent.

¶164 I am authorized to state that Justice ANN WALSH BRADLEY joins this dissent.

20

¶165 BRIAN HAGEDORN, J. *(dissenting).* We are facing a unique public health crisis the likes of which few among us has ever seen. And the government response of shutting down businesses, travel, and schools, forbidding private gatherings, and other such measures is a demonstration of government power the likes of which few among us has ever seen. Understandably, our public discourse is full of passionate debate——both over how to handle the public health issues facing our world, and over whether this exercise of government power is appropriate for this crisis and for a nation "conceived in Liberty." Abraham Lincoln, Address at Gettysburg, Pennsylvania (Nov. 19, 1863).

¶166 The pressing and consequential nature of these questions cannot be overstated, but this particular case has nothing to do with them——nothing whatsoever. The judiciary receives its charge from the people through the Wisconsin Constitution. And the people have not empowered this court to step in and impose our wisdom on proper governance during this pandemic; they left that to the legislative and executive branches. They have empowered this court to decide cases according to the law, and that alone is what we must do.

¶167 Some would like to characterize this case as a battle over the constitutional limits on executive power——can an executive branch officer really shut down businesses, limit travel, and forbid public gatherings? These are important questions for sure, but they are not what this case is about. No party has raised or developed such a claim. Some would also like to frame this as a challenge to the government's potential

1

infringement of certain constitutional protections like the freedoms of religion, speech, and assembly, and the right to hunt and fish. But these issues are not before us either. No party has raised or developed a claim along these lines.

¶168 We are a court of law. We are not here to do freewheeling constitutional theory. We are not here to step in and referee every intractable political stalemate. We are not here to decide every interesting legal question. It is no doubt our duty to say what the law is, but we do so by deciding cases brought by specific parties raising specific arguments and seeking specific relief. In a case of this magnitude, we must be precise, carefully focusing on what amounts to the narrow, rather technical, questions before us. If we abandon that charge and push past the power the people have vested in their judiciary, we are threatening the very constitutional structure and protections we have sworn to uphold.

¶169 This court granted the legislature's petition for original action on two issues. First, we are asked whether the commands in Emergency Order 28 (Order 28) were required to be promulgated as an administrative rule under chapter 227 of the Wisconsin Statutes. I conclude they were not because Order 28 is an order applying to a specific factual circumstance, and is therefore not an order of "general application" under Wis. Stat. § 227.01(13) (2017-18).[1] Second, the legislature asks us to address whether, even if rulemaking was not required, Order 28 exceeds the Department of Health Services' (DHS) statutory

---

[1] All subsequent references to the Wisconsin Statutes are to the 2017-18 version unless otherwise indicated.

2

authority. Because this is a challenge to executive branch enforcement of clearly on-point statutes, I conclude the legislature—as a constitutional body whose interests lie in enacting, not enforcing the laws—lacks standing to bring this claim. Such claims should be raised by those injured by the enforcement action, not by the branch of government who drafted the laws on which the executive branch purports to rely. To the extent we countenance an argument that Wis. Stat. § 252.02 grants too much power to DHS, we are allowing the legislature to argue its own laws are unconstitutional, a legal claim it has no authority to make.

¶170 In striking down most of Order 28, this court has strayed from its charge and turned this case into something quite different than the case brought to us. To make matters worse, it has failed to provide almost any guidance for what the relevant laws mean, and how our state is to govern through this crisis moving forward. The legislature may have buyer's remorse for the breadth of discretion it gave to DHS in Wis. Stat. § 252.02. But those are the laws it drafted; we must read them faithfully whether we like them or not. To be sure, this leaves much unanswered. Significant legal questions remain regarding the limits, scope, and propriety of the powers asserted in Order 28, and in the powers that might plausibly be exercised pursuant to the broad authority and responsibility given to DHS in § 252.02. But those are questions we must leave for another day; this court has no business raising and deciding claims to vindicate the rights of parties not before

3

us now. Based on the legal issues presented in this case, I would uphold Order 28. I respectfully dissent.

## I. Background

¶171 The factual background to this case is well-known and sufficiently stated in the other writings. But some pertinent legal background will be helpful in understanding the issues——namely, that which pertains to our basic constitutional structure and the police power generally.

¶172 The foundation of our system of government rests in the sovereignty of the people. Government has a morally legitimate claim to order and command not because it has the biggest guns or because it's always been that way, but because the people have given it that power. The Declaration of Independence para. 2 (U.S. 1776); Wis. Const. art. I, § 1.

¶173 The people have granted power and delineated its limits through the United States Constitution and the Wisconsin Constitution. These constitutions reflect and describe both a vertical separation of powers and a horizontal separation of powers. More than even our Bill of Rights, our founders understood the separation of powers as the central bulwark of our liberty. See Morrison v. Olsen, 487 U.S. 654, 697 (1988) (Scalia, J., dissenting) ("The Framers of the Federal Constitution . . . viewed the principle of separation of powers as the absolutely central guarantee of a just Government.").

¶174 The vertical separation of powers is reflected in the allocation of powers between the federal government and state

4

governments, a concept known as federalism. Power is diffused into two separate sovereigns, each having their own spheres of authority within which they can and cannot act. The federal government, as established by the federal constitution, is a government of limited and enumerated powers. This means the federal government can only do what the federal constitution itself grants it power to do. Powers not given to the federal government are retained by the people and the states. U.S. Const. amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."); see also Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938) ("Congress has no power to declare substantive rules of common law applicable in a state whether they be local in their nature or 'general,' be they commercial law or a part of the law of torts. And no clause in the Constitution purports to confer such a power upon the federal courts.").

¶175 The horizontal separation of powers is the idea that government power at large is divided and deposited into three institutions or officers. The power to make law, to decide what the law should be, is given to the legislative branch. Wis. Const. art. IV, § 1. The power to enforce and execute the law already enacted is given to the executive branch. Id. art. V, § 1. And the power to decide disputes about the law is given to the judicial branch. Id. art. VII, § 2. This horizontal separation of powers is reflected in both the United States Constitution and the

5

Wisconsin Constitution. See <u>Gabler v. Crime Victims Rights Bd.</u>, 2017 WI 67, ¶11, 376 Wis. 2d 147, 897 N.W.2d 384.

¶176 These two principles——both the vertical and horizontal separation of powers——are of key importance to this case in a number of ways.

¶177 First, while the federal government is one of limited and enumerated powers, the state government is not. States have what is known as the police power. This is the state's inherent power "to promote the general welfare," which "covers all matters having a reasonable relation to the protection of the public health, safety or welfare." <u>State v. Interstate Blood Bank, Inc.</u>, 65 Wis. 2d 482, 490, 222 N.W.2d 912 (1974). If that sounds incredibly broad and far-reaching, that's because it is. It is the police power which allows states to enact general criminal laws and punish those who don't comply. It is the police power that allows states to enact permitting requirements on the use of private property. It is the police power that allows the state to tax its citizens, prohibit speeding, enact inheritance laws, and on and on.[2]

_____

[2] Quoting the United States Supreme Court, this court has explained:

> But what are the police powers of a State? They are nothing more or less than the powers of government inherent in every sovereignty to the extent of its dominions. And whether a State passes a quarantine law, or a law to punish offenses, or to establish courts of justice, or requiring certain instruments to be recorded, or to regulate commerce within its own limits, in every case it exercises the same powers; that is to say, the power of sovereignty, the power to govern men and things within the limits of its dominion. It is by virtue of this power that it legislates; and its

6

¶178 From the British common law through the Industrial Revolution and up through today, the power to quarantine and take other invasive actions to protect against the spread of infectious diseases has been universally recognized as a legitimate exercise of state police power. United States Supreme Court Chief Justice John Marshall said in the 1824 case of Gibbons v. Ogden that the police powers of the state include "every thing within the

---

authority to make regulations of commerce is as absolute as its power to pass health laws, except in so far as it has been restricted by the constitution of the United States.

Thus has this court from the early days affirmed that the power to promote the general welfare is inherent in government. Touching the matters committed to it by the Constitution the United States possesses the power, as do the states in their sovereign capacity touching all subjects jurisdiction of which is not surrendered to the federal government.

Chi. & N.W. Ry. Co. v. La Follette, 43 Wis. 2d 631, 644, 169 N.W.2d 441 (1969) (quoting Nebbia v. New York, 291 U.S. 502, 524-25 (1934)).

Nineteenth century legal luminary Thomas Cooley described the police power this way:

The police power of a State, in a comprehensive sense, embraces its system of internal regulation, by which it is sought not only to preserve the public order and to prevent offenses against the State, but also to establish for the intercourse of citizen with citizen those rules of good manners and good neighborhood which are calculated to prevent a conflict of rights, and to insure to each the uninterrupted enjoyment of his own, so far as is reasonably consistent with a like enjoyment of rights by others.

Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union *572 (1871) (citing Blackstone).

7

territory of a State, not surrendered to the general government," including "quarantine laws" and "health laws of every description." 22 U.S. (9 Wheat.) 1, 203 (1824). In 1902, the Court again sounded a similar theme, concluding that preventing a ship from docking due to a partial quarantine was a reasonable exercise of Louisiana's police power. Campagnie Francaise de Navigation a Vapeur v. Bd. of Health, 186 U.S. 380, 387-93 (1902). And in 1905, the Supreme Court went even further and concluded that mandatory vaccination to prevent the spread of infectious disease was a valid exercise of the police power. Jacobson v. Massachusetts, 197 U.S. 11, 27-30, 35 (1905).[3]

¶179 The power of state government is not without limits, however. Every exercise of the police power is subject to the limits set by the people through our constitutions. Bushnell v. Town of Beloit, 10 Wis. 195, 225 (1860) ("[T]he constitution of the state is to be regarded not as a grant of power, but rather as a limitation upon the powers of the legislature, and . . . it is competent for the legislature to exercise all legislative power not forbidden by the constitution or delegated to the general government, or prohibited by the constitution of the United States."). The federal constitution imposes certain limits on state action——prohibiting slavery, guaranteeing the right to vote for men and women eighteen or older of any race, and guaranteeing the right to due process and equal protection of the laws, among

---

[3] I cite these cases not to approve or disapprove of their holdings, but to establish that strong public health measures have long been understood as valid exercises of the police power.

8

others.[4] The state constitution also contains many limits, some overlapping with the protections in the federal constitution. Among them are the freedom of religion, the right to hunt and fish, the right to bear arms, and a variety of protections for crime victims and those accused of crimes.[5]

¶180 These limits are real and substantive. Neither legislative enactments themselves nor executive enforcement of otherwise valid laws may transgress these or any other constitutional boundary. See State v. Wood, 2010 WI 17, ¶13, 323 Wis. 2d 321, 780 N.W.2d 63 ("If a challenger successfully shows that such a violation [of his or her constitutional rights] occurred, the operation of the law is void as to the party asserting the claim." (citation omitted)). And among these limits, now generally understood to be housed in due process guarantees, any exercise of police power must be legitimately aimed at protecting the public health, safety, and welfare of the people. State v. McManus, 152 Wis. 2d 113, 130, 447 N.W.2d 654 (1989) ("Due process requires that the means chosen by the legislature bear a reasonable and rational relationship to the purpose or object of the enactment; if it does, and the legislative purpose is a proper

---

[4] See U.S. Const. amend. XIII (prohibiting slavery); id. amend. XV (suffrage for all races); id. amend. XIX (suffrage for women); id. amend. XXVI (suffrage for eighteen-year-olds); id. amend. XIV (due process and equal protection).

[5] See Wis. Const. art. I, § 18 (freedom of worship); id. art. I, § 26 (right to fish, hunt, trap, and take game); id. art. I, § 25 (right to bear arms); id. art. I, §§ 6, 7, 8, 9, 9m & 11 (protecting rights of crime victims and those accused of crimes).

9

one, the exercise of the police power is valid." (citation omitted)).

¶181 Of course, recognizing the potential breadth of state power is not the same as applauding or affirming use of that power. Whether the state can quarantine individuals, forbid public gatherings, and take drastic emergency measures during a pandemic is quite a different question than whether government has used that power wisely or within constitutional limits.

¶182 Moving beyond the boundaries of potentially permissible uses of the police power, its mechanism is also important to this case. The scope of the police power determines the potentially legitimate goals of government action——that is, the policies that will govern the state. In our constitutional system, it is the legislature that determines policy choices in the first instance. Bushnell, 10 Wis. at 225 ("The legislature, subject to a qualified veto of the executive, possesses all the legislative power of the state."). It does this pursuant to its constitutional power to enact laws. Wis. Const. art. IV, § 17. Following enactment of laws, the legislature's constitutional role as originally designed is generally complete.

¶183 The executive then has authority to faithfully execute the laws already on the books. Wis. Const. art. V, § 4. Executive authority is in one sense quite limited; the executive branch must enforce the laws the legislature has passed whether it likes them or not. In another sense, however, the authority is quite extensive. The executive branch generally has broad authority to execute the laws, and to use judgment and discretion in so doing.

10

¶184 Where the legislature gives broad discretionary authority to the executive——in the enforcement of the criminal law, for example——that power can be immense. To illustrate, the legislature defines crimes, and has created a system for the prosecution of those crimes. But law enforcement has considerable discretion in determining whether to arrest those who break the law and refer them for punishment. All of us who have received a kindly warning from a merciful officer for driving a bit over the speed limit know this firsthand. Even after referral, prosecutors are given vast discretion in choosing whether to file a criminal complaint, and which crimes to charge. In practical effect, some crimes are almost never prosecuted in some jurisdictions.[6]

¶185 Thus, under our constitutional design, the scope and size of the executive branch, the areas in which the executive branch is called upon to act, and the discretion with which it is entrusted is set by the legislature through the enactment of laws.

¶186 While more can be said, it is with this foundation that we proceed to the two issues before us. The first question is whether Order 28, with all of its various dictates, was required to be promulgated as an administrative rule, the failure of which renders the order unlawful. The second issue is whether Order 28 goes beyond the statutory powers granted to DHS in Wis. Stat. § 252.02.

---

[6] See, e.g., https://www.wiscontext.org/wisconsins-racial-chasm-marijuana-enforcement (noting that the Dane County district attorney informed law enforcement not to bring him cases based on small amounts of marijuana possession).

11

II. Order 28 Is Not an Administrative Rule

¶187 The legislature argues that Order 28 constitutes an administrative rule that was not promulgated pursuant to the procedural requirements in Wis. Stat. ch. 227 and should therefore be struck down in its entirety. The legislature appears to have standing to raise this issue since it has a statutory role in the promulgation of rules, in particular, the authority to oversee and suspend proposed rules through the Joint Committee for Review of Administrative Rules (JCRAR). See generally Wis. Stat. § 227.19. Moreover, nothing in Wis. Stat. § 227.40, the section pertaining to judicial review of the validity of a rule, expressly precludes the legislature from bringing a claim of this kind. While an argument could be made that JCRAR is the proper party with a cognizable harm——rather than the legislature as a whole——this is, at the very least, a close enough call that I do not see standing as a roadblock to consideration of this issue.


A. Agency Authority and Rulemaking Generally

¶188 Before examining the precise arguments of the parties regarding Order 28, it is helpful to understand the role administrative agencies and administrative rules play within our government.

¶189 Administrative agencies are created by the legislature. Wis. Stat. § 15.02. The legislature has the ability to withdraw an agency's power, dictate how any agency power is exercised, and extinguish the agency's power entirely. Schmidt v. Dep't of Res. Dev., 39 Wis. 2d 46, 57, 158 N.W.2d 306 (1968). Even so, agencies

12

are members of the executive branch. See Wis. Stat. § 15.001(2); Koschkee v. Taylor, 2019 WI 76, ¶14, 387 Wis. 2d 552, 929 N.W.2d 600.

¶190 The legislature created DHS as an executive branch agency through Wis. Stat. § 15.19 and granted it a variety of statutory powers and duties generally found in Wis. Stat. chs. 250 to 257, including authority relating to communicable diseases under chapter 252.[7] Some of these powers are triggered when the governor declares a public health state of emergency under Wis. Stat. § 323.10. DHS is then treated as the public health authority and given certain powers and duties specific to that designation. Wis. Stat. § 250.01(6g). However, chapter 252 contains separate authority that is not, at least on its face, dependent on a governor's emergency declaration. Secretary Palm asserts that Order 28 is grounded in such separate statutory authority. Thus, an emergency declaration by the governor is not relevant to

---

[7] See also Justice Dallet's dissent, ¶¶135-38 (discussing the historical path of Wisconsin's public health law and law enforcement, including emergency response measures taken in previous instances of communicable disease outbreak).

analysis of whether Order 28 meets the statutory definition of an administrative rule.[8]

¶191 At the outset, it bears mentioning that the administrative rulemaking process itself sits a bit uneasily within a constitutional structure that vests three different kinds of power in three different branches. See Koschkee, 387 Wis. 2d 552, ¶¶42-57 (Rebecca Grassl Bradley, J., concurring). In practice today, administrative rules occupy a form of shared governance between the executive and legislative branches.

¶192 During its rise in the Progressive Era, this court had some difficulty squaring the emerging administrative state with the structure of the Wisconsin Constitution. But eventually, like the U.S. Supreme Court, it acquiesced. See J.W. Hampton, Jr. & Co. v. United States, 276 U.S. 394, 409 (1928) (upholding a congressional delegation of authority to the executive to fix customs duties). See generally Gundy v. United States, 139 S. Ct. 2116, 2133–42 (2019) (Gorsuch, J., dissenting) (criticizing the nondelegation doctrine in federal law for its wayward departure

---

[8] If the legislature's rulemaking argument is correct, it would appear that Secretary Palm's prior orders, including the original "Safer at Home" order issued on March 24, would be captured in the same net. After all, the definition of a rule, as explained more fully below, includes something issued by an agency. An order from Secretary Palm, even one issued at the direction of the governor, would still be issued by the agency. In other words, nothing in the definition of a rule suggests the governor's declaration of an emergency gives Secretary Palm the power to issue orders without first going through the rulemaking process. If so, the legislature's rulemaking argument was ripe when the first COVID-19 orders were issued in March.

from the federal constitution and its historical embrace of a separation-of-powers triangle).

¶193 When the administrative rules process was adopted, early cases treated rulemaking as more of an executive power. See, e.g., State ex rel. Buell v. Frear, 146 Wis. 291, 306–07, 131 N.W. 832 (1911) (rejecting the theory that rulemaking and other related administrative action was, in this case, a legislative power, and explaining that such action falls within the ambit of executing the law within legislatively set parameters). The logic is not hard to understand. If the legislature passes a law requiring cigarettes to be taxed, for example, it would be an executive function to interpret and enforce the law, including determining what constitutes a cigarette and what does not. Rulemaking over the definition of a cigarette is, in one sense, the legislature's attempt to add further definition to statutes that the legislature did not provide in the first place. It is a post-enactment effort to control and limit how the laws are executed.

¶194 But over time, this court has come to describe rulemaking as closer to a legislative power. See, e.g., Watchmaking Examining Bd. v. Husar, 49 Wis. 2d 526, 533–34, 182 N.W.2d 257 (1971) (characterizing rulemaking as a "delegation" of legislative power to a subordinate administrative agency). The logic here is not hard to understand either. As government grew into the modern behemoth it is today, the legislature began to enact statutes that looked more like broad, undefined goals, rather than concrete laws. Doing so left specific policy decisions to the executive branch. Understandably, the legislature then subjected those choices to a

15

check through the rulemaking process. For example, if the legislature passes a law empowering the Department of Revenue to "tax products in the public interest," it has, one could argue, made no policy judgments at all for the executive to execute. In this view, rulemaking is the legislature's attempt to ensure it retains the power to make policy decisions, which is consistent with its constitutional role to say what the law should be.

¶195 Both parties invoke the separation of powers reflected in these concepts to support their assertion that rulemaking should or should not be required here. Regardless of how we characterize rulemaking generally, the parties accept the constitutional status quo, and merely ask us to enforce and apply the statutory rulemaking prescriptions.

### B. Defining the Claim

¶196 The legislature asserts that Order 28 is a rule and that DHS's failure to comply with the rulemaking requirements in Wis. Stat. ch. 227 leaves an invalid rule that must be enjoined from further application. Not all agency action is rulemaking, of course. The question is a matter of statutory interpretation, both of the definition of a rule in Wis. Stat. § 227.01(13), and Wis. Stat. § 252.02(4), one of the statutory bases DHS cited for the order's authorization.

¶197 Relevant for what follows, Wis. Stat. § 252.02(4) states in part that DHS "may promulgate and enforce rules or issue orders," both of which may "be made applicable to the whole or any specified part of the state," for purposes of controlling and

16

suppressing any communicable disease. Secretary Palm argues the statutory distinction between "rules" and "orders" indicates that DHS has authority to act on a statewide basis outside of the rulemaking process——that is, DHS can issue orders based on the police power given to the executive through the legislatively set parameters in § 252.02. The legislature rejects this theory, arguing that a statewide order issued pursuant to § 252.02(4) that has the force of law (as Order 28 does) is, by virtue of its statewide application, required to be promulgated as a rule. With this in mind, we must unpack what makes a rule.

## C. Defining a Rule

¶198 According to Wis. Stat. § 227.01(13), a "rule" is defined by five separate criteria. It must be "(1) a regulation, standard, statement of policy or general order; (2) of general application; (3) having the [force[9]] of law; (4) issued by an agency; (5) to implement, interpret or make specific legislation enforced or administered by such agency [or] to govern the interpretation or procedure of such agency." Citizens for Sensible Zoning, Inc. v. DNR, 90 Wis. 2d 804, 814, 280 N.W.2d 702 (1979) (citing § 227.01(13)). Neither party disputes that Order 28 has the force of the law and was issued by an agency, the third and fourth requirements in the statutory definition. It was issued by DHS, and has the force of law because it is legally enforceable rather than just exhortatory. But the parties dispute whether DHS

---

[9] In 2017 Wis. Act 369, § 32, the legislature changed this portion of the definition from "effect of law" to "force of law."

17

issued Order 28 "to implement, interpret or make specific" legislation that it enforces or administers, as well as the requirements that it be "a regulation, standard, statement of policy, or general order" and one of "general application."

¶199 I conclude the textual evidence overwhelmingly shows that Order 28 is a "general order" precisely because of its statewide application. Therefore, the legislature's argument that its statewide effect also makes it an order of "general application" is incorrect. An order of "general application" is one that has prospective application beyond the situation at hand. Order 28 does not. I focus my analysis on the "general order" and "general application" requirements because they conclusively demonstrate that Order 28 does not meet the definition of a rule.[10]

---

[10] I am also skeptical that Order 28 was issued by DHS "to implement, interpret, or make specific legislation enforced or administered by the agency or to govern the organization or procedure of the agency." Wis. Stat. § 227.01(13). Order 28 was obviously not issued to govern DHS's organization or procedure, and nothing suggests that Order 28 interprets or makes specific any terms or requirements of Wis. Stat. § 252.02. Whether Order 28 "implements" legislation is a closer call, however.

18

¶200 First, a rule must be "a regulation, standard, statement of policy, or general order." Wis. Stat. § 227.01(13). On its face, each of these phrases speaks of a broad and substantive policy choice of some sort. And the chosen policy or standard would, by implication, go beyond a one-time situation or decision.

¶201 Of particular relevance here is the "general order" requirement. Both parties agree Order 28 is a general order, but they are not especially precise on why that is. Note first that a simple "order" is not enough to meet the definition. The statute has the modifier "general"——meaning not all orders fit the bill, only "general" ones. And we need to, where possible, "give reasonable effect to every word." State ex rel. Kalal v. Circuit Court for Dane Cty., 2004 WI 58, ¶46, 271 Wis. 2d 633, 681

---

In context, "implement," like the rest of the rule definition and rulemaking process, seems aimed at covering future enforcement and application of the statutory powers and duties vested in a respective agency. See State ex rel. Kalal v. Circuit Court for Dane Cty., 2004 WI 58, ¶46, 271 Wis. 2d 633, 681 N.W.2d 110 (explaining statutory language is to be interpreted "in the context in which it is used"). A rule expresses how a statute will be enforced going forward, and part of that can involve establishing the specifics of a larger procedure or system for all future applications of that statute. Accord Citizens for Sensible Zoning, Inc. v. DNR, 90 Wis. 2d 804, 808 & n.1, 816, 280 N.W.2d 702 (1979) (explaining that the Department of Natural Resources' adoption of a floodplain zoning ordinance constituted implementation of a statute pertaining to floodplain zoning that the department administered). This is distinct from actual enforcement and application of the law. Although the parties do not provide much help in this analysis, Order 28 seems to be enforcing and applying the law, rather than implementing a procedure for future applications of Wis. Stat. § 252.02.

In any event, because Order 28 does not satisfy the "general application" requirement in the definition of a rule, a firm conclusion on this requirement is unnecessary.

19

N.W.2d 110. Yet, Wis. Stat. ch. 227 does not tell us what makes an ordinary order, much less a general order. So we must look for clues in chapter 227 and the rest of our laws. See id., ¶45 ("Statutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." (citation omitted)); Bank Mut. v. S.J. Boyer Constr., Inc., 2010 WI 74, ¶31, 326 Wis. 2d 521, 785 N.W.2d 462 ("When the same term is used throughout a chapter of the statutes, it is a reasonable deduction that the legislature intended that the term possess an identical meaning each time it appears." (citation omitted)).

¶202 In chapter 227, an "order" most commonly describes a binding decision applying to a specific person or situation. For instance, in Wis. Stat. § 227.01(3), a "contested case" is defined as an agency proceeding that determines a party's rights; this proceeding results in "a decision or order." This type of order is also explicitly excluded from the definition of a rule in § 227.01(13)(b). Elsewhere in the administrative rules statutes, Wis. Stat. § 227.03(6) excludes from chapter 227's reach "[o]rders of the election commission" issued under Wis. Stat. § 5.06(6). That section references the election commission's power to decide "by order" certain election-related complaints against election officials. § 5.06(6). Various other provisions in chapter 227 refer to court "orders" directed at specific parties. See, e.g., Wis. Stat. § 227.11(3)(b); Wis. Stat. § 227.114(6m)(d).

¶203 The most helpful clue in chapter 227 is found in Wis. Stat. § 227.40, which governs judicial review of the validity of rules. Section 227.40(2)(e) states, among other things, that the validity of a rule may be challenged in proceedings "under chapters 102, 108, or 949 for review of decisions and orders of administrative agencies." Wisconsin Stat. chs. 108 and 949 cover unemployment claims and crime victim compensation, respectively. Those chapters discuss person-specific orders, again confirming the common usage of "order" as some government decision tied to and resulting from a specific factual situation.

¶204 But Wis. Stat. ch. 102, governing worker compensation claims, is different. Unlike any of the foregoing, that chapter defines both an "order" and a "general order." "'Order' means any decision, rule, regulation, direction, requirement, or standard of the department or the division, or any other determination arrived at or decision made by the department or the division." Wis. Stat. § 102.01(2)(dm). And a "general order" is "such order as applies generally throughout the state to all persons, employments, places of employment or public buildings, or all persons, employments or places of employment or public buildings of a class under the jurisdiction of the department. All other orders of the department shall be considered special orders." § 102.01(2)(bm) (emphasis added). Thus, chapter 102 distinguishes between special orders, those applying to a specific person or party, and general orders, those applying generally to the entire state.

¶205 As it happens, this same statutory distinction between general and special orders is found all throughout Wisconsin

21

statutes governing agency action. For example, Wis. Stat. ch. 103 deals with employment regulations as overseen by the Department of Workforce Development (DWD). In the chapter's definitions section, which covers Wis. Stat. chs. 103 to 106, nearly identical definitions are used, this time adding a complementary definition of a local order as well:

> (9) "General order" means such order as applies generally throughout the state to all persons, employments, places of employment or public buildings, or all persons, employments or places of employment or public buildings of a class under the jurisdiction of the department. All other orders of the department shall be considered special orders.
>
> (10) "Local order" means any ordinance, order, rule or determination of any common council, board of alderpersons, board of trustees or the village board, of any village or city, a regulation or order of the local board of health, as defined in s. 250.01(3), or an order or direction of any official of a municipality, upon any matter over which the department has jurisdiction.
>
> (11) "Order" means any decision, rule, regulation, direction, requirement or standard of the department, or any other determination arrived at or decision made by the department.

Wis. Stat. § 103.001(9), (10), (11). Again, this understanding is replicated throughout Wisconsin law, offering a consistent

22

definition of a "general order" as an order having statewide effect.[11]

¶206 This is not all. The statutes not only make clear that a general order is one applying statewide, but also that such statewide general orders may or may not need to be promulgated as rules. This can be seen throughout chapters 103 to 106, where we see that DWD has statutory authority to issue statewide orders, which may or may not be rules falling under the scope of Wis. Stat. ch. 227. One example is in Wis. Stat. § 106.01(9), which authorizes DWD to issue apprenticeship-related "rules and general

---

[11] The same definitions of "Order," "Local order," and "General order" are found in Wis. Stat. ch. 101, which governs the Department of Safety and Professional Services. Wis. Stat. § 101.01(7), (8), (9). In Wis. Stat. ch. 218, in a section governing collection agencies, a "General order" is defined as "an order which is not a special order," while a "'Special order' means an order against a person." Wis. Stat. § 218.04(1)(d), (g). Elsewhere in this section, the Department of Financial Institutions (DFI) is authorized "To issue general or special orders" and may require reasonable and relevant information "by general or special order" that licensees must annually report. § 218.04(7)(a), (10)(a). Likewise, Wis. Stat. ch. 138 authorizes DFI to issue "general orders or special orders" to prevent or correct certain actions by insurance premium finance companies. Wis. Stat. § 138.12(5m)(b). In this context, a special order is "an order of [DFI] to or affecting a person," and a general order is any order "other than a special order." § 138.12(5m)(a)1. & 2. The same definitions and order-issuing authority are found in Wis. Stat. § 138.14, which governs payday loans. See § 138.14(1)(h), (L); § 138.14(8). We also find nearly identical language and usage in Wis. Stat. ch. 217, which governs check sellers (Wis. Stat. § 217.02(3), (10); § 217.18(1)), and in Wis. Stat. ch. 93, which describes various powers and duties of the Department of Agriculture, Trade and Consumer Protection (DATCP) (Wis. Stat. § 93.06(3), (5), (6)). See also Wis. Stat. § 100.19(2) & (3) (authorizing DATCP to issue "general orders" and "a special order against any person" related to methods of or practices in food products and fuel distribution).

or special orders." Wisconsin Stat. § 106.015(1) similarly prohibits DWD from prescribing, enforcing, or authorizing certain requirements "whether through the promulgation of a rule [or] the issuance of a general or special order."

¶207 The logic is plain, and of immense importance to this case. General orders are those that apply to everyone. And some general orders may be rules, but not all of them are. If all general orders must be promulgated as rules, these provisions would make no sense. They would instead say, "rules and special orders," not "rules and general or special orders."[12] The only reasonable reading of these statutes is that orders applying statewide are general orders, and that these may be rules, but only if they meet the other requirements of the rule definition.[13]

---

[12] Or the statutes could expressly inform that orders issued pursuant to these provisions will be considered rules for purposes of chapter 227. The legislature has shown it can do precisely that in Wis. Stat. § 87.30(1), where any order issued by the Department of Natural Resources that fixes limits of floodplains or enacts local floodplain zoning ordinances is subject to the rulemaking process under Wis. Stat. § 227.19 (legislative review before promulgation) and Wis. Stat. § 227.26 (legislative review after promulgation), and "may be suspended by the joint committee for review of administrative rules." § 87.30(1).

[13] This reading is further supported by other chapters in the Wisconsin Statutes. For instance, Wis. Stat. ch. 281 governs water and sewage, which is an area generally under the purview of the Department of Natural Resources (DNR). See Wis. Stat. § 281.01(3). Wisconsin Stat. § 281.19, which is entitled "Orders," states:

> (1) The department may issue general orders, and adopt rules applicable throughout the state for the construction, installation, use and operation of practicable and available systems, methods and means for preventing and abating pollution of the waters of the state. Such general orders and rules shall be issued

24

only after an opportunity to be heard thereon has been afforded to interested parties.

(2) (a) The department <u>may issue special orders directing particular owners</u> to remedy violations of the safe drinking water program under s. 281.17 (8) and (9) or to secure such operating results toward the control of pollution of the waters of the state as the department prescribes, within a specified time. Pending efforts to comply with any order, the department may permit continuance of operations on such conditions as it prescribes. If any owner cannot comply with an order within the time specified, the owner may, before the date set in the order, petition the department to modify the order. The department may modify the order, specifying in writing the reasons therefor. If any order is not complied with within the time period specified, the department shall immediately notify the attorney general of this fact. After receiving the notice, the attorney general shall commence an action under s. 299.95.

(b) The department may issue temporary emergency orders without prior hearing when the department determines that the protection of the public health necessitates such immediate action. Such emergency orders shall take effect at such time as the department determines. As soon as is practicable, the department shall hold a public hearing after which it may modify or rescind the temporary emergency order or issue a special order under par. (a).

§ 281.19 (emphasis added).

The next subsection provides that "[t]he department shall make investigations and inspections to insure compliance with <u>any general or special order or rule</u> which it issues." Wis. Stat. § 281.19(3) (emphasis added). Note that elsewhere in Wis. Stat. ch. 281 the department is directed to prescribe various performance and certification standards, practices, and prohibitions solely by promulgating rules. § 281.16(2), (3); § 281.165(1); § 281.17(3).

25

¶208 The legislature does not address this overwhelming textual evidence informing what "general order" means for purposes of Wis. Stat. § 227.01(13). Rather, it looks to one of the enumerated exclusions from the rule definition relating to orders, and suggests this alone proves that any order applying statewide must also be a rule.

¶209 Wisconsin Stat. § 227.01(13)(c) excludes from the definition of "rule" any agency action or inaction that

> [i]s an order directed to a specifically named person or to a group of specifically named persons that does not constitute a general class, and which is served on the person or persons to whom it is directed by the appropriate means applicable to the order. The fact that a named person serves a group of unnamed persons that will also be affected does not make an order a rule.

With this, the legislature maintains, by way of converse implication, that any order applying statewide is included in the definition of a rule. But this argument does not do the heavy analytical lifting the legislature wishes it to do. Section 227.01(13)(c) does not purport to define any particular kind of order, nor does it state or imply that all orders are rules but for those fitting this description. Instead, it clarifies that certain person or group-specific orders served on those

---

The distinctions are clear. Special orders are issued to particular persons. General orders apply to everyone "throughout the state." And not all general orders, which again, apply to all, are rules. Otherwise, the language in Wis. Stat. § 281.19(1) and (3) indicating that DNR may issue general orders and adopt rules, and ensure compliance with both, would make no sense.

26

persons or groups are not rules, making it one of many belt-and-suspenders exclusions from the definition of a rule.[14]

¶210 None of this overcomes or even contradicts the statutory meaning of the phrase "general order." And although chapter 227 does not tell us what a "general order" is, the story told throughout the rest of the Wisconsin Statutes does. A general order is an order that applies to everyone statewide. Other orders, often referred to as special orders, apply to specific persons or entities only.

¶211 This reading also makes sense in the context of the other phrases listed in the first criteria of the rule definition. A "regulation," a "standard," and a "statement of policy" all give the idea of a general standard applicable to everyone affected by its subject. It would only make sense that a general order does the same. This first requirement, at root, addresses the kind of decree and the statewide breadth of its impact (even if only some people are personally affected).

¶212 Importantly, however, our statutes also show that just because something is a general order does not make it a rule. While many general orders are rules, not all of them are. They still must meet the other criteria to actually qualify as a rule.

¶213 With that in mind, the second requirement for any rule is that it must have "general application." The legislature's

---

[14] Like Wis. Stat. § 227.01(13)(c), other listed exclusions appear quite unlikely to meet the definition of a rule under even normal circumstances. E.g., § 227.01(13)(r) (excluding a "pamphlet or other explanatory material that is not intended or designed as interpretation of legislation enforced or administered by an agency, but which is merely informational in nature").

main theory in this case is that a "general order of general application" is an order applying statewide. Connecting the dots, because Order 28 applies to a broad class of persons or entities rather than a specific person or entity, it is an order of "general application" in the legislature's telling. In other words, the legislature maintains the temperature gauge for what constitutes an order of general application is the breadth of the persons subject to the order.

¶214 But for reasons that are obvious from the previous discussion, this is plainly wrong. If a "general order" is an order applying statewide, that cannot be what "general application" means too. The legislature never makes any attempt to give separate meaning to "general order," nor does it engage in any statutory analysis regarding its interpretation. "General application" is a second, separate statutory requirement under the rule definition, and it must be given independent meaning. Kalal, 271 Wis. 2d 633, ¶46 ("Statutory language is read where possible to give reasonable effect to every word, in order to avoid surplusage."). The legislature's theory, which depends on conflating the two, fails from the outset.

¶215 Secretary Palm argues, and I agree, that a regulation, standard, statement of policy, or general order is one of "general application" if it applies generally, as opposed to specifically. That is, an application is specific if it applies to a single, particular factual situation. Something with general application applies to multiple, prospective factual situations. A specific

application is focused on the present; a general application is focused on the future.

¶216 This reading makes sense first and foremost given the statutory text's use of the modifier "general." Just like the modifier "general" in "general order" means an order directed to everyone (as opposed to a specific someone), the modifier "general" in "general application" should have the same effect——that is, an order that applies to every situation covered by the subject matter (as opposed to a specific situation covered by the subject matter).

¶217 This reading also makes sense because of what rules are meant to be. Rules are designed to have enduring effect. They are published in official registers. They require public hearings, written input, and a series of complicated bureaucratic checks before being implemented. And while emergency rules are an option, they are still relatively slow and cumbersome. This is all by design. Government orders with limited application to a particular situation and individual circumstances warranting temporary action are not what rulemaking is designed to address.

¶218 In some ways, Secretary Palm's interpretation of the statutes may even be constitutionally required. To the extent rulemaking has a justification under our state constitution, it is because it retains the legislature's constitutional prerogative to determine the general policies that will govern the state. But rulemaking itself cannot tread so far as to authorize a legislative intrusion into the core power of the executive to enforce the laws. Our constitution's commitment to the separation of powers means the legislature should not, as a general matter, have a say in the

29

executive branch's day-to-day application and execution of the laws. The legislature gets to make the laws, not second guess the executive branch's judgment in the execution of those laws. If rulemaking is understood as establishing a check on how a law is prospectively understood, that could be justified as retaining the legislature's constitutional prerogative to determine the state's public policy. But if rulemaking morphs into subjecting executive branch enforcement of enacted laws to a legislative veto, that turns our constitutional structure on its very head.

¶219 The parties do not maintain that any cases directly address or control the issues before us, and I agree. But two cases that do address the meaning of "general application" support Secretary Palm's reading, not the legislature's.

¶220 In Citizens for Sensible Zoning, Inc., this court concluded that a Department of Natural Resources' (DNR) floodplain zoning ordinance covering Columbia County was a regulation of general application. We reasoned that a rule "need not apply to all persons within the state" to have general application. 90 Wis. 2d at 815-16. The class size was small, we said, but the class was "described in general terms and new members can be added to the class." Id. at 816. That is consistent with Secretary Palm's interpretation of "general application." The newly enacted zoning ordinance was not tailored to a specific circumstance or current dispute; rather, it was a regulation applying to the general class of all future property owners. Id. (citing Frankenthal v. Wis. Real Estate Brokers' Bd., 3 Wis. 2d 249, 257B, 89 N.W.2d 825 (1958), which held an instruction covering the

30

license renewal procedure for real estate brokers was a policy statement of "general application").

¶221 Similarly, in <u>Cholvin v. DHFS</u>, the court of appeals explained that a written instruction used by screeners to determine new applicants' eligibility for a certain Wisconsin Medicaid program was of "general application." 2008 WI App 127, ¶¶24–25, 313 Wis. 2d 749, 758 N.W.2d 118. As the court put it, the instruction "does not speak to a specific case, nor is it limited to an individual applicant. It announces the general policy and the specific criteria to be employed when entering information on fluctuating levels of functional ability for all applicants." <u>Id.</u>, ¶25. In other words, the instruction was meant for prospective application to everyone covered by the subject matter, namely a Medicaid program eligibility screening, not just to a current factual situation.

¶222 Therefore, the best reading of the "general application" requirement, as a matter of text, context, structure, constitutional limitation, and caselaw is that a general order, which by definition covers everyone statewide, must apply not just to a specific circumstance, but to all circumstances present and future that are contemplated by the scope of the order.

D. Wis. Stat. § 252.02 Does Not Require Rulemaking

¶223 Collectively, the definition of a rule reflects a dictate with statewide effect that takes broad statutory language and makes it specific or workable, not just to a particular situation, but for future situations of the same kind. While

31

orders certainly can be, and often are, rules, Order 28 does not meet this definition. It is statewide in scope, and therefore it constitutes a general order. But it does not have general application. It is an order with only temporary effect, expiring on May 26, 2020, and focused specifically on the control and suppression of a particular communicable disease.

¶224 Wisconsin Stat. § 252.02 confirms this reading. Section 252.02(4), on which Order 28 is based in part, states that DHS

> <u>may promulgate and enforce rules or issue orders</u> for guarding against the introduction of any communicable disease into the state, for the control and suppression of communicable diseases, for the quarantine and disinfection of persons, localities and things infected or suspected of being infected by a communicable disease and for the sanitary care of jails, state prisons, mental health institutions, schools, and public buildings and connected premises. <u>Any rule or order may be made applicable to the whole or any specified part of the state</u>, or to any vessel or other conveyance. The department may issue orders for any city, village or county by service upon the local health officer. Rules that are promulgated and orders that are issued under this subsection supersede conflicting or less stringent local regulations, orders or ordinances.

§ 252.02(4) (emphasis added).

¶225 The only and unavoidable conclusion from this text is that DHS can issue an order that applies statewide <u>and is not a rule</u>. It still must meet the other criteria defining a rule in Wis. Stat. § 227.01(13), including the "general application" requirement. Not coincidentally, that is perfectly consistent with the distinctions found throughout the Wisconsin Statutes between general statewide orders and person-specific orders, and the textual distinction in other statutes confirming that a statewide order may or may not be a rule.

32

¶226 This textual reading is also supported by statutory history. In 1982, the statute was amended to explicitly give DHS the power to issue orders in addition to promulgating and enforcing rules, and to clarify that both could have statewide application. § 21, ch. 291, Laws of 1981. Nothing in this amendment indicated that orders issued by DHS would be treated as rules for purposes of Wis. Stat. ch. 227. Cf. Wis. Stat. § 87.30(1) (dictating that orders issued by DNR under this subsection will be treated as rules for purposes of Wis. Stat. ch. 227).

¶227 The textual evidence conclusively stands against the legislature's position that a statewide order issued under Wis. Stat. § 252.02(4) is necessarily a rule.[15] But taking a step back to look at the reasonableness of its interpretive approach makes its error even more plain. Kalal, 271 Wis. 2d 633, ¶46 ("[S]tatutory language is interpreted in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results.").

¶228 The administrative rulemaking process is about as smooth sailing as a canoe traversing the Atlantic Ocean. It's not

---

[15] Elsewhere in its briefing, the legislature seems to turn its entire argument inside out by contending that Wis. Stat. § 252.02 is nothing more than a general powers and duties statute. But if this were true, and § 252.02 was only a general powers and duties statute, then DHS would have no authority to promulgate rules under that provision because, as the legislature helpfully explains, agencies may not rely on general powers and duties provisions to promulgate rules. See Wis. Stat. § 227.11(2)(a)2. Said differently, the legislature somehow suggests that rulemaking cannot happen under the statute, notwithstanding its primary theory that rulemaking must happen under the statute.

impossible, but it's not a particularly fun trip. This is a feature, by the way, not a bug. The rulemaking process is filled with checks and double checks and public input and imposed waiting periods to discourage some rulemaking, and to ensure a final product that is fully vetted, sufficiently clear, statutorily grounded, and able to guide agency action moving forward.

¶229 During oral argument, the legislature effectively conceded that the requirements of Order 28 could have been issued for Milwaukee County, and that it would not need to be promulgated as a rule. But it continued to argue that the same order applying to half the state or the whole state would need to be promulgated as a rule. This makes no sense. Wisconsin Stat. § 252.02 on its face gives broad authority to take statewide action to combat the spread of communicable diseases. Under the legislature's theory, DHS can act locally without going through the rulemaking process, but not on a statewide basis. Presumably it could issue 72 identical orders applying to each of Wisconsin's counties, and these would not need to be promulgated as rules. But it could not do the same thing in one order applying statewide. Such a line is wholly impractical and inconsistent with the broad authority and discretion granted to DHS by the very words of the statutes the legislature enacted. If we are truly in a public health emergency requiring immediate state action, it would make little sense to tie the hands of DHS from acting to protect the whole state, but give it expansive authority to do the same exact thing through multiple actions with a narrower geographic focus. My point is not that we read the statute to give DHS the powers it needs, but

34

rather that the legislature's position is an unreasonable way to read these broadly worded statutes.[16]

¶230 The legislature suggests that the emergency rulemaking process ameliorates some of these problems. During oral argument, the legislature indicated that emergency rules——from concept to legal effect——could happen in as soon as 12 days under a best-case scenario. That's much quicker than the ordinary rulemaking process, but it is wholly unequal to the task Wis. Stat. § 252.02 seems to ask of DHS. Twelve days is far too long in a real emergency.[17] Epidemics don't always give you a two-week heads up on their next move. In addition, emergency rules, just like ordinary rules, require a new rule to revoke the earlier one. Wis. Stat. § 227.265.[18] If facts on the ground are different next week

---

[16] Moreover, the legislature's line-drawing derives from no discernable statutory text. At some undefined point, according to the legislature, the amount of people covered by an order becomes too large, and any such order must be promulgated as a rule. This line, we are told, is apparently less than statewide, but larger than Milwaukee County. Why? Who knows? This "I know it when I see it" argument will no doubt prove to be a complicated line to adjudicate moving forward since it has no textual foundation or guide.

[17] And as Justice Dallet correctly points out, a 12-day turnaround time is hardly guaranteed given the number of assumptions that are baked into the legislature's claim. Justice Dallet's dissent, ¶150.

[18] Emergency rules of the kind proposed here are only effective for 150 days after publication. Wis. Stat. § 227.24(1)(c). While § 227.24 provides a method to extend the effectiveness of the rule for up to an additional 120 days, § 227.24(2)(a), it is silent with respect to how such emergency rules would be revoked or modified. As a new rule is required to modify or repeal an existing rule, it stands to reason that this process would also be required for emergency rules.

35

than they are this week (and in this pandemic, we seem to be learning new things all the time), that makes even changing short-term policies practically impossible. The reality is, the emergency rules process does not allow for the kind of fits and starts and day-in, day-out modifications that would be required in any comprehensive, real-time response to a statewide epidemic. And again, my point is not that DHS should be granted these powers because it needs them, but instead that the legislature's proffered interpretation of § 252.02 in conjunction with Wis. Stat. § 227.01(13) is a wholly unreasonable way to read these statutes.

¶231 Rather than the game of statutory twister offered by the legislature, the faithful judicial approach is to read these statutes reasonably, and to construe them as they are written. Wisconsin Stat. § 252.02(4) contemplates that orders may be issued statewide and not be rules. The meaning of "general order" as derived from our statutes as a whole confirms this. Section 252.02(4) seems to give DHS extraordinarily broad powers to act and respond to public health emergencies not just county by county, but statewide. To the extent any general orders have general, prospective application, they may need to be promulgated as rules. But situation-specific orders made pursuant to the authority already outlined in the statute, whether statewide or local, are not subject to the rulemaking requirements of chapter 227.

¶232 In sum, Order 28 is a statewide order and therefore a general order. But it is temporary and designed to specifically and singly address the current COVID-19 pandemic. This order does not have general application to future DHS actions based on Wis.

36

Stat. § 252.02; it has no application after May 26, 2020. Rather, it is an effort to apply and enforce the statute pursuant to the authority DHS has already been granted. Order 28 therefore does not meet the definition of a rule in Wis. Stat. § 227.01(13).[19]

### III.   The Legislature Lacks Standing to Challenge DHS's Application of the Statutes

¶233 The legislature has a fallback issue. If Order 28 is not a rule (and it is not), they argue that its terms nonetheless exceed the statutory authority on which it is purportedly based. To be clear, this is not a constitutional claim; it is an executive branch enforcement claim. That is, the legislature argues the executive branch is imposing requirements on the people of Wisconsin that go beyond the powers granted to DHS in Wis. Stat. § 252.02.

¶234 While I am not unmindful of the unusual circumstances giving rise to this case, claims of this kind are common; they happen all the time. Unemployment compensation claimants argue they were illegally denied benefits to which they were statutorily entitled. Agricultural operations claim they were asked to submit

---

[19] The majority reaches a contrary conclusion, but somehow excepts section 4.a. from its analysis. See majority op., ¶3 n.6. If rulemaking is required, however, then there is no good reason to remove section 4.a. from the result of this reasoning, for it is no less a statewide order. To the extent section 4.a. should be treated differently due to the explicit authority granted to DHS to close schools in Wis. Stat. § 252.02(3), that same logic would seem to apply to the other provisions in Order 28 that have the same statutory support. See Justice Dallet's dissent, ¶154 n.17 (discussing how section 4.c. of Order 28 closes places of public amusement and activity, which also seemingly falls within DHS's stated authority in § 252.02(3)).

37

to permit requirements the authorities had no authority to impose. Criminal defendants argue their convictions were secured in violation of, for example, the expiration of a statute of limitations. As these common claims illustrate, challenges to executive branch enforcement are ordinarily brought by the specific individuals and entities who are injured or otherwise affected by the purportedly overreaching government action.

¶235 The legislature, on the other hand, is not the state's litigator-in-chief or even the representative of the people at large. The legislature is a constitutional creation having a significant, but limited, role in governance——the enactment of laws. It is the executive branch that enforces the laws pursuant to its own constitutionally vested power. When the executive branch enforces the law in a way that is beyond the statutory terms or otherwise violates our constitution, it harms those who are directly affected by that enforcement. And it is those same individuals and entities that can challenge that enforcement.

¶236 The requirement that those challenging government action have some cognizable harm is far more flexible in Wisconsin than in federal courts, but there are good reasons for not dispensing with this requirement altogether. While federal courts may only hear "cases or controversies," "standing in Wisconsin is not a matter of jurisdiction, but of sound judicial policy." McConkey v. Van Hollen, 2010 WI 57, ¶15, 326 Wis. 2d 1, 783 N.W.2d 855. In determining whether a party has standing, the overarching theme is "whether 'a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that

controversy.'" State ex rel. First Nat'l Bank of Wis. Rapids v. M & I Peoples Bank of Coloma, 95 Wis. 2d 303, 307–08, 290 N.W.2d 321 (1980) (quoting Sierra Club v. Morton, 405 U.S. 727, 731 (1972)). Wisconsin courts apply a two-step analysis for standing determinations: we ask "(1) whether the plaintiff has suffered a threatened or actual injury, and (2) whether the interest asserted is recognized by law." Norquist v. Zeuske, 211 Wis. 2d 241, 247–48, 564 N.W.2d 748 (1997) (citations omitted).

¶237 Generally, in order to demonstrate an injury, "a plaintiff must allege 'such a personal stake in the outcome of the controversy,' as to insure that 'the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution.'" First Nat'l Bank, 95 Wis. 2d at 308-09 (quoted sources omitted). The extent of the injury is not determinative, a mere trifle will suffice to satisfy this requirement. Id. at 309. However, the injury "must be actual or threatened." Norquist, 211 Wis. 2d at 249.

¶238 To satisfy the second step, courts determine "[w]hether the injury is of a type recognized, regulated, or sought to be protected by the challenged law." Waste Mgmt. of Wis., Inc. v. DNR, 144 Wis. 2d 499, 506, 424 N.W.2d 685 (1988).

¶239 The legislature would no doubt like to see the laws it has passed enforced within their limits and within constitutional boundaries. But as an institution, the legislature suffers no particular cognizable injury when the executive branch enforces the law unlawfully. To accept this principle would grant the

legislature a seat in every executive branch enforcement action, whether public or private, in the state of Wisconsin. Can the legislature sue over unlawful DNR permit requirements? Overbroad criminal prosecutions? Generally not. While we have allowed the legislature to litigate and sue the governor and other executive branch officials in limited situations, that is not a blanket invitation to the legislature to litigate every challenge to executive action. See, e.g., State ex rel. Wis. Senate v. Thompson, 144 Wis. 2d 429, 432-33, 424 N.W.2d 385 (1988) (permitting the legislative houses, their leaders, and a joint legislative committee to bring an original action against the governor's use of his partial veto).

¶240 In its briefing, the only harm the legislature offers is its right to suspend administrative rules it finds objectionable. That's it; they allege nothing else. But this harm is wholly inapplicable to this issue, which concerns only the execution and enforcement of the laws. Economic harm to individual citizens and businesses may be real, but it is not harm to the legislature as a constitutional body. And that is the only kind of harm that can establish the standing necessary to raise this claim. See Powers v. Ohio, 499 U.S. 400, 410 (1991) ("[A] litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." (citation omitted)).

¶241 A sad feature of our government is that the executive branch sometimes acts outside its administrative, statutory, and constitutional authority. This is, of course, not a commendable

state of affairs. Sometimes we the people respond by persuading lawmakers to change the law. Sometimes we throw the bums out. Sometimes we respond with protest and argument, and sometimes civil disobedience. In extraordinary situations, even revolution may be justified. See The Declaration of Independence (U.S. 1776). But the ordinary legal remedy for executive branch overreach is for someone personally harmed by that overreach to seek judicial relief. If a business ordered closed wants to challenge the authority of the executive branch to close its business, it may do so. If a person wanting to travel wishes to challenge the authority of the executive to forbid travel, she may do so. If a church wanting to challenge the authority of the executive branch to shut down Sunday services, it may do so. This is the way our system works, and it ensures a careful adjudication of the issues based on specific harms, not theoretical broadsides.

¶242 This also ensures courts enjoin only unlawful executive action. If Order 28 does not need to be promulgated as a rule, then presumably some of its commands are lawful. The legislature appears to acknowledge statutory authority to close schools and churches and forbid other "public gatherings" to control outbreaks and epidemics. Wis. Stat. § 252.02(3). But how would this apply to large sporting events, small coffee shops, and open-air tree farms? These are hard questions, and having litigants who are able to present specific harms and specific burdens ensures we remedy only unlawful enforcement efforts and do not sweep more broadly than is necessary.

41

¶243 While interpreting statutes is a question of law, application of statutes generally requires facts. To my mind, the legislature's broad arguments do not sufficiently assist this court in separating the wheat from the chaff. The legislature cites no law in support of the notion that they are injured by poor or even unlawful enforcement of the laws. We do not let anyone bring any case they want, and we certainly don't let the legislature bring any case it wants. Accord Bowsher v. Synar, 478 U.S. 714, 733-34 (1986) ("[O]nce Congress makes its choice in enacting legislation, its participation ends. Congress can thereafter control the execution of its enactment only indirectly—by passing new legislation." (citation omitted)). The legislature did not even try to assert that it is harmed by the alleged statutory overreach. Therefore, I conclude the legislature lacks standing to raise this issue.

¶244 Executive overreach, of course, should not be blithely dismissed. But as a court of law, and as an appellate court of last resort, it is essential we do not turn ourselves into a panel that offers advisory opinions to the legislature on what the laws it passed mean. See Broadrick v. Oklahoma, 413 U.S. 601, 610-11 (1973) ("[U]nder our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws." (citation omitted)). Except in limited situations, only those affected by executive branch enforcement can claim injury, not the branch that drafted the law in the first place.

42

IV. Response to Other Writings

¶245 While the above analysis addresses many of the shortcomings in the various writings of members of the majority, several arguments deserve a more direct response.

¶246 A majority of this court suggests Order 28 should be struck down because the statute on which it is based contains indiscernible and therefore constitutionally problematic limits. But this approach runs completely counter to the way we adjudicate these kinds of questions.

¶247 At the outset, it is a misrepresentation to suggest Secretary Palm argues her power knows no bounds. She made no such claim. Secretary Palm acknowledged that her orders could be challenged on the grounds that they violated provisions of the constitution, including violation of our fundamental liberties and basic due process protections. No party, of course, raised these kinds of claims here. It is fair game to reject the Secretary's proffered legal arguments; it is unfair to ascribe to her and then reject arguments she did not make.

¶248 But suppose Wis. Stat. § 252.02 does offer Secretary Palm too much power. The remedy for this, assuming there are some permissible constitutional applications of the statute, would be to entertain an as-applied constitutional challenge to the statute by someone alleging injury from its enforcement. We do not enjoin particular enforcement actions under a facially constitutional statute simply because the statute could be deployed in ways that violate the constitution.

43

¶249 Some members of the majority try to get around this by asserting that Order 28 violates the nondelegation doctrine under a legal test raised and developed sua sponte without the benefit of adversarial briefing. Even assuming this new legal framework is correct and should be adopted, the rationale offered does not support the suggested conclusion.

¶250 Under the nondelegation doctrine as traditionally understood, it is usually the statute itself that is the basis for any nondelegation problems, not enforcement efforts. In the recent United States Supreme Court decision where Justice Gorsuch in dissent called for reinvigoration of a more vigorous nondelegation doctrine, the question was whether a law could give the executive the discretion to decide to whom it would apply. See Gundy, 139 S. Ct. at 2121 (majority opinion) (asking whether Congress violated the nondelegation doctrine in enacting 34 U.S.C § 20913(d)); see also id. at 2135 (Gorsuch, J., dissenting) (inquiring as to whether Congress "unconstitutionally divested itself of its legislative responsibilities"). Similarly, in early cases challenging the emerging administrative state, the question was whether the law itself provided enough detail. See J.W. Hampton, Jr. & Co., 276 U.S. at 409 (explaining Congress could statutorily delegate if it set forth an "intelligible principle" authorizing how the delegated authority was to be exercised).

¶251 Accordingly, if Wis. Stat. § 252.02 gives too much undefined power to Secretary Palm——and that is the argument being made by the majority and concurrences——the remedy would be that the statute itself should be declared unconstitutional. The

44

problem under a nondelegation theory is not whether an enforcement action is consistent with the law, but whether the underlying law is constitutionally capable of being enforced in the first place. But there's an obvious obstacle with deploying that approach in this case with respect to § 252.02. Namely, it would need to be premised on legislative standing to argue that the laws it wrote are unconstitutional. It cannot be that the legislative branch has standing to sue the executive branch on the grounds that the legislature itself violated the constitution when it passed certain laws.

¶252 Furthermore, a certain irony inheres in calls to breathe new life into the nondelegation doctrine in this case. If we are to return to a vision of the separation of powers that does not allow delegation from one branch to another,[20] how in the world can we support that proposition and at the same time hold that Secretary Palm is <u>required</u> to submit to rulemaking, a process that is premised, lo and behold, on the delegation of legislative power to the executive branch? If we are going to have a serious discussion about the separation of powers and its relationship to the administrative state, I welcome that conversation. But a decision grounded in "it's good for me but not for thee" does not inspire confidence that we are applying the same law to both parties before us.

¶253 Finally, the majority premises much of its argument on the notion that an executive branch order may only carry criminal

---

[20] In his separate writing, Justice Kelly argues the legislature cannot delegate "even a sliver of its core power." Justice Kelly's concurrence, ¶103.

45

penalties for any violation if the elements of a crime are first promulgated as a rule or otherwise defined in the statutes. Majority op., ¶¶36-40. This argument suffers from several glaring flaws.

¶254 First, in what is a recurring theme, this argument was not developed by any party. This is raised sua sponte by this court without the benefit of adversarial briefing. We risk serious error when we issue broad rulings based on legal rationales that have not been tested through the crucible of adversarial litigation. When accepting an original action, this danger is even greater.

¶255 More to the point, this is a dramatic holding that could call into question all kinds of laws. Our statues include numerous instances where violating an agency's order can result in criminal

penalties.[21] In each of these statutes, it is the legislature that has defined violation of a lawful order as a criminal offense. If an enactment of this sort is unlawful, then all of these statutes

---

[21] See, e.g., Wis. Stat. § 26.985(2) (authorizing criminal penalties for violation of any order issued by DNR pursuant to protection of forest lands and forest productivity provisions); Wis. Stat. § 93.21(3) (authorizing criminal penalties for violation of any order issued by the Department of Agriculture, Trade and Consumer Protection (DATCP)); § 93.21(4) (authorizing criminal penalties for violation of any general or special order issued by DATCP to avert, relieve, or terminate a scarcity of food products or fuel in the state); Wis. Stat. § 94.77(1)-(2) (authorizing criminal penalties for violation of any orders issued by DATCP or DNR that are not the subject of a specific penalty under chapter 94); Wis. Stat. § 95.99 (authorizing criminal penalties for violation of any order issued by DATCP pursuant to animal health provisions); Wis. Stat. § 126.87(2)(b) (authorizing criminal penalties for violations of any order issued by DATCP pursuant to agriculture producer security provisions); Wis. Stat. § 250.04(7) (authorizing criminal penalties for violation of any orders issued by DHS regarding the duties of local health officers and boards); Wis. Stat. § 254.30(2)(b) (authorizing criminal penalties for violation of any order issued by DHS pursuant to toxic substances provisions); Wis. Stat. § 285.87(2) (authorizing criminal penalties for violation of any special order issued by DNR pursuant to air pollution provisions); Wis. Stat. § 291.97(2)(b)2. (authorizing criminal penalties for violation of any special order issued by DNR pursuant to hazardous waste management provisions); Wis. Stat. § 463.18 (authorizing criminal penalties for violation of any order issued by the Department of Safety and Professional Services (DSPS) pursuant to body art laws and relating to public health); Wis. Stat. § 551.508(1) (authorizing criminal penalties for violation of any order issued by the Department of Financial Institutions (DFI) pursuant to securities law provisions); Wis. Stat. § 552.19(1) (authorizing criminal penalties for violation of any order issued by DFI directing any person to file any belated statement required under corporate take-over provisions).

would presumably be unconstitutional. The same may be true for analogous statutes authorizing civil penalties.[22]

¶256 Wisconsin Stat. § 252.25 does the same thing here. It defines criminal penalties for any person who violates a "departmental order under this chapter and relating to the public health." This applies to any DHS order, whether a statewide ban on large public gatherings or closing Green Bay West High School or quarantining someone in Racine. No further course of conduct

---

[22] See, e.g., Wis. Stat. § 89.079(4)(a) (authorizing penalties for violation of any special order issued by DATCP regarding unauthorized practice of veterinary medicine); Wis. Stat. § 94.73(13) (authorizing penalties for violation of any order issued by DATCP or DNR pursuant to corrective action for discharge of agricultural chemicals); Wis. Stat. § 168.26 (authorizing penalties for violation of any order issued by DATCP pursuant to storage of dangerous substances provisions); Wis. Stat. § 169.45(3) (authorizing penalties for violation of any order issued by DNR requiring any captive animal licensee to comply with promulgated rules regarding captive animals); Wis. Stat. § 194.17 (authorizing penalties for violation of any order issued by the Department of Administration (DOA) or the Secretary of Transportation pursuant to motor vehicle provisions); Wis. Stat. § 218.43 (authorizing penalties for violations of any orders issued by DOA regarding licensure for selling mopeds); Wis. Stat. § 254.20(11) (authorizing penalties for violation of any order issued by DHS regarding asbestos abatement certification); Wis. Stat. § 283.91(2) (authorizing penalties for violation of any order issued by DNR pursuant to pollution discharge elimination provisions); Wis. Stat. § 289.96(3)(a) (authorizing penalties for violation of any special order issued by DNR pursuant to solid waste facilities provisions); Wis. Stat. § 293.87(3) (authorizing penalties for violation of any order issued by DNR pursuant to nonferrous metallic mining provisions applicable to person holding a prospecting or mining permit); § 293.87(4) (same but for non-permit holders); Wis. Stat. § 295.19(3)(a)-(b) (authorizing penalties for violation of any order issued by DNR pursuant to nonmetallic mining reclamation provisions); § 295.37(2) (same but oil and gas provisions); § 295.79(4)(a) (same but ferrous metallic mining); Wis. Stat. § 440.21(4)(a) (authorizing penalties for violation of any special order issued by DSPS regarding uncredentialed practice or use of a title).

needs to be articulated as the legislature has plainly stated that violations of DHS orders—which is exactly what Order 28 is—are conduct subject to criminal penalties.

¶257 The majority's logic is premised not on the proposition that Order 28 violates Wis. Stat. ch. 252, but rather that the statute authorizing criminal penalties for violation of Order 28, Wis. Stat. § 252.25, is unconstitutional. This means all of the public health authority granted to DHS in chapter 252 will be left with no enforcement mechanism at all, contrary to the law as the legislature drafted it.[23]

¶258 If we're going to go there, we should be clear-eyed about where this logic takes us and what else it applies to. The legislature cannot, as I've already stated, sue the executive branch and argue one of its duly-enacted laws is unconstitutional. And in fact, they did not do so. This court should not craft such an argument for them, thereby dispensing with scores of contrary law,[24] without at least a squarely presented issue supported by

---

[23] And even if this conclusion could be reached, the majority pays no heed to the possibility of severing the penalty provision from Order 28, despite a severability clause being expressly included by Secretary Palm. See also Justice Dallet's dissent, ¶154.

[24] Beyond the plethora of statutes that do exactly what the majority now says cannot be done, our cases have long supported the notion that, at least in concept, criminal penalties for violating a lawful order are permissible.

49

adversarial briefing and raised by a party with standing to bring such a claim.

## V. Conclusion

¶259 It is without doubt that the strictures of the constitution must be diligently defended during this crisis; the judiciary must never cast aside the law in the name of emergency. But just as true, the judiciary must never cast aside our laws or the constitution itself in the name of liberty. The rule of law, and therefore the true liberty of the people, is threatened no less by a tyrannical judiciary than by a tyrannical executive or legislature. Today's decision may or may not be good policy, but it is not grounded in the law.

¶260 The legislature brings two narrow claims to us, none involving constitutional questions or a determination of how far DHS can go in exercising its powers under Wis. Stat. § 252.02. I would stick to the legal issues before us and go no further.

¶261 The first question is whether Order 28 was required to be promulgated as an administrative rule. Order 28 is a general order by virtue of having statewide effect, but it is not one of general application. It is a temporary order issued to address

---

One example is Ervin v. State, a case concerning the validity of an arrest made for violation a community-wide curfew order issued by the Milwaukee mayor. 41 Wis. 2d 194, 163 N.W.2d 207 (1968). The mayor, under the relevant Wisconsin statute, had authority to declare a state of emergency "and do what is necessary in such emergency." Id. at 198-99. The court upheld the temporary curfew order as "a legitimate and proper exercise of the police power." Id. at 201-02. The majority's logic would require a different result in this and who knows how many other cases.

50

the outbreak of a particular communicable disease. Therefore, it does not meet the definition of a rule under Wis. Stat. § 227.01(13).

¶262 The legislature asks in the alternative that we address whether Order 28 goes beyond the statutory powers DHS has been granted in Wis. Stat. § 252.02. But the legislature has not alleged, nor can I identify, any harm to the legislature as a constitutional body for which this court can grant relief. Executive branch overreach may be challenged by those who are harmed by the executive branch action. Except in unusual cases, the lawmaking body is not injured in its lawmaking functions by executive branch enforcement gone awry. Therefore, the legislature lacks standing to bring this claim, and it should be dismissed.

¶263 For these reasons, I respectfully dissent.[25]

¶264 I am authorized to state that Justices ANN WALSH BRADLEY and REBECCA FRANK DALLET join ¶¶198-258 of this dissent.

---

[25] In light of my legal conclusions, and in accord with the legislature's request, I would have granted a stay of the court's decision to give the parties time to consider a replacement for Order 28.